# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF LOUISIANA

POWER COALITION FOR EQUITY AND JUSTICE;
LOUISIANA STATE CONFERENCE OF THE
NAACP; JANE CHANDLER, JENNIFER HARDING,
EDITH GEE JONES, and JASMINE POGUE

Case. No. _____

*Plaintiffs*,

v.

JOHN BEL EDWARDS, in his official capacity as
Governor of Louisiana; KYLE ARDOIN, in his
official capacity as Secretary of State of Louisiana; STEVE
RABORN, in his official capacity as East Baton Rouge
Parish Registrar of Voters and Member of the Parish
Board of Election Supervisors; and SANDRA L.
WILSON, in her official capacity as Orleans Parish
Registrar of Voters and Member of the Parish Board of
Election Supervisors.

*Defendants*.

## **COMPLAINT**

Plaintiffs Power Coalition for Equity and Justice ("PCEJ"); Louisiana State Conference of

the  NAACP ("Louisiana NAACP"); Jane Chandler, Jennifer Harding, Edith Gee Jones, and

Jasmine Pogue (collectively "Plaintiffs") by and through their undersigned attorneys, bring this

Complaint against the above-named Defendants, their employees, agents, and successors in office,

and in support thereof allege the following:

## PRELIMINARY STATEMENT

1.      On March 11, 2020, the World Health Organization ("WHO") declared a global pandemic due to COVID-19.[1]  That same day, the Governor of Louisiana, John Bel Edwards, declared a statewide emergency.[2]  On March 22, 2020, Governor Edwards enacted a stay-at-home order.[3]

2.      As of April 2020, Louisiana's death rate from the virus was, per capita, the second highest in the country.[4]  St. John the Baptist Parish had the highest death rate of any parish or county in the country.[5]  Four out of six of the parishes/counties in the United States with the highest COVID-19-related death rates are in Louisiana.[6]

3.      Public health experts have projected that "controlling this pandemic will depend on a safe and efficacious vaccine," however "[t]he estimated timeline for availability of an initial vaccine is between early and mid-2021."[7]

---

[1] *See* World Health Org. (WHO) (@WHO), Twitter (Mar. 11, 2020), https://twitter.com/WHO/status/1237777021742338049 ("We have therefore made the assessment that #COVID19 can be characterized as a pandemic."); WHO Director-General's opening remarks at the media briefing on COVID-19, WHO (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[2] Press Release, Office of the Governor, *Gov. Edwards Declaration of Public Health Emergency in Response to COVID-19*, (Mar. 11, 2020), https://gov.louisiana.gov/index.cfm/newsroom/detail/2400.

[3] La. Exec. Dep't Proclamation No. 33 JBE 2020 (Mar. 22, 2020), https://gov.louisiana.gov/assets/Proclamations/2020/JBE-33-2020.pdf.

[4] Johnston von Springer, *"Louisiana ranks second per capita in COVID-19 deaths,"* WBRZ 2 (Apr. 2, 2020), https://www.wbrz.com/news/louisiana-ranks-second-per-capita-in-covid-19-deaths/.

[5] Ashley Killough and Ed Lavandera, *"This small Louisiana parish has the highest death rate per capita for coronavirus in the country,"* CNN (April 16, 2020), https://www.cnn.com/2020/04/15/us/louisiana-st-john-the-baptist-coronavirus/index.html.

[6] WWL Staff, *"4 of top 6 parishes or counties in deaths per capita from COVID-19 are in Louisiana,"* 4WWL, (Apr. 1, 2020, https://www.wwltv.com/article/news/health/coronavirus/4-of-top-6-parishes-or-counties-in-deaths-per-capita-are-in-louisiana/289-1ab60d0c-1298-4c44-8940-b3890aef37c6.

[7] Saad B. Omer et al., *The COVID-19 Pandemic in the US: A Clinical Update*, J. Am. Med. Assoc. Net. (Apr. 6, 2020), https://jamanetwork.com/journals/jama/article-abstract/2764366.; *see also* Hailey Waller et al., *Bill Gates'*
(continued…)

4.      In this unprecedented context of the COVID-19 pandemic, multiple provisions of Louisiana law, policies, and procedures that establish requirements for voting absentee by mail and voting early pose undue burdens on the right to vote, including (1) the requirement that eligible voters are required to identify one of a limited number of excuses to be eligible to vote absentee by mail (the "Excuse Requirement"); (2) the requirement that a voter voting absentee by mail obtain a witness signature (the "Ballot Witness Requirement"); (3) the requirement that a voter who uses a mark to certify their application for an absentee by mail ballot obtain two witness signatures on the application (the "Application Witness Requirement," and together with the "Ballot Witness Requirement," collectively "the Witness Requirements"); and (4) the failure to extend the early voting period to fourteen days for all elections in Louisiana in 2020 (collectively, the "Challenged Provisions").

5.      *First*, Plaintiffs challenge the limited list of excuses allowing individuals to vote by absentee ballot set forth in La. R.S. 18:1303.  A voter who does not qualify under any of the listed categories has to vote in person or not at all.

6.      In the context of the COVID-19 pandemic, the Excuse Requirement violates the fundamental right to vote as protected by the First and Fourteenth Amendments.  Voters who do not have a qualifying excuse are compelled to endure unacceptable health risks (and to increase the health risk to the community) in order to exercise their right to vote.  The burdens imposed by the Excuse Requirement will fall with particular severity on voters with underlying medical conditions and disabilities, older voters, and Black voters.

---

*coronavirus vaccine could be manufacturing at scale in a year*, Fortune (Apr. 26, 2020), https://fortune.com/2020/04/26/bill-gates-coronavirus-vaccine-covid-19/ (Bill Gates, who is funding production of vaccine development, has projected that, "[i]f everything went perfectly, we'd be in scale manufacturing within a year . . . . It could be as long as two years.").

7.    Nor does the Secretary of State's Emergency Election Plan (the "Emergency Plan")[8]—which was approved by the Louisiana Legislature on April 27, 2020, and allows voters to vote by absentee ballot due to five limited COVID-19-specific excuses—remedy this constitutional defect.  As an initial matter, the Emergency Plan only applies to the July 11, 2020 (Presidential Preference Primary/Municipal Primary Election, hereinafter the "July Election") and the August 15, 2020 (Municipal General Election, hereinafter the "August Election") elections; it does not address the health risks entailed by in-person voting in the November 3, 2020 election (Presidential General and Open Congressional Primary Elections, hereinafter the "November Election") and/or the December 5, 2020 election (Congressional and Open General Election, hereinafter the "December Election").

8.    Even as to the July and August Elections, the Emergency Plan does not adequately protect the right to vote.  The COVID-19 related excuses in the Emergency Plan are unduly restrictive.  The first COVID-19 related excuse applies to voters who are "[a]t higher risk of severe illness from COVID-19 due to serious underlying medical conditions," but limits the conditions to ones identified by the Centers for Disease Control and Prevention ("CDC") and provides an exclusive list of conditions.  The next excuse applies to voters who are "[s]ubject to a medically necessary quarantine or isolation order as a result of COVID-19," but fails to define *medically necessary*.  The third excuse applies to voters who have been "[a]dvised by a health care provider to self-quarantine due to COVID-19 concerns," but is vague with respect to what advisement by a health care provider means.  Similarly, the fourth COVID-19 related excuse applies to voters

---

[8] Secretary of State Emergency Election Plan for the July 11, 2020 Presidential Preference Primary and August 15, 2020 Municipal General Elections in the State of Louisiana (Apr. 20, 2020), https://www.sos.la.gov/OurOffice/PublishedDocuments/Revised%20Emergency%20Election%20Plan%20for%20PPP%20and%20Mun%20General%20Rev.%204-20.pdf.

[e]xperiencing symptoms of COVID-19 and seeking medical diagnosis," but does not provide guidance about whether this excuse, for instance, applies to a voter who saw a doctor and was tested (but has not received a test result) or who may have seen a health care provider but was not tested. The fifth excuse applies to a voter who is "[c]aring for an identified individual who is subject to medically necessary quarantine or isolation order as a result of COVID-19 or who has been advised by a health care provider to self-quarantine due to COVID-19 concerns," but also does not define *medically necessary* and requires the voter to identify the individual for whom they are caring by name.[9] Notably, none of the COVID-19 excuses in the Emergency Plan apply to the many thousands of voters who reasonably fear that voting in person may result in their contracting or unintentionally contributing to the spread of COVID-19. Defendants have forced Louisiana voters to make an untenable decision between risking their health and the health of their families and communities or giving up their fundamental right to vote.

9.      For example, Plaintiff Jasmine Pogue suffers from environmentally induced asthma and a history of upper respiratory infections. When experiencing an asthma attack, she has severe trouble breathing and requires an inhaler. Due to her breathing troubles, Ms. Pogue fears that if she contracted COVID-19 she could suffer fatal consequences. Accordingly, she has been practicing strict social distancing with her husband and son since the virus reached Louisiana. Because Ms. Pogue does not require asthma medication on a regular basis, her condition does not qualify as "moderate or severe" and is not listed among the accepted virus-related excuses on the absentee ballot application under the Emergency Plan. Ms. Pogue's only option to vote requires risking virus exposure—and perhaps her life—at an in-person voting site.

---

[9] *Id.*

10.    *Second*, Plaintiffs challenge Louisiana's requirement pursuant to La. R.S. 18:1306E(2)(a) that all absentee by mail ballot envelopes be signed by a witness in addition to the voter.  In the context of the COVID-19 pandemic, the Ballot Witness Requirement imposes an undue burden on many Louisiana voters who live alone or who do not live in a household with another adult who can act as a witness, and must choose between risking contact with a third party or foregoing their right to vote.

11.    The Ballot Witness Requirement will impose an undue burden on voters such as Plaintiff Jane Chandler, a 76-year-old breast cancer survivor who lives alone in Baton Rouge, Louisiana.  Ms. Chandler suffers from idiopathic pulmonary fibrosis, a progressive condition that compromises her lung capacity and is likely the result of late onset side effects of her cancer treatment.  There is no treatment and no cure.  She also has osteoporosis and moderate allergies, which she regulates with medication.  Ms. Chandler has taken extreme precautions to avoid in-person contacts since COVID-19 reached Louisiana because infection would pose a grave risk to her health.  Ms. Chandler qualifies to vote absentee because she is over 65 years of age.  However, because she lives alone and fears welcoming guests into her home during the pandemic, Ms. Chandler would have difficulty obtaining a witness signature without compromising her social distancing practices and her safety.

12.    *Third*,  Plaintiffs challenge Louisiana's Application Witness Requirement, La. R.S. 18:1307, that requires individuals who are unable to sign their name and use a mark instead to obtain the signature of two third-party witnesses in order to apply for an absentee ballot.  Although the Emergency Plan reduces the number of required witness signatures from two to one for the July and August Elections, it does not address the barrier that the Application Witness Requirement

presents to voters who wish to apply for an absentee ballot but who cannot obtain a witness signature without violating social distancing recommendations or medical advice.

13.     *Fourth*, Plaintiffs challenge the constitutionality of the State's early voting practices to the extent that they only allow for early voting for seven days prior to the November and December Elections.  Under La. R.S. 18:1309, early voting may take place up to fourteen days prior to a scheduled election.  While the Emergency Plan extends early voting to 13 days for the July and August Elections, it does not extend early voting for the November and December Elections.

14.     Plaintiffs seek relief enjoining the State from limiting early voting to seven days insofar as it unreasonably burdens their fundamental right to vote by exposing them to intensified health risks by requiring a larger number of voters to vote in person during a constrained schedule. For those voters who wish to vote in person, such as Plaintiff Edith Gee Jones, early voting reduces the health risks of doing so by reducing the number of voters at the polling places at any given time, making social distancing more achievable.

15.     The burdens imposed by the Challenged Provisions will disproportionately impact Black voters in Louisiana, who are more likely to live alone, more likely to have a disability compared to white Louisiana residents, and who are disproportionately subject to infection and death from COVID-19.  Black people currently comprise over 58% of Louisiana's reported COVID-19 deaths while they only comprise 32% of Louisiana's population.[10]  Louisiana's history of discrimination in voting, and ongoing and current racial disparities in education, employment,

---

[10] *See* La. Dep't of Pub. Health, *Coronavirus (COVID-19)*, http://ldh.la.gov/Coronavirus/ (last visited May 6, 2020); U.S. Census Bureau, QuickFacts Louisiana, https://www.census.gov/quickfacts/fact/table/LA,US/PST045219? (last visited May 6 2020).

and health interact with the Challenged Provisions to hinder Black people's opportunity to participate equally in the political process.

16.     The Challenged Provisions, individually and collectively, will materially and unduly burden the right to vote of Louisiana's voters in the context of the COVID-19 pandemic. Accordingly, Plaintiffs respectfully request that the Court declare that the Challenged Provisions are unconstitutional and violate the Voting Rights Act, and further, enjoin Defendants from enforcing the Challenged Provisions for all elections in Louisiana in 2020.

## JURISDICTION AND VENUE

17.     This action arises under the First and Fourteenth Amendments to the U.S. Constitution and the Voting Rights Act, and is brought under 42 U.S.C. §§ 1983 and 1988 and 52 U.S.C. § 10301 to seek injunctive and declaratory relief for violations of constitutional rights under color of state law.  This Court therefore has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

18.     This Court has personal jurisdiction over Defendants, who are sued in their official capacities as state officials.  The violations complained of concern their conduct in such capacities.

19.     Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

20.     Venue is proper under 28 U.S.C. § 1391(b)(2) because Defendants reside in this judicial district, and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events that gave rise to Plaintiffs' claims occurred there.

## PARTIES

21.     Plaintiff the Power Coalition for Equity and Justice ("PCEJ") is a nonpartisan, nonprofit statewide civic engagement table in Louisiana that works to build grassroots power, advocate for community-centered policies, and increase voter participation.  PCEJ's mission is to support community-driven activism and grassroots leadership development to empower citizens

to address classism, racism, and other marginalization in their own lives and communities.  PCEJ advances its mission with the support of full-time staff, community volunteers, and a team of nonprofit and advocacy organizations united around an integrated civic engagement strategy to educate and empower voters across Louisiana.  In 2019, PCEJ engaged with 465,406 infrequent and semi-frequent voters of color through hundreds of thousands of doors knocked, phone calls, and text messages totaling over 1.2 million contact attempts.  PCEJ also routinely provides rides to the polls and rapid response voter support on Election Days.  Since the COVID-19 pandemic began, PCEJ has been forced to shift to virtual engagement models, including tele-town halls, video meetings, and multilayer press strategies to communicate information to its membership and target constituencies.  PCEJ has been required to dedicate staff time and resources to monitoring and responding to each iteration of Louisiana's Emergency Plan, including attending the April 15 and April 22 Senate and House committee meetings at risk to personal health.  If the Challenged Provisions remain in effect, PCEJ anticipates diverting resources to train volunteers and educate voters on the limitations of these measures.  PCEJ expects to receive an influx of requests for rides to the polls or assistance obtaining a witness signature in advance of Election Day, and recurring questions about how to adhere to social distancing guidance while attempting to vote in person or in the presence of a signatory.

22.    Plaintiff Louisiana State Conference of the National Association for the Advancement of Colored People (the "Louisiana NAACP") is a state subsidiary of the National Association for the Advancement of Colored People, Inc.  For decades, the Louisiana NAACP has worked to ensure the economic, educational, political, and social equity of Black people and of all Americans.  Its membership includes Black voters residing throughout Louisiana.  The Louisiana NAACP's mission includes eliminating racial discrimination in the democratic process and

ensuring the protection of voting rights and equitable political representation.  Its work includes efforts to register, educate, and advocate on behalf of Black voters throughout Louisiana.  As a direct result of the Challenged Provisions, the Louisiana NAACP has diverted its limited resources to monitor and investigate the impact of the Challenged Provisions on its members, and has advocated for a modified Emergency Plan that considers the significant impact of the COVID-19 pandemic on Black Louisianans and that will not disproportionately burden Black voters.

23.     Plaintiff Jane Chandler is 76 years old and lives alone in Baton Rouge, Louisiana. She is a U.S. citizen and lawfully registered voter.  Ms. Chandler is self-quarantining due to a lung condition that is a comorbidity of COVID-19.  Since COVID-19 reached Louisiana, she has only left her home for limited purposes, such as a doctor's appointment, and has maintained social distancing best practices while out.  To reduce unnecessary interactions, Ms. Chandler has arranged to have her groceries and other necessities dropped off and has completely sanitized all items delivered to her home.  While Ms. Chandler has been eligible to vote by absentee ballot for over ten years, she prefers to vote in person and has consistently voted at her polling site on Election Day.  This year, however, she intends to request an absentee ballot for all elections due to her fear of exposure to COVID-19.  Because Ms. Chandler lives alone and is abstaining from avoidable in-person contact, she does not know how she will be able to safely and efficiently obtain a witness signature for her ballot envelope without defying the predominant health guidance to maintain isolation.

24.     Plaintiff Jennifer Harding is a 42-year-old community organizer from Baton Rouge, Louisiana.  She is a U.S. citizen and lawfully registered Louisiana voter.  Ms. Harding lives with her husband and their son, who is in the fourth grade.  Her nuclear family has been strictly socially distancing since schools closed in Louisiana in order to protect their own health and the health of

others.  In her current stage of life, Ms. Harding has both child and parental care responsibilities. Her 72-year-old father, 71-year-old mother, and 93-year-old grandmother live together close by and require various levels of assistance.  Her father has Parkinson's disease, her mother has limited mobility due to post-polio syndrome, and her grandmother has been diagnosed with dementia.  Ms. Harding is responsible for completing tasks that they cannot easily perform, including taking out the trash, but does not serve in a fulltime or live-in caretaking role.  During visits to their home, she has taken extreme precautions to maintain distance and use sanitary practices.  She is aware of the potential of undetected and asymptomatic infection and has reasonable fear that she could expose her at-risk family to COVID-19 if she does not continue to maintain extreme social distancing.  Ms. Harding has not left her house for any other purpose than to visit her parents' and grandmother's home or to take a walk in her immediate neighborhood.  If able, she would vote by absentee ballot in order to decrease her risk of virus exposure at her polling location.  However, she does not believe the Emergency Plan absentee ballot application permits her, or others similarly situated in part-time eldercare roles, to request a ballot without exposure to the risk of criminal penalty.  As a result, her only option to vote in this year's elections requires jeopardizing her health and the health of her family and community by voting in person.

25.    Plaintiff Edith Gee Jones is over 65 years old and resides in New Orleans with her husband.  Mrs. Jones is Black.  She is a U.S. citizen and lawfully registered Louisiana voter.  Mrs. Jones routinely votes in Louisiana elections, and has done so for decades.  Historically, Mrs. Jones has voted in person.  She takes advantage of the opportunity to engage in early voting, preferring to vote in person when her polling site has typically been less crowded than on election days.  Mrs. Jones would like the option to continue her tradition of voting in person in 2020 but recognizes that she is at higher risk of experiencing COVID-19-related complications because of her age.  She

is also aware of the heightened risk that Black Louisianans face with regard to COVID-19. Given her preference for in-person voting, Mrs. Jones would like to have the opportunity to safely participate in early voting in each of Louisiana's upcoming elections.

26.    Plaintiff Jasmine Pogue is a 33-year-old Black woman who was recently diagnosed with asthma. She is a U.S. citizen and lawfully registered Louisiana voter. She lives with her husband and 6-year-old daughter in Baton Rouge, Louisiana. Ms. Pogue's asthma is environmentally induced, triggered by allergens and other pollutants. She also has a history of upper respiratory infections, and last contracted one in mid-March. Ms. Pogue and her family have been engaging in strict social distancing to avoid all unnecessary risk of exposure to COVID-19. Ms. Pogue has severe difficulty breathing and requires an inhaler when experiencing an asthma attack. However, because Ms. Pogue does not require her inhaler on a frequent, standard basis, she does not believe her asthma qualifies as "moderate or severe." Because her diagnosis is not among the "serious underlying medical conditions" listed on the COVID-19 emergency absentee ballot application or identified by the CDC as a comorbidity of COVID-19, she does not believe she qualifies to apply for an absentee ballot. Ms. Pogue is aware of the disproportionate rates of infection and death among Black Louisianans and especially individuals with respiratory concerns. She reasonably fears that voting in person—her only option to participate in this year's elections if the Challenged Provisions remain in effect—would pose severe and potentially fatal risk to her health.

27.    Defendant John Bel Edwards is the Governor of Louisiana and is being sued in his official capacity. Under the Louisiana Constitution, he is "the chief executive officer of the state," and must "faithfully support the constitution and laws of the state and of the United States," as well as ensure that "the laws are faithfully executed." La. Const. art. IV, § 5(A). Like other

executive officers of the State, Defendant Edwards is required to uphold the U.S. Constitution, including the Fourteenth and Fifteenth Amendments to it, as part of the execution of his gubernatorial duties and responsibilities.  4 U.S.C. § 101.  His authority to protect public health during the pandemic in connection with elections was exercised by his order postponing the primary elections.[11]

28.      Defendant Robert Kyle Ardoin is the Louisiana Secretary of State and is being sued in his official capacity.  The Secretary of State is the "chief election officer of the state."  La. Const. art. IV, § 7; La. R.S. 18:421.  Defendant Ardoin is responsible for, among other things, preparing and certifying the ballots for all Louisiana elections, promulgating all election returns, and promulgating and publishing all laws enacted by the legislature.  La. Const. art. IV, § 7; La. R.S. 18:18; 18:421.

29.      Defendant Steve Raborn is the Registrar of Voters for East Baton Rouge Parish and a member of the East Baton Rouge Parish Board of Election Supervisors and is being sued in his official capacity.  As registrar and a member of the parish board of election supervisors Defendant Raborn has the duty to supervise the preparation for and the conduct of all elections held in the East Baton Rouge Parish, and is charged with processing requests for absentee ballots, receiving absentee ballots from voters, and tabulating and counting absentee by-mail ballots and early voting ballots.

30.      Defendant Sandra L. Wilson is the Registrar of Voters for Orleans Parish and a member of the Orleans Parish Board of Election Supervisors and is being sued in her official capacity.  As registrar and a member of the parish board of election supervisors Defendant Wilson

---

[11] La. Exec. Dep't Proclamation No. 28 JBE 2020 (Mar. 13, 2020),
https://gov.louisiana.gov/assets/Proclamations/2020/modified/28-JBE-2020-Special-Elections-COVID19-Postponement.pdf.

has the duty to supervise the preparation for and the conduct of all elections held in the Orleans Parish, and is charged with processing requests for absentee ballots, receiving absentee ballots from voters, and tabulating and counting absentee by-mail ballots and early voting ballots.

## STATEMENT OF FACTS

### I.    The COVID-19 Pandemic

#### A.  COVID-19's Impact

31.     The rapid spread of COVID-19 has triggered a global health crisis of unprecedented consequence.  By April 2020, the United States became the epicenter of the pandemic, surpassing other nations in both instance and concentration of infection.[12]  By the end of that month, over 1 million cases were recorded nationwide.[13]   Yet according to experts, this figure is a drastic undercount of the virus' actual reach.[14]

32.     As of May 6, 2020, over 70,000 people have died from COVID-19 in the United States.[15]  Even with appropriate preventive measures, COVID-19-related fatalities are expected to continue through the summer months.[16]   Projections forecast higher rates of fatality if health

---

[12] David Smith, *US Surpasses China for Highest Number of Confirmed COVID-19 Cases in the World,* The Guardian (Mar.27, 2020), https://www.theguardian.com/world/2020/mar/26/coronavirus-outbreak-us-latest-trump.

[13] Daniel Wood, *Tracking The Pandemic: How Quickly Is The Coronavirus Spreading State By State?*, NPR (May 1, 2020), https://www.npr.org/sections/health-shots/2020/03/16/816707182/map-tracking-the-spread-of-the-coronavirus-in-the-u-s.

[14] Emma Brown et al., *U.S. deaths soared in early weeks of pandemic, far exceeding number attributed to covid-19,* Washington Post (Apr. 27, 2020), https://www.washingtonpost.com/investigations/2020/04/27/covid-19-death-toll-undercounted/?arc404=true.

[15] Ctrs. for Disease Control & Prevention (CDC), Cases in the US , https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited May 7, 2020).

[16] Laura Castañón and Khalida Sarwari, *Northeastern Models are Helping Shape US COVID-19 Policy*, Northeastern University (Apr. 1, 2020), https://news.northeastern.edu/2020/04/01/northeastern-models-are-helping-shape-us-covid-19-policy/.

guidance is ignored.[17]   The leading public model of the disease recently doubled the predicted

number of deaths in order to reflect "the easing of social distancing measures expected in 31 states

by May 11, indicating that growing contacts among people will promote transmission of the

coronavirus."[18]

33.    COVID-19 is the respiratory infection caused by the novel coronavirus SARS-

CoV-2.   It transmits through respiratory droplets, which are spread primarily through close in-

person contacts.[19]   People with both detected and undetected infection are capable of transmitting

the virus, even when showing no symptoms.[20]

34.    The novel coronavirus can severely damage lung tissue, cause permanent loss of

respiratory capacity, and damage tissues in the kidney, heart, and liver.[21]   It may trigger strokes

and seizures, leading to serious brain impairments.[22]   It is lethal at its worst.

35.    The health effects of COVID-19 vary by patient and demographic subgroup.   While

older age groups face heightened risks of death, people of all ages have been infected and killed

by COVID-19.   Preliminary reports show mortality rates of 3.6% among individuals between 60–

---

[17] Isaac Sher, *Without any interventions like social distancing, one model predicts the coronavirus could have killed 40 million people this year*, Bus. Insider (Mar. 27, 2020) https://www.businessinsider.com/covid19-model-predicts-40-million-people-could-die-without-interventions-2020-3.

[18] Press Release, IHME, *New IHME Forecast Projects Nearly 135,000 COVID-19 Deaths in US* (May 4, 2020), http://www.healthdata.org/news-release/new-ihme-forecast-projects-nearly-135000-covid-19-deaths-us ("Increases in testing and contact tracing, along with warming seasonal temperatures – factors that could help slow transmission – do not offset rising mobility, thereby fueling a significant increase in projected deaths.").

[19] CDC, Coronavirus Disease 2019 (COVID-19): *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited May 1, 2020).

[20] *Id.*

[21] CDC, Coronavirus Disease 2019 (COVID-19): *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (last visited May 6, 2020).

[22] *See* Roni Caryn Rabin, *Some Coronavirus Patients Show Signs of Brain Ailments*, N.Y. Times (Apr. 1, 2020), https://www.nytimes.com/2020/04/01/health/coronavirus-stroke-seizures-confusion.html.

69 years old, 8.0% for those 70–79 years old, and 14.8% among people who are 80 years of age and older.[23]   These rates are significantly higher than the mortality rate of seasonal influenza.[24] People across all ages with certain preexisting medical issues, such as heart and respiratory conditions, compromised immune systems, and many other conditions also face heightened risks.[25]

36.     The sweeping health consequences of COVID-19 have had a ripple effect across the entire healthcare system.  WHO estimates that approximately 20% of individuals infected with COVID-19 require hospitalization.[26]  This surge of COVID-19 patients has triggered shortages in healthcare staff, hospital beds, medical equipment, and personal protective equipment ("PPE").[27]

37.     Government leaders from the federal to local level have released emergency declarations, halting or limiting both public and private operations for weeks on end and, at times, indefinitely.[28]  Over 30 million people have filed for unemployment insurance since the crisis hit.[29]

---

[23] CDC, Coronavirus Disease 2019 (COVID-19): *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, *supra* n.21.

[24] *See* Darren Thackeray, *How COVID-19 compares to seasonal flu, and why you should take it seriously*, World Economic Forum (Apr. 1, 2020), https://www.weforum.org/agenda/2020/04/coronavirus-covid19-flu-influenza/.

[25] CDC, Coronavirus Disease 2019 (COVID-19): *Groups at Higher Risk of Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited May 6, 2020).

[26] WHO, Q&A on coronaviruses (COVID-19), https://www.who.int/news-room/q-a-detail/q-a-coronaviruses (last visited May 6, 2020).

[27] *See* Christi A. Grimm, Principal Deputy Inspector General, *Hospital Experiences Responding to the COVID-19 Pandemic: Results of the National Pulse Survey March 23–27, 2020*, U.S. Dept. of Health & Human Servs., Office of Inspector General (Apr. 2020), https://oig.hhs.gov/oei/reports/oei-06-20-00300.pdf.

[28] Michelle Stoddart, Mark Osborne, Abby Cruz, *When each state's stay-at-home order lifts*, ABC (May 1, 2020), https://abcnews.go.com/US/list-states-stay-home-order-lifts/story?id=70317035.

[29] Christopher Rugaber, *30 million have sought US unemployment aid since virus hit,* Assoc. Press (Apr. 30, 2020), https://apnews.com/7f38d7fa2982dc53572232c9d2049dca.

38.     The effects of the virus's first wave will last well into the summer of 2020, and the virus is projected to resurge in the later months of the year, and beyond.  Indeed, the "flattening of the curve" is designed to extend the duration of the virus.[30]  Experts suggest that COVID-19 "will face less immunity and thus transmit more readily even outside of the winter season," and that seasonal changes are "unlikely to stop transmission."[31]  Even if infections subside in the summer, a second wave of COVID-19 infections appears inevitable.[32]

39.     Dr. David Nabarro, a WHO Special Envoy on COVID-19, has warned that the virus will continue to pose a serious threat to Americans until a vaccine is developed, stating: "We think it's going to be a virus that stalks the human race for quite a long time to come until we can all have a vaccine that will protect us and that there will be small outbreaks that will emerge sporadically and they will break through our defenses."[33]  Accordingly, Dr. Anthony Fauci recently said that he "can't guarantee" in-person voting will be safe in November, because of the potential resurgence of COVID-19 in the fall.[34]

---

[30] *See generally* Neil M. Ferguson et al., *Report 9: Impact of non-pharmaceutical interventions (NPIs) to reduce COVID-19 mortality and healthcare demand*, Imperial College COVID-19 Response Team (Mar. 16, 2020), https://www.imperial.ac.uk/media/imperial-college/medicine/sph/ide/gida-fellowships/Imperial-College-COVID19-NPI-modelling-16-03-2020.pdf.

[31] Marc Lipsitch, DPhil, Professor of Epidemiology and Director, Center for Communicable Disease Dynamics, Harvard T.H. Chan School of Public Health, *Seasonality of SARS-CoV-2: Will COVID-19 go away on its own in warmer weather?*, Center for Communicable Disease Dynamics, https://ccdd.hsph.harvard.edu/will-covid-19-go-away-on-its-own-in-warmer-weather/.

[32] Matthew Impelli, *What Experts Have Said About a Second Wave of Coronavirus in the U.S.*, Newsweek (Apr. 22, 2020), https://www.newsweek.com/what-experts-have-said-about-second-wave-coronavirus-us-1499501; *see also* New IHME Forecast Projects Nearly 135,000 COVID-19 Deaths in US, *supra* n.18.

[33] Devan Cole, *Fauci admits earlier Covid-19 mitigation efforts would have saved more American lives*, CNN (Apr. 12, 2020), https://www.cnn.com/2020/04/12/politics/anthony-fauci-pushback-coronavirus-measures-cnntv/index.html.

[34] Jason Silverstein, *Fauci says he "can't guarantee" in-person voting in November will be safe*, CBS News (Apr. 13, 2020), https://www.cbsnews.com/news/coronavirus-fauci-says-he-cant-guarantee-in-person-voting-in-november-will-be-safe/.

40.    To date, there is no vaccine for COVID-19 and no known or widely effective treatment.  Further, there is "no evidence" that those who develop an immune response to the virus—known as antibodies—after an infection are safe from reinfection, nor is there sufficient data about how long immunity to the virus would last.[35]  Despite the absence of a cure, experts have identified techniques that are effective in decreasing the transmission rate of COVID-19. Officials have encouraged the practice of social distancing through avoiding close in-person contacts, as well as frequent and thorough hand-washing.[36]

**B.    The COVID-19 Pandemic in Louisiana**

41.    Louisiana is among the states hit hardest by the COVID-19 pandemic.[37]  As of May 6, 2020, over 2,000 Louisianans had died from COVID-19.[38]  Approximately 30,000 cases were reported by the State, which excludes individuals who were never tested.[39]  These tallies only grow each day.

42.    Since early March, state and local leaders in Louisiana have taken various measures to reduce the spread of the deadly virus.  Local leaders in the state's largest cities, including Mayor LaToya Cantrell of New Orleans and Mayor-President Sharon Weston Broome of Baton Rouge, have issued multiple stay-at-home orders, limiting all non-essential operations through at least

---

[35] Stephanie Nebehay, *"No evidence" that recovered COVID-19 patients cannot be reinfected: WHO*, Reuters (Apr. 25, 2020), https://www.reuters.com/article/us-health-coronavirus-who/no-evidence-that-recovered-covid-19-patients-cannot-be-reinfected-who-idUSKCN2270FB; *see also*, Apoorva Mandavilli and Katie Thomas, *Will an Antibody Test Allow Us to Go Back to School or Work?*, N.Y. Times (Apr. 10, 2020), https://www.nytimes.com/2020/04/10/health/coronavirus-antibody-test.html.

[36] Lisa Lockerd Maragakis, M.D., M.P.H , *Coronavirus, Social and Physical Distancing and Self-Quarantine*, Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-social-distancing-and-self-quarantine (last visited May 6, 2020).

[37] Aila Slisco, *Louisiana Becomes Fourth U.S. State to Reach 1,000 Coronavirus Deaths*, Newsweek (Apr. 15, 2020), https://www.newsweek.com/louisiana-becomes-fourth-us-state-reach-1000-coronavirus-deaths-1497930.

[38] La. Dep't of Pub. Health, *Coronavirus (COVID-19)*, *supra* n.10.

[39] *Id.*

May 15, 2020.[40]  At the statewide level, Governor Edwards has issued a series of incremental proclamations closing down most "non-essential" businesses and encouraging Louisianans to shelter in place.

43.    On March 11, Governor Edwards issued Proclamation No. 25 JBE 2020, declaring a State of Emergency for Louisiana.[41]  Two days later President Donald Trump proclaimed a National Emergency concerning COVID-19.[42]

44.    On March 12, Governor Edwards issued Proclamation No. JBE 2020-27, which, among other things, banned public gatherings of more than 250 people and closed all K-12 public schools statewide until at least April 13, 2020.[43]

45.    On March 13, upon the recommendation of Secretary of State Ardoin, Governor Edwards issued Proclamation No. 28 JBE 2020, which rescheduled the April 4, 2020 presidential preference primary election to June 20, 2020 and the May 9, 2020 municipal general election to July 25, 2020.[44]  It delegated responsibility to the Secretary of State, Commissioner of Elections, Parish Boards of Election Supervisors, Clerks of Court, Registrars of Voters, and any others

---

[40] Press Release, City of New Orleans, Mayor LaToya Cantrell, *Mayor Cantrell Issues Stay Home Mandate in Response to COVID-19* (March 20, 2020), https://nola.gov/mayor/news/march-2020/mayor-cantrell-issues-stay-home-mandate-in-response-to-covid-19/; Terry L. Jones, Stay-at-Home Order to Remain in Place in East Baton Rouge Despite Other Parishes' Defiance, The Advocate (Apr. 30, 2020), https://www.theadvocate.com/baton_rouge/news/coronavirus/article_482ea0ee-8af1-11ea-900d-bb852bbc325c.html.

[41] La. Exec. Dep't Proclamation No. 25 JBE 2020 (Mar. 11, 2020), https://gov.louisiana.gov/assets/ExecutiveOrders/25-JBE-2020-COVID-19.pdf.

[42] Proclamation 9994, 85 Fed. Reg. 15337 (Mar. 18, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

[43] La. Exec. Dep't Proclamation No. JBE 2020-27 (Mar. 13, 2020), https://gov.louisiana.gov/assets/ExecutiveOrders/27-JBE-2020-COVID-19.pdf.

[44] La. Exec. Dep't Proclamation No. 28 JBE 2020, *supra* n.11.

charged with conducting elections in Louisiana to "do every act necessary to conduct the elections."[45]

46.     On March 13, 2020, this Court responded to the pandemic by, among other things, postponing civil trials and suspending in-person filing through April 30.[46]  This Court has also authorized the use of video conferencing and other technology for criminal-related appearances.[47]  This Court subsequently extended postponement of civil and criminal trials, suspension of in-person filing, and other preventive measures through June 30.[48]

47.     On March 16, Governor Edwards issued Proclamation No. JBE 2020-30, which, among other measures, banned public gatherings of more than 50 people, closed or limited the operations of certain, "non-essential" businesses (e.g., casinos, bars, restaurants, gyms, etc.) statewide until at least April 13, 2020.[49]

48.     On March 22, Governor Edwards issued Proclamation No. 33 JBE 2020, a statewide Stay-at-Home order requiring "all individuals within the state of Louisiana . . . to stay home unless performing an essential activity," cancelling public gatherings of more than 10 people, and expanding the definition of "non-essential" businesses.[50]  It directed individuals in

---

[45] *Id.*

[46] *See* United States District Court, Middle District of Louisiana, Administrative Order No. 2020-1 (Mar. 13, 2020) https://www.lamd.uscourts.gov/sites/default/files/pdf/AO%202020-1.pdf; *see also* Administrative Order No. 2020-5 (Apr. 8, 2020) http://www.lamd.uscourts.gov/orders/public_orders/AO%202020-5.pdf.

[47] *See id.*

[48] *See* United States District Court, Middle District of Louisiana, Administrative Order No. 2020-7 (May 1, 2020) http://www.lamd.uscourts.gov/orders/public_orders/AO%202020%207-4.30.2020.pdf.

[49] La. Exec. Dep't Proclamation No. JBE 2020-30 (Mar. 16, 2020), https://gov.louisiana.gov/assets/Proclamations/2020/modified/30-JBE-2020-Public-Health-Emergency-COVID-19.pdf.

[50] La. Exec. Dep't Proclamation No. JBE 33 2020 (Mar. 22, 2020), https://gov.louisiana.gov/assets/Proclamations/2020/JBE-33-2020.pdf.

Louisiana to "maintain a distance of six feet from one another and abide by the 10-person limitation on gathering size."[51]  It ordered residents to limit movement outside the home, until at least April 13, 2020, except for the purpose of visiting essential businesses, obtaining non-elective medical care, performing their job at an essential business, visiting family, exercising, and going to a place of worship.[52]

49.    In issuing the Stay-at-Home order, Governor Edwards explained that despite having taken "aggressive measures to mitigate the spread of COVID-19 and flatten the curve," the measures already taken had not been enough.[53]

50.    On March 24, President Trump approved a major disaster declaration for Louisiana, which made federal emergency aid available for recovery efforts due to COVID-19.[54]

51.    On April 14, upon the recommendation of Secretary of State Ardoin, Governor Edwards issued Proclamation No. 46 JBE 2020, further postponing or rescheduling all elections scheduled to be held in the State.  The June 20, 2020 presidential preference primary election in Louisiana was rescheduled for July 11, 2020.  The July 25, 2020 municipal election was rescheduled for August 15, 2020.[55]

---

[51] *Id.*

[52] *Id.*

[53] Press Release, Office of the Governor, *Gov. Edwards Issues Statewide Stay at Home Order to Further Fight the Spread of COVID-19 in Louisiana* (Mar. 22, 2020), https://gov.louisiana.gov/order/.

[54] *See* FEMA, *President Donald J. Trump Approves Major Disaster Declaration for Louisiana* (Mar. 24, 2020), https://www.fema.gov/news-release/2020/03/24/president-donald-j-trump-approves-major-disaster-declaration-louisiana.

[55] La. Exec Dep't Proclamation No. 46 JBE 2020 (Apr. 14, 2020), https://gov.louisiana.gov/assets/Proclamations/2020/46-JBE-2020-Elections-Rescheduled.pdf.

52.     On April 27, Governor Edwards announced that Louisiana's Stay-at-Home order would be extended until at least May 15 in order to continue to slow the spread of the disease,[56] officially implementing the extension on April 30.[57]  Governor Edwards intends to make his next announcement on whether the Stay-at-Home order will be modified on or by May 11.[58]

**C.     COVID-19's Disproportionate Impact on Black People in Louisiana**

53.     As the COVID-19 pandemic has spread across the country, it has taken a devastating toll on Black people, who make up a disproportionate number of confirmed cases and deaths resulting from the virus.[59]  Preliminary nationwide data released by the CDC on April 25, which included race data for 42.1% of the 671,485 cases analyzed, found that Black people make up 30% of reported COVID-19 cases although they only make up 13% of the total U.S. population.[60]

54.     In Louisiana, racial disparities in infections and deaths resulting from the coronavirus have been particularly acute.  On April 6, Governor Edwards announced that initial data categorizing deaths resulting from COVID-19 by race showed that Black people comprised

---

[56] Press Release, Office of the Governor, *Gov. Edwards Will Extend Stay at Home Order Until May 15 to Continue Flattening the Curve and Slowing the Spread of COVID-19* (Apr. 27, 2020), https://gov.louisiana.gov/home-order-extended-may15/.

[57] La. Exec. Dep't Proclamation No. 52 JBE 2020 (Apr. 30, 2020), https://gov.louisiana.gov/assets/Proclamations/2020/52-JBE-2020-Stay-at-Home-Order.pdf.

[58] *Id.*

[59] Reis Thebault, et al., *The coronavirus is infecting and killing black Americans at an alarmingly high rate*, Washington Post (Ap. 7, 2020), https://www.washingtonpost.com/nation/2020/04/07/coronavirus-is-infecting-killing-black-americans-an-alarmingly-high-rate-post-analysis-shows/?arc404=true&itid=lk_inline_manual_3

[60] CDC, Coronavirus Disease 2019 (COVID-19): *Cases, Data, & Surveillance, Demographic characteristics of COVID-19 cases in the U.S.* (May 5, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

70% of deaths, despite making up only 32% of Louisiana's population.[61]   The Governor called this alarming statistic "a disturbing trend and one that deserves our attention," and announced the creation of the Louisiana COVID-19 Health Equity Task Force to explore "how health inequities are affecting communities that are most impacted by the coronavirus."[62]

55.    As of May 4, data updated weekly by the Louisiana Department of Health indicates that the COVID-19 death rate remains disproportionately high for Black people at over 57%. Further, recently released Louisiana Department of Health data reporting COVID-19 cases by U.S. census tract shows high rates of infection in Louisiana's predominantly Black areas.[63]   For example, in Orleans Parish, where Black people make up 60% of the population, the census tract data indicate that neighborhoods with high concentrations of Black residents have higher numbers of reported cases.[64]   While the State's data does not report rates of COVID-19 infection by race, the census tract data reflect a disparate impact on Louisiana's Black communities as opposed to predominately white communities.  These figures mirror developing trends in other states, such as Maryland and North Carolina, which have both released data showing that Black people face higher rates of both infection and death from COVID-19 than the population as a whole.[65]

---

[61] Gordon Russell & Sam Karlin, *Coronavirus disparity in Louisiana: About 70% of victims are black, but why?*, nola.com (Apr. 6, 2020), https://www.nola.com/news/coronavirus/article_d804d410-7852-11ea-ac6d-470ebb61c694.html.

[62] Press Release, Office of the Governor, *Gov. Edwards Announces Creation of COVID-19 Health Equity Taskforce* (Apr. 10, 2020), https://gov.louisiana.gov/index.cfm/newsroom/detail/2457.

[63] Jeff Adelson, *'Glaring' racial disparities found in coronavirus infection rates in these New Orleans neighborhoods*, nola.com (Apr. 20, 2020), https://www.nola.com/news/coronavirus/article_0ea8b004-8357-11ea-81e3-ff26d085e141.html.

[64] Linda Villarosa, *'A Terrible Price': The Deadly Racial Disparities of Covid-19 in America,* N.Y. Times (Apr. 29, 2020), https://www.nytimes.com/2020/04/29/magazine/racial-disparities-covid-19.html.

[65] N.C. Dep't of Health & Human Servs., *COVID-19 North Carolina Dashboard*, https://www.ncdhhs.gov/divisions/public-health/covid19/covid-19-nc-case-count#by-race-ethnicity (last updated May 6, 2020); Fenit Nirappil et al., *Record set for single-day covid-19 deaths in D.C., Maryland and Virginia at 53;* (continued…)

56.     The stark racial disparities reflected in COVID-19's effects on Louisiana's residents are a manifestation of longstanding discrimination and socioeconomic inequities in the State.  According to 2018 American Community Survey 1-Year estimates, in Louisiana, 30% of all Black residents compared to 12% of all white residents live in poverty; the unemployment rate is 9.9% for Black residents compared to 4.5% for white residents; per capita income for Black residents is $17,491, compared to $33,856 for white residents; only 19% of Black residents have finished high school compared to 10.8% of white residents; 7.8% of Black residents had no health insurance compared to 6.2% of white residents; and 15.8% of Black residents lacked a vehicle compared to 4.7% white residents.[66]

57.     Together with race and class biases that impact access to healthcare, these racially disparate socioeconomic conditions contribute to adverse health conditions and outcomes that predispose Black people to contracting COVID-19.  According to statistics from the Louisiana State Health Department, the number of deaths from asthma, heart disease, diabetes, and severe obesity are higher for Black people than for whites.[67]  The CDC has cited racial disparities in these

_black residents hit hardest_, Washington Post (Apr. 9, 2020), https://www.washingtonpost.com/local/covid-19-deaths-hit-new-high-in-dc-maryland-and-virginia-at-53-black-residents-hit-hardest/2020/04/09/cc85cd14-77b3-11ea-b6ff-597f170df8f8_story.html.

[66] U.S. Census Bureau, 2010-2018 American Community Survey 1-Year Estimates: _Selected Social Characteristics of the United States: Louisiana_ (2018), https://data.census.gov/cedsci/table?q=s0201&tid=ACSSPP1Y2018.S0201&y=2018&t=400%20-%20Hispanic%20or%20Latino%20%28of%20any%20race%29%20%28200-299%29%3A451%20-%20White%20alone,%20not%20Hispanic%20or%20Latino%3A453%20-%20Black%20or%20African%20American%20alone,%20not%20Hispanic%20or%20Latino%3ARace%20and%20Ethnicity&hidePreview=true&moe=false&g=0400000US22.

[67] La. Dep't of Pub. Health, Community Partnerships & Health Equity, _Minority Health Indicators_, http://ldh.la.gov/index.cfm/page/672

underlying medical conditions as a factor that influences the disproportionate impact of COVID-19 on the Black population.[68]

58.    Racial disparities in employment and access to transportation also make it more difficult for Black people to take measures that mitigate the risks posed by COVID-19, including engaging in social isolation or working from home.  In Louisiana, 29.9% of African Americans 16 years and over who are employed work in service industry occupations compared to only 14.8% of whites, and only 24.7% are in management and business positions, positions more likely to facilitate remote work, as compared to 39.3% of whites; thus, African Americans face a higher degree of exposure to COVID-19 both at their workplace and in transit.[69]

59.    The COVID-19 pandemic has both exposed and exacerbated deep-rooted and systemic inequalities faced by Black people throughout the country, and in Louisiana in particular. Indeed recognizing that "[h]ealth differences between racial and ethnic groups are often due to economic and social conditions that are more common among some racial and ethnic minorities

---

[68] *Id.* (citing A.P. Bartel et al., *Racial and ethnic disparities in access to and use of paid family and medical leave: evidence from four nationally representative datasets,* U.S. Bureau of Labor Statistics (Jan. 2019), https://doi.org/10.21916/mlr.2019.2; T.J. Cunningham et al., *Vital signs: racial disparities in age-specific mortality among blacks or African Americans—United States, 1999–2015*, 66(17) CDC Morbidity and Mortality Weekly Report 444 (2017)); *see also* Joseph P. Williams, *Rumor, Disparity and Distrust: Why Black Americans Face an Uphill Battle Against COVID-19*, U.S. News and World Report (Mar. 25, 2020), https://www.usnews.com/news/healthiest-communities/articles/2020-03-25/why-black-americans-face-an-uphill-battle-against-the-coronavirus (citing Dr. Lisa Cooper, internist and social epidemiologist with Johns Hopkins Bloomberg School of Public Health: "The concern that black communities presently hampered by health inequities could be devastated by the coronavirus is rooted in decades of research as well as the nation's checkered racial history."); Ibram X. Kendi, *Stop Blaming Black People for Dying of the Coronavirus*, The Atlantic (Apr. 14, 2020), https://www.theatlantic.com/ideas/archive/2020/04/race-and-blame/609946/ ("Without question, African Americans suffer disproportionately from chronic diseases such as hypertension, cardiovascular disease, diabetes, lung disease, obesity, and asthma, which make it harder for them to survive COVID-19.").

[69] U.S. Census Bureau, 2010-2018 American Community Survey 1-Year Estimates: Selected Social Characteristics of the United States: Louisiana (2018), *supra* n.66.

than whites," the CDC has identified racial and ethnic minority groups among "people who need to take extra precautions to protect themselves from COVID-19."[70]

### D. The COVID-19 Pandemic and Voting

60.     The CDC has issued specific guidance concerning safe voting practices during the COVID-19 pandemic to prevent spread of the coronavirus.  In particular, the CDC has warned of the high potential of COVID-19 transmission at polling sites, and instructs election officials to "[e]ncourage voters to use voting methods that minimize direct contact with other people and reduce crowd size at polling stations."[71]  The guidance advises officials to encourage mail-in methods of voting, early voting, and drive up voting, among other recommendations.[72]

61.     The CDC lists "mail-in methods of voting" first among its recommendations to reduce person-to-person contacts and congestion at polling sites.[73]  While COVID-19 spreads rapidly in crowds, like those at congested polling sites, there is no evidence that it spreads through the mail.[74]  In the interest of extreme caution, the U.S. Postal Service has also implemented policies to reduce contacts between mail carriers and members of the businesses and households they serve.[75]

---

[70] CDC Coronavirus Disease 2019 (COVID-19): *People Who Need Extra Precautions, Others at Risk, Racial and Ethnic Minority Groups*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities.html (last updated Apr. 20, 2020).

[71] CDC, Coronavirus Disease 2019 (COVID-19): *Recommendations for Election Polling Locations: Interim guidance to prevent spread of coronavirus disease 2019 (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html (last updated Mar. 27, 2020).

[72] *Id.*

[73] *Id.*

[74] CDC, Coronavirus Disease 2019 (COVID-19): *Frequently Asked Questions*, https://www.cdc.gov/coronavirus/2019-ncov/faq.html (last updated Apr. 28, 2020).

[75] Press Release, United States Postal Service, *Media Statement – COVID-19* (Apr. 2, 2020), https://about.usps.com/newsroom/statements/usps-statement-on-coronavirus.htm (citing guidance from World Health Organization, CDC, and Surgeon General).

62.    Across the country, voters and election workers have already fallen victim to COVID-19 through contacts made at in-person polling sites.  After Florida's March 17 primary, two Broward County poll workers tested positive for COVID-19, one of whom was handling driver's licenses as part of the identification verification process.[76]  Chicago officials later reported that a poll worker died of COVID-19 after working at the polls on March 17, with officials identifying individuals with confirmed coronavirus cases at additional polling locations.[77]  Just weeks later, in-person voting proceeded in Wisconsin, where voters in Milwaukee and Green Bay waited in multi-hour lines.[78]  Following that election, health officials identified at least 52 individuals who tested positive for COVID-19 after either voting in person or working at a polling site.[79]

63.    Expanded access to voting by mail for all voters also helps reduce lines and crowds at polling sites by allowing some people who would otherwise vote in person to vote by mail. Many other voters, including but not limited to people who are homeless, visually impaired, have limited English proficiency, or are illiterate and need accessible voting machines and personal assistance, will continue to rely on in-person voting to participate in the democratic process.  The

---

[76] Anthony Man, *Two Broward poll workers, including one who handled voters' driver licenses, test positive for coronavirus*, S. Fla. Sun Sentinel (Mar. 26, 2020), https://www.sun-sentinel.com/coronavirus/fl-ne-broward-elections-poll-workers-coronavirus-20200326-wmgy775dvjc5jis2oagxlpmule-story.html.

[77] *See* Mary Ann Ahern, *Poll Worker at Chicago Voting Site Dies of Coronavirus, Election Officials Say*, NBC Chicago (Apr. 13, 2020), https://www.nbcchicago.com/news/local/chicago-politics/poll-worker-at-chicago-voting-site-dies-of-coronavirus-election-officials-say/2255072/.

[78] Devi Shastri, *In-person voting was likely a 'disaster' for Wisconsin's efforts to flatten coronavirus curve, national experts say*, Milwaukee J. Sentinel (Apr. 8, 2020) (quoting Wisconsin Department of Health Services Secretary Andrea Palm), https://www.jsonline.com/story/news/politics/elections/2020/04/08/coronavirus-wisconsin-election-likely-hurt-effort-flatten-curve/2961718001/.

[79] Nolan D. McCaskill, *Wisconsin Health Dept.: 36 People Positive for Coronavirus After Primary Vote*, Politico (Apr. 27, 2020), https://www.politico.com/news/2020/04/27/wisconsin-tested-positive-coronavirus-election-211495; *The Latest: 52 positive cases tied to Wisconsin election*, The Associated Press (Apr. 28, 2020), https://apnews.com/b1503b5591c682530d1005e58ec8c267.

CDC recommendations also address best practices for in-person voting during the COVID-19 pandemic, including sanitizing surfaces and maintaining 6 feet of distance between individuals.[80] As noted, however, the CDC recommends that election officials "[e]ncourage voters to use voting methods that minimize direct contact with other people and reduce crowd size at polling stations," including mail-in methods of voting and drive up voting.[81]  Maximizing options for voters ensures less congestion at polling sites, while maintaining inclusive access to the franchise.

64.    The majority of states, that is, 34 and the District of Columbia, already offer all eligible voters a vote-by-mail ballot option.[82]  Of the 16 states that require an excuse to vote absentee by mail, several have expanded the scope of absentee eligibility in recognition of the extensively documented threat that the pandemic continues to pose to the public and in response to the well-founded health and safety concerns of qualified voters.

---

[80] CDC, Coronavirus Disease 2019 (COVID-19): *Recommendations for Election Polling Locations: Interim guidance to prevent spread of coronavirus disease 2019 (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html (last updated Mar. 27, 2020).

[81] *Id.*

[82] The Brennan Center for Justice, Research & Reports: Preparing Your State for an Election Under Pandemic Conditions, https://www.brennancenter.org/our-work/research-reports/preparing-your-state-election-under-pandemic-conditions (last updated Apr. 27, 2020).

65.    For example, Arkansas,[83] Alabama,[84] Delaware,[85] Massachusetts,[86] New Hampshire,[87] Virginia,[88] and West Virginia[89] have, via varying interpretations, expanded the scope of existing state election laws establishing absentee ballot eligibility for illness, injury, or disability to now include all qualified voters concerned about or taking preventative measures because of the COVID-19 pandemic.  Courts have similarly removed the burdens of witness and notary requirements for absentee ballots within the context of the pandemic.[90]

---

[83] Governor of Arkansas, Exec. Order No. 20-08, (Mar. 20, 2020), https://governor.arkansas.gov/images/uploads/executiveOrders/EO_20-08._.pdf.

[84] Ala. Legis. Servs. Agency, *Absentee Voting During State of Emergency, 17-11-3(e)* (Mar. 18, 2020), https://www.sos.alabama.gov/sites/default/files/SOS%20Emergency%20Rule%20820-2-3-.06-.01ER.pdf; *see also* Press Release, *Alabama Secretary of State, 100 Days Left to Apply for Absentee Ballot for the Primary Runoff Election* (Mar. 31, 2020), https://www.sos.alabama.gov/newsroom/100-days-left-apply-absentee-ballot-primary-runoff-election; *see also* Ala. Code § 17-11-3(a)(2).

[85] *See* Governor of Delaware, Exec. Dep't, Sixth Modification of the Declaration of a State of Emergency for the State of Delaware Due to a Public Health Threat (Mar. 24, 2020), https://governor.delaware.gov/wp-content/uploads/sites/24/2020/03/Sixth-Modification-to-State-of-Emergency-03242020.pdf (Delaware executive order providing that for upcoming primary and special elections "the qualification of 'sick or physically disabled' [in Delaware vote-by-mail provisions] shall apply to and include any such voter who is asymptomatic of COVID-19 . . . and who herself or himself freely chooses to use such qualification to vote by absentee ballot.").

[86] An Act Granting Authority to Postpone 2020 Municipal Elections in the Commonwealth and Increase Voting Option in Response to the Declaration of Emergency to Respond to COVID-19, 191st General Court of the Commonwealth of Mass., ch. 45 (2020), https://malegislature.gov/Laws/SessionLaws/Acts/2020/Chapter45 (new Massachusetts law clarifying that "any person taking precaution related to COVID-19 in response to a declared state of emergency or from guidance from a medical professional, local or state health official, or any civil authority shall be deemed to be unable by reason of physical disability to cast their vote in person," which is one of the reasons set forth in the state constitution that permits a Massachusetts voter to vote by mail).

[87] Memorandum from the Sec'y of State and Att'y General to New Hampshire Election Officials re: Elections Operations During the State of Emergency at 2 (Apr. 10, 2020), https://www.governor.nh.gov/news-media/press-2020/documents/20200410-absentee-voting.pdf.

[88] Absentee Voting, Va. Dep't of Elections, https://www.elections.virginia.gov/casting-a-ballot/absentee-voting/ (last visited May 6, 2020) (Virginia Department of Elections statement clarifying that "[v]oters may choose reason '2A My disability or illness'" to vote absentee in upcoming elections due to COVID-19).

[89] W. Va. Sec'y of State Mac Warner, Admin. Law Div., Notice Of An Emergency Rule (Mar. 20, 2020), http://apps.sos.wv.gov/adlaw/csr/readfile.aspx?DocId=53039&Format=PDF.

[90] *See League of Women Voters of Va. v. Va. State Bd. of Elections*, F. Supp. 3d, No. 6:20-cv-00024, 2020 WL 2158249, at *8 (E.D. Va. May 5, 2020) (approving order enjoining enforcement of absentee ballot witness (continued…)

## II.    Louisiana's Absentee and Early Voting Process

66.    At least four major elections are scheduled to take place in Louisiana between May and the end of the calendar year, including major statewide and federal elections.  The elections are currently scheduled to take place on July 11, 2020 (Presidential Preference Primary/Municipal Primary Election), August 15, 2020 (Municipal General Election), November 3, 2020 (Presidential General and Open Congressional Primary Election), and December 5, 2020 (Congressional and Open General Election).[91]

67.    Louisiana's state election code enumerates specific categories of eligible voters who may request and vote by mail-in ballot, a process described in Louisiana's election code as "absentee voting by mail."  La. R.S. 18:1308.  The categories include voters who expect to be out of the parish in which they would be qualified to vote in person on Election Day, such as service members, students, clergy members, and overseas citizens.  La. R.S. 18:1303(B).  Voters who are not necessarily absent from the parish but will remain incarcerated pre-trial or sequestered as a jury member during the election may also request and vote by absentee ballot.  La. R.S. 18:1303(C)-(G).  Eligible voters who submit certain identification or documentation of a qualifying disability may vote absentee.  La. R.S. 18:1303(I).  Voters who are 65 years-of-age and older also qualify for this accommodation.  La. R.S. 18:1303(J).  Finally, qualified voters who

---

requirement, noting "[n]otwithstanding the proffered steps which could be taken to mitigate the risks to health in having somebody witness one's absentee ballot, many would be dissuaded from exercising their vote both on account of the remaining health risks and required steps to mitigate them"); *League of Women Voters of Okla. v. Ziriax*, No. 118765, 2020 WL 2111348, at *1 (Okla. May 4, 2020) (barring use of notary requirement for absentee ballots).

[91] *See* 2020 Elections Calendar, La. Sec. State, https://www.sos.la.gov/ElectionsAndVoting/PublishedDocuments/ElectionsCalendar2020.pdf (last visited Apr. 27, 2020).

were unable to participate in early voting and will be unable to vote on election day due to hospitalization may vote by absentee ballot.  La. R.S. 18:1303(D).

68.     All requests to vote absentee by mail must specify the reason for the request.  La. R.S. 18:1307.  Applications can be sent to the registrar of voters by mail, fax, hand delivery, or electronically through the Secretary of State's website at GeauxVote.com.  La. R.S. 18:1307.

69.     When applying for an absentee ballot, the applicant must provide the reason for their request to vote absentee by mail and attach any documents in support thereof.  La. R.S. 18:1307(A)(2).  If the registrar of voters has reason to believe that the eligibility of a voter to vote absentee by mail pursuant to La. R.S. 18:1303 is based upon false or fraudulent information, they "shall immediately notify the parish board of election supervisors."  La. R.S. 18:1307(I).  And, if "after appropriate hearing and opportunity for the voter to be heard, the parish board of election supervisors finds that the voter's eligibility to vote absentee by mail was based upon false or fraudulent information, the board shall inform the appropriate district attorney and the registrar of voters who shall not allow the voter to vote absentee by mail."  La. R.S. 18:1307(I).

70.     The Secretary of State is responsible for preparing absentee ballots.  La. R.S. 18:1306(A).  Every ballot is mailed in an envelope with the following on its face in red bold face type: "VIOLATION OF ABSENTEE BY MAIL OR EARLY VOTING LAWS VOIDS BALLOT AND MAY RESULT IN CRIMINAL PENALTIES" and "VOTING AT POLLS AFTER VOTING ABSENTEE BY MAIL OR DURING EARLY VOTING IS PROHIBITED AND MAY RESULT IN CRIMINAL PENALTIES."  La. R.S. 18:1306(D).  The envelope also includes a "Certificate" to be signed by the voter, certifying that they "applied for the ballot, marked the enclosed ballot(s) himself or that they were marked for him according to his instructions and in his

presence;" that the voter is entitled to vote at the precinct they name; and that the parish board of election supervisors is authorized to open the envelope and count their ballot.  La. R.S. 18:1306(E).

71.    The "Certificate," which is on the envelope, includes "an affidavit followed by a line for the handwritten signature or mark of the voter, certifying that the statements made . . . are true and correct and that the voter is aware of the penalties for knowingly making a false statement therein, which penalties shall be stated on the certificate."  La. R.S. 18:1306(E)(1)(f).

72.    Finally, the voter must sign the certificate in the presence of one witness, who must also sign the envelope.  The voter's certificate "shall be made under penalty of perjury for providing false or fraudulent information."  La. R.S. 18:1306(E)(2)(a).

73.    Once completed, the ballot must be returned to the registrar by the U.S. Postal Service, a commercial courier, or by hand delivery.  La. R.S. 18:1308(B).  If delivered by someone other than the voter, a commercial courier, or the U.S. Postal Service, the registrar must require that the person making such delivery sign a statement, prepared by the Secretary of State, certifying that they have the authorization and consent of the voter to hand deliver the marked ballot.  La. R.S. 18:1308(B).  No person except the immediate family of the voter may hand deliver more than one marked ballot to the registrar.  La. R.S. 18:1308(B).  Under most circumstances, ballots must be received by 4:30 p.m. on the day before Election Day in order to be counted.  La. R.S. 18:1308(C).

74.    The parish board of election supervisors conducts the counting and tabulation of all absentee by mail and early voting ballots in the parish.  La. R.S. 18:1313(A).  Absentee by mail and early voting ballots are counted at a public facility within the parish no later than 8:00 p.m. on Election Day.  La. R.S. 18:1313(B).  Several steps must be taken to validate each ballot before it may be counted: (1) a member of the board must compare the name on the certificate or on the

flap of the envelope containing the absentee by mail ballot with the names on the absentee by mail voter report; (2) the board will consider any properly filed challenges to the ballot, following procedures delineated elsewhere in the statutes; (3) if a majority of the members of the board determine that an absentee by mail ballot is invalid, the members must leave the flap on the envelope containing the absentee by mail ballot, leave the envelope sealed, and a board member must write the word "rejected," together with the reasons for rejecting the ballot, and their initials. La. R.S. 18:1313(F).  The rejected absentee by mail ballots and certificates must be replaced in the special absentee by mail and early voting ballot envelope or container.  La. R.S. 18:1313(F).

75.    No rejected absentee by mail ballot is counted.  La. R.S. 18:1313(F)(5).

76.    If the board determines that an absentee by mail ballot is valid, the ballot certificate must be signed by two board members.  La. R.S. 18:1313(F)(6).

77.    Any person who knowingly, willfully, or intentionally votes or attempts to vote more than once in an election, or otherwise votes in a false, fictitious, or fraudulent way shall be fined up to $2,000 dollars, be imprisoned for up to two years, or both, for the first offense.  La. R.S. 18:1461.2(B).  These penalties are listed boldly on all absentee ballot applications.[92]

---

[92]See General Application for Absentee By Mail Ballot, La. Sec. State, https://www.sos.la.gov/ElectionsAndVoting/PublishedDocuments/GeneralApplicationForAbsenteeByMailBallot.pdf (last visited May 6, 2020); Disabled Application for Absentee By Mail Ballot, La. Sec. State, https://www.sos.la.gov/ElectionsAndVoting/PublishedDocuments/DisabledApplicationForAbsenteeByMailBallot.pdf (last visited May 6, 2020); Military Overseas Application for Absentee By Mail Ballot, La. Sec. State, https://www.sos.la.gov/ElectionsAndVoting/PublishedDocuments/MilitaryOverseasApplicationForAbsenteeByMailBallot.pdf (last visited May 6, 2020).

78.    La. R.S. 18:1309 allows for early voting from seven to fourteen days prior to any scheduled election.  In practice, over at least the past four years, Louisiana has only allowed for seven days of early voting in primary and general elections.[93]

79.    All registered voters may vote early.[94]

**III.    The Emergency Election Plan**

80.    Louisiana election procedures are governed by the Louisiana Election Code. Pursuant to La. R.S. 18:401.3, if the Governor declares a statewide emergency, the Secretary of State may certify that the emergency will impair an upcoming election.  The Secretary of State sends the certification with the underlying facts and reasons detailing the election impairment to the Governor, the Senate Committee on Senate and Governmental Affairs, and the House Committee on House and Governmental Affairs.

81.    If the Governor and the majority of each of the two committees agree that an emergency election plan is necessary, the Secretary of State shall develop a plan to address any impairments the emergency presents to the holding of the election.  The Secretary of State may, if deemed necessary, include in the emergency plan a proposal to conduct early voting in certain parishes to enable displaced voters to vote.  The written emergency plan must then be submitted by the Secretary of State to the two aforementioned committees and the Governor.

82.    The majority of the two committees must approve of the plan, after which it will be submitted to the members of each house of the legislature for approval by the majority of each

---

[93]*See* Search Election Dates, La. Sec. State, https://www.sos.la.gov/ElectionsAndVoting/GetElectionInformation/SearchElectionDates/Pages/default.aspx (last visited May 6, 2020).

[94]*See*, Elections and Voting, La. Sec. State, https://www.sos.la.gov/ElectionsAndVoting/Vote/VoteEarly/Pages/default.aspx (last visited May 6, 2020).

house.  Upon approval by a majority of the members of the House and the Senate and by the Governor, the Secretary of State must then take steps necessary to implement the plan.

83.    On March 13, 2020, Secretary of State Ardoin certified to the Governor that a state of emergency exists that would affect the electoral process, and certified the same one month later on April 13, 2020.[95]  On April 14, 2020, Secretary Ardoin presented his first emergency plan to the Governor, the Senate Committee on Senate and Governmental Affairs, and the House Committee on House and Governmental Affairs ("the First Emergency Plan").

84.    The First Emergency Plan recognized the serious threat COVID-19 poses to Louisianans.  The First Emergency Plan explained that:

> COVID-19 poses unknown and unprecedented logistical problems regarding the availability of polling places, commissioners, election officials, and sanitation and safety products (like clothing, protective eyewear, masks, sanitizing products, and sterilizing services to clean facilities prior to and following the election) with respect to conducting in-person voting for the July 11, 2020 and August 15, 2020 elections.[96]

85.    Secretary Ardoin then described the steps he believed were necessary to ensure a safe and fair election.  These included (1) expanding early voting from seven to thirteen days before election day; (2) expanding the reasons to request an absentee by mail ballot to registered voters who are affected by COVID-19 and included voters:

- Sixty years of age or older;
- At higher risk of severe illness from COVID-19 due to serious underlying medical conditions (such as chronic lung disease, moderate to severe asthma, hypertension and other serious heart conditions, diabetes, undergoing chemotherapy,

---

[95] *See* State of Louisiana Executive Department: Proclamation No. 46 JBE 2020 (Apr. 14, 2020), https://gov.louisiana.gov/assets/Proclamations/2020/modified/46-JBE-2020-Elections.pdf.

[96] *See* Secretary of State Emergency Election Plan for the July 11, 2020 Presidential Preference Primary and August 15, 2020 Municipal General Elections in the State of Louisiana, at 2 (Apr. 14, 2020), https://house.louisiana.gov/Agendas_2020/Apr_2020/Emergency%20Election%20Plan%20for%20PPP%20and%20Mun%20General%20Rev.%204-13.pdf.

immunodeficiencies, severe obesity, chronic kidney disease and undergoing dialysis, and liver disease);

- Subject to a stay at home, quarantine, or isolation order;
- Advised by a health care provider or governmental authority to self-quarantine due to COVID-19 concerns;
- Experiencing symptoms of COVID-19 and seeking a medical diagnosis;
- Unable to appear in public due to concern of exposure to or transmission of COVID-19;
- Caring for an individual who is subject to a stay at home, quarantine, or isolation order or who has been advised by a health care provider or governmental authority to self-quarantine due to COVID-19 concerns; or
- Caring for a child or grandchild if the child's school or daycare is closed, or the child care provider is unavailable, due to precautions taken because of COVID-19 concerns;

(3) reducing the number of witness signatures required on an absentee ballot application where the applicant is unable to sign their own name from two witnesses to one witness; and (4) providing polling locations and election workers with supplies to prevent against the spread of the virus.[97]

86.    On April 15, 2020, the Senate and Governmental Affairs Committee blocked the First Emergency Plan in committee on a party-line vote, citing concerns that making absentee voting available to anyone concerned about exposure to COVID-19 would enable voter fraud, despite statistics and evidence to the contrary.[98]  Blocking the First Emergency Plan in committee ensured that the full Louisiana legislature would not be able to approve of the plan.[99]

---

[97] *See id.*

[98] *See* Sam Karlin, *Louisiana Republicans Block Emergency Coronavirus Election Plan; Future of Election Unclear*, The Advocate (Apr. 15, 2020), https://www.theadvocate.com/baton_rouge/news/coronavirus/article_4dfccfd6-7f44-11ea-b67e-73d2172ba20b.html; *see also* Melinda Deslatte, *Louisiana Lawmakers Approve Emergency Summer Elections Plan*, U.S. News (Apr. 28, 2020), https://www.usnews.com/news/best-states/louisiana/articles/2020-04-28/louisiana-lawmakers-approve-emergency-summer-elections-plan.

[99] *See id.*

87.    On April 20, 2020, less than a week after the First Emergency Plan was blocked, Secretary Ardoin presented his new emergency plan (the "Emergency Plan").[100]   The new Emergency Plan would no longer allow voters with a "concern of exposure" to COVID-19 to request an absentee-by-mail ballot.[101]   The Emergency Plan would no longer extend access to absentee ballots to voters over the age of 60 or those caring for a child or grandchild whose school or daycare is closed and/or where alternative childcare is not available due to COVID-19 concerns.[102]   And, the revised Emergency Plan would cover only the July Election and the August Election—it would not provide for expanded access to absentee ballots for either the November Election or December Election.[103]

88.    Two days later, on April 22, 2020, both the Senate and Governmental Affairs Committee and House Committee on House and Governmental Affairs approved the revised Emergency Plan.  On April 27, 2020, the Emergency Plan was approved by the full Louisiana State House (passing 62–39) and State Senate (passing 31–8).

89.    Contrary to recommendations from federal health experts at the CDC, the Emergency Plan only allows voters to seek absentee ballots if they attest on an application that they (i) are "[a]t a higher risk of severe illness from COVID-19  due to serious underlying medical conditions as identified by the CDC (including chronic lung disease, moderate to severe asthma, hypertension and other serious heart conditions, diabetes, undergoing chemotherapy, severe obesity (BMI of 40 or higher), chronic kidney disease and undergoing dialysis, liver disease,

---

[100] *See* Secretary of State Emergency Election Plan for the July 11, 2020 Presidential Preference Primary and August 15, 2020 Municipal General Elections in the State of Louisiana (Apr. 20, 2020), *supra* n.8.

[101] *See id.*

[102] *See id.*

[103] *See id.*

pregnancy, or immunocompromised due to cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications)"; (ii) are "[s]ubject to a medically necessary quarantine or isolation order as a result of COVID-19"; (iii) are "[a]dvised by a health provider to self-quarantine due to COVID-19 concerns"; (iv) are "[e]xperiencing symptoms of COVID-19 and seeking medical diagnosis"; or (v) are "[c]aring for an identified individual  who is subject to medically necessary quarantine or isolation order as a result of COVID-19 or who has been advised by a health care provider to self-quarantine due to COVID-19 concerns."[104]

90.    The Emergency Plan does not define or explain qualifying terms included in the list of COVID-19 specific excuses, including the terms "medically necessary," and "moderate or severe," nor does the Emergency Plan provide guidance on what qualifies as being "advised by a health provider" or "seeking medical diagnosis."[105]  Given that the State's medical infrastructure is overwhelmed and hospitals are advising all but the most severely ill patients not to go to a hospital, most voters quarantining due to COVID-19 symptoms will be unable to obtain the medical advice or documentation of such advice that may be required under the Emergency Plan.[106]

91.    The State's COVID-19 Emergency Absentee Ballot Application expressly states and requires a voter requesting an absentee mail in ballot based on one of the COVID-19-related

---

[104] Secretary of State Emergency Election Plan for the July 11, 2020 Presidential Preference Primary and August 15, 2020 Municipal General Elections in the State of Louisiana (Apr. 20, 2020), *supra* note 8; Exhibit A, Emergency Ballot Application.

[105] *See id.*

[106] *See Healthcare Facility Notice/Order: Notice #2020-COVID19-All-010*, L.A. Dept. of Health (Apr. 20, 2020) http://ldh.la.gov/assets/oph/Coronavirus/resources/providers/LDH-MEMO-UPDATE-RESTORE-MED-SURG-Procedures.pdf, (requiring all non-essential healthcare services to be done via telehealth due to ongoing pandemic).

excuses to acknowledge that "[p]roviding a false statement to an election official is a felony offense," and that doing do will subject the voter to a fine or imprisonment.[107]

## ARGUMENT

**I.    Louisiana's Restrictions on Absentee Mail-In Voting and Early Voting Will Place Undue Burdens on the Right to Vote in Light of the COVID-19 Pandemic**

### A. The Excuse Requirement Will Severely Burden the Right to Vote

92.    Louisiana's Excuse Requirement will severely burden the right to vote because it will require many thousands of Louisiana's voters to choose between exposing themselves and others to the risk of illness from COVID-19 to vote in person or foregoing their right to vote.

93.    The ongoing health risks posed by COVID-19 necessitate that Defendants provide all eligible voters the opportunity to cast an absentee by mail ballot without any excuse so that they can avoid the significant risks posed by voting in person.  Moreover, all voters who are forced by Defendants to take on the risks of voting during the pandemic will necessarily bring those risks home with them, potentially spreading COVID-19 to their families and community members, vulnerable and healthy alike.

94.    Voting in person requires individuals to leave the safety of their homes; to commute to and from the polls, potentially via public transportation; to line up at polling places (potentially for hours); and to congregate with unknown individuals including other voters, poll workers, and poll monitors.  Making one's way to cast a vote in person will also require voters to touch shared surfaces, which may include voting machines, shared writing instruments, doorknobs, elevator buttons, and parking meters.  Public health officials have unequivocally warned of the risks of engaging in these activities in public during the COVID-19 pandemic.

---

[107] *See* Exhibit A, Emergency Ballot Application.

95.     None of the statutory excuses nor the COVID-19-related excuses created by the Emergency Plan include self-isolating due to a pandemic.  The existence of the Emergency Plan reflects Defendants' recognition that the risks of the COVID-19 pandemic will still loom large over the State's upcoming elections.  Yet, Defendants fail to provide any protection or accommodation for many thousands of voters—including many who are at heightened risk of complications from COVID-19 and/or live with individuals who are at increased risk—to vote absentee by mail-in ballot and thereby continue taking protective steps of remaining at home and observing strict social distancing, as current orders from the State instruct them to do.

96.     A failure to provide for a no-excuses regime during the COVID-19 pandemic will likely impose particularly severe burdens on the rights of certain categories of vulnerable individuals, including older voters, voters with underlying medical conditions and disabilities, and Black voters.

97.     Louisiana's current Excuse Requirement will disproportionately burden older voters, who face heightened risks from contracting COVID-19.  The CDC has warned that older individuals are at higher risk for severe illness and death from COVID-19, because "[t]he immune systems of older adults weaken with age, making it harder to fight off infections," and "older adults commonly have chronic diseases that can increase the risk of severe illness from COVID-19."[108] Thus, "the older you are, the higher your risk of serious disease."[109]

98.     The virus is already having a devastating impact on older individuals in Louisiana. Almost one-fifth of all COVID-19 cases reported in Louisiana (approximately 19%) involve

---

[108] CDC, *Groups at Higher Risk for Severe Illness* (webpage last updated Apr. 17, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.

[109] *Id.*

individuals aged 50–59, with another 17% involving individuals aged 60–69.[110]  Currently, only senior citizens over the age of 65 may request an absentee ballot based on age.[111]

99.    Louisiana's Excuse Requirement will also disproportionately burden voters with pre-existing health conditions, who face heightened risks from contracting COVID-19.  The CDC has warned that "people of any age who have serious underlying medical conditions might be at higher risk for severe illness from COVID-19."[112]  Louisiana ranks in the bottom five among states for both adult obesity,[113] and cardiovascular deaths,[114] two indicators of chronic health conditions.

100.    While one of the COVID-19-related excuses accounts for some immunocompromised voters, the plan only applies to the upcoming July and August elections; thus, these vulnerable voters will be at heightened risk during the November and December elections. Due to their medical condition, immunocompromised individuals face a greater risk of contracting the virus on the way to the polls.  If immunocompromised individuals contract the virus while voting in person, they are more likely to suffer serious and even deadly consequences.

101.    Louisiana's Excuse Requirement will also disproportionately burden Black voters, who face heightened risks from contracting COVID-19 because of social and economic disparities, as well as disparities in health and healthcare that raise the stakes for them at every step of the process.

---

[110] *See* La. Dep't of Pub. Health, Coronavirus (COVID-19) *supra* note 38.

[111] La. R.S. 18:1303(J).

[112] Ctrs. for Disease Control & Prevention (CDC), People Who Are at Higher Risk for Severe Illness, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited May 7, 2020).

[113] America Health Rankings, Obesity, https://www.americashealthrankings.org/explore/annual/measure/Obesity/state/LA (last visited May 7, 2020).

[114] America Health Rankings, CVD Deaths, https://www.americashealthrankings.org/explore/annual/measure/CVDDeaths/state/LA (last visited May 7, 2020).

102.    Black voters also face a greater risk of contracting the virus on their way to the polls.  Black Americans are "least likely to own a car,"[115] and therefore more likely to have to rely on public or shared transportation to go to the polls.  In Louisiana, about one in six (15.8%) Black households lack access to a vehicle, compared to 4.7% white households.[116]

103.    If Black voters contract the virus while voting in person, they are more likely to suffer serious and even deadly consequences, because they disproportionately suffer from the underlying medical conditions that exacerbate the virus and because they are also more likely to be subject to inequalities in the health care system.

104.    These heightened risks, both individually and collectively, demonstrate that the Excuse Requirement imposes an especially severe burden on Black voters.  Racial disparities in serious illness and death due to COVID-19 are inextricably linked to a long history and ongoing patterns of racial discrimination against Black people in voting and ongoing and current racial disparities in education, employment, and health.

105.    Louisiana's failure to allow all eligible voters to vote by mail in the upcoming elections will also impose a heightened risk of contracting COVID-19 on voters who live with, care for, or work with individuals who have a heightened risk of contracting COVID-19; and all poll workers.  As the health data from states that have held in-person primaries indicate, requiring in-person voting during the pandemic is not a mere inconvenience: failing to treat the pandemic as an excuse, even after complete shelter-in-place policies have been lifted, can cost lives.

---

[115] Jamelle Bouie, *Why Coronavirus Is Killing African-Americans More Than Others*, N.Y. Times (Apr. 14, 2020), https://www.nytimes.com/2020/04/14/opinion/sunday/coronavirus-racism-african-americans.html.

[116] U.S. Census Bureau, 2010-2018 American Community Survey 1-Year Estimates: Selected Social Characteristics of the United States: Louisiana (2018), *supra* n.66.

106.    Louisiana's current excuse-required regime is unduly burdensome because the refusal to allow all Louisianans to vote absentee by mail in response to the pandemic cannot be justified by any legitimate state interest.  Voters should not have to make the untenable decision between risking their health and giving up their right to vote.

**B.    The Witness Requirements Will Severely Burden the Right to Vote**

107.    The requirements that an absentee mail-in ballot and an absentee ballot application certified by a mark (as opposed to a signature) include witness signatures (the "Witness Requirements") present significant health risks during the COVID-19 pandemic and will severely burden voters who live alone and have no access to a witness who can sign their absentee ballot request application or their ballot.

108.    In line with the guidance provided by the CDC and public health and medical experts to reduce the spread of the novel coronavirus, Louisiana's current Stay-at-Home order instructs all Louisiana residents to shelter at home and limits movement outside of their homes beyond essential needs. The Governor's order further instructs that residents should maintain at least 6 feet of distance from others when outside their homes.  If required to secure a witness signature, the Witness Requirements will force voters who live alone or do not live with another adult who can witness their ballot to not only violate the Stay-at-Home order, but also risk their health and safety.

109.    Given that approximately 15% (or 532,678 individuals) of the 3,560,000 Louisiana residents of voting age live alone, and that individuals of any age are susceptible to COVID-19

infection, the Witness Requirements will pose a serious risk to and material burden on a significant number of the State's voters.[117]

110.    Indeed, there will also be voters for whom the burden of the Witness Requirements will be amplified given that they already face a disproportionate risk of infection and death from COVID-19, including voters with underlying medical conditions and disabilities, older voters, and Black voters.  For Louisiana residents of voting age living alone, 27.5% are disabled, and for those who are 65 years old and older living alone, 44% are disabled.[118]  The Witness Requirements put older voters at particular risk.  As explained above, older individuals face heightened risks from contracting COVID-19, and they are more likely to suffer serious and even deadly consequences. Of those Louisiana residents who live alone, 35.8% are over 65 years-of-age.

111.    In addition to the devastating and disproportionate impact that COVID-19 has had on Black people in Louisiana, *see supra* ¶¶ 53–59, they face several compounding factors that heightens the burden of the Witness Requirement.  According to the 2018 ACS 1-Year Estimates, Black people make up 32% of Louisiana's population, yet at the same time, 18.1% of Black people of voting age in Louisiana live alone, compared to 14.9% of whites of voting age, and 29.8% of Black people who are 65 and older live alone, compared to 27.1% of whites who are 65 and older.[119]

112.    The Witness Requirements, which the Emergency Plan preserve, will therefore likely prevent many Louisianans who might otherwise cast absentee ballots from doing so this year.  In effect, the Witness Requirements defeat the purpose of the expanded COVID-19-related

---

[117] U.S. Census Bureau, 2010-2018 American Community Survey 1-Year Estimates: *Selected Social Characteristics of the United States: Louisiana* (2018), *supra* n.66.

[118] *Id.*

[119] *Id.*

excuses included in the Emergency Plan.  Even if the Emergency Plan excuses expand eligibility

to vote by absentee ballot to some additional categories of voters, maintaining the requirement that

those voters must obtain a witness signature in order to vote by absentee ballot will still potentially

expose them to the risks posed by COVID-19.

### C.    The Failure to Expand Early Voting for the General and Runoff Elections Unreasonably Increases the Risks of COVID-19 Infection and Severely Burdens the Right to Vote

113.    In light of public health officials' assurances that the United States will likely have

a second wave of the coronavirus in the fall even if the pandemic subsides this summer,

Louisiana's failure to expand the early voting period for the November and December elections

will severely burden the fundamental right of all eligible voters.

114.    Medical experts, including Dr. Fauci, have stated that is likely that the COVID-19

pandemic will continue into the fall, [120] requiring social distancing guidelines to remain in effect.[121]

For in-person voters, early voting can help make social distancing effective and reduce the risk of

crowds gathering at polling places.

115.    Defendants recognized as much by extending early voting for the July Primary and

August Municipal elections in the Emergency Plan.  Their failure to do so for the November

General and December Runoff elections is an unreasonable burden on Louisiana voters.

---

[120] Jason Silverstein, *Fauci says he "can't guarantee" in-person voting in November will be safe*, CBS News (Apr. 13, 2020), *supra* n.34.

[121] CDC, Coronavirus Disease 2019 (COVID-19): *How Coronavirus Spreads, supra* n. 19.

## COUNT I

**Violations of the Fundamental Right to Vote
under the First and Fourteenth Amendments to the U.S. Constitution (42 U.S.C. § 1983)**

116.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the Counts below as though fully set forth herein.

117.    The First and Fourteenth Amendments of the U.S. Constitution protect the fundamental right to vote.  Under the *Anderson-Burdick* doctrine, a court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the First and Fourteenth Amendment rights that the plaintiff seeks to vindicate against the precise interests put forward by the State as justification for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights. *See Burdick v. Takushi,* 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

118.    Under the circumstances brought about by COVID-19, Defendants' enforcement of the Excuse Requirement will impose a severe and undue burden on the fundamental right to vote of Louisiana voters.  This requirement limits eligibility for absentee voting to a narrow category of voters and will likely prevent many thousands of otherwise eligible voters from casting effective ballots, placing a disproportionate burden on voters with underlying medical conditions and disabilities, older voters, and Black voters.

119.    Despite Louisiana's adoption of the Emergency Plan, the burden imposed by the Excuse Requirement persists for a significant number of voters in the July Primary and August Municipal elections, and for all voters in the November and December elections.  Even under the

Emergency Plan many voters will be forced to choose between risking their lives and the lives of others or not exercising their right to vote at all.

120.    Under the circumstances brought about by COVID-19, Defendants' enforcement of the Witness Requirements will impose a severe and undue burden the fundamental right to vote of Louisiana voters.  These requirements force voters to subject themselves to significant health risks and will likely prevent many thousands of eligible voters from casting effective ballots, placing disproportionate burdens on voters with underlying medical conditions and disabilities, older voters, and Black voters.

121.    Despite Louisiana's adoption of the Emergency Plan, the Ballot Witness Requirement will persist for all voters casting an absentee ballot in the July Primary and August Municipal elections, and for all voters in the November and December elections.  The Application Witness Requirement persists for all voters who must mark (as oppose to sign) their request to vote by absentee ballot in all upcoming elections in Louisiana.  By failing to waive these requirements Louisiana is forcing voters to choose between breaking social distancing rules and risking their lives and the lives of others, or not voting at all.

122.    Under the circumstances brought about by COVID-19, Defendants' failure to extend early voting for the November General and December Runoff elections will impose a severe and undue burden on the fundamental right to vote of Louisiana voters.  The lack of additional days of early voting forces voters to subject themselves to significant health risks and will likely prevent many thousands of eligible voters from casting effective ballots, placing disproportionate burdens on voters with underlying medical conditions and disabilities, older voters, and Black voters.

123.    Defendants' stated interest in protecting the integrity of elections is a valid governmental interest, but it is not advanced by the Excuse Requirement, the Witness Requirements, or the failure to expand early voting, nor does the interest outweigh or justify the undue burdens imposed on the fundamental right to vote, especially in the context of the global COVID-19 pandemic.

## COUNT II

### Violations of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301

124.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the Count below as though fully set forth herein.

125.    Section 2 of the Voting Rights Act prohibits Defendants from imposing, applying, or maintaining any "qualification or prerequisite to voting or standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a).

126.    "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and [nonblack] voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).

127.    Section 2 vote-denial claims have two elements.  First, "[t]he challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." Second, "[t]hat burden must in part be caused by or linked to social and historical conditions that

have or currently produce discrimination against members of the protected class." *Veasey v Abbott*, 830 F.3d 216, 244 (5th Cir. 2016), *cert. denied*, 137 S. Ct. 612 (2017).

128.    The Witness Requirement, the Excuse Requirement, and the failure to expand the early voting period for the November and December 2020 elections (collectively "the Challenged Provisions"), will result in the denial or abridgment of the right to vote for Black voters in Louisiana.

129.    The Challenged Provisions, if not enjoined, will independently and collectively, impose a discriminatory burden on Black voters in Louisiana.

130.    Because Black people in Louisiana continue to bear the effects of discrimination in areas such as education, employment, and health status, they are particularly at risk of infection from COVID-19 if forced to vote in person, and thus, disproportionately burdened by the Excuse Requirement.

131.    Because Black people in Louisiana continue to bear the effects of discrimination in areas such as education, employment, and health status, they are particularly at risk of infection from COVID-19 if required to obtain a witness signature on an absentee ballot, and thus, disproportionately burdened by the Witness Requirements.

132.    Because Black people in Louisiana continue to bear the effects of discrimination in areas such as education, employment, and health status, they are particularly at risk of infection from COVID-19 if they vote in person, and thus, disproportionately burdened by the failure to expand the early voting period for the November and December 2020 elections.

133.    The discriminatory burdens imposed by the Challenged Provisions affect Black voters disparately because they interact with social and historical conditions that have produced or

currently produce discrimination against Black people in Louisiana causing an inequality in the opportunities to elect their preferred representatives.

134.    Under the totality of the circumstances, the Challenged Provisions deny or abridge the rights of Black voters in Louisiana because the State has an established and judicially recognized history of official voting-related discrimination; Louisiana also has an extensive and judicially recognized history of racially polarized voting; and Black people in Louisiana continue to bear the effects of discrimination in areas such as education, employment, and health status, which hinder their ability to participate effectively in the political process.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A. Declare that Defendants' enforcement of the Excuse Requirement for all elections taking place for the duration of the COVID-19 pandemic in Louisiana violates the First and Fourteenth Amendments of the U.S. Constitution and the Voting Rights Act;

B. Declare that Defendants' enforcement of the Witness Requirements for all elections taking place for the duration of COVID-19 pandemic in Louisiana violates the First and Fourteenth Amendments of the U.S. Constitution and the Voting Rights Act;

C. Declare that Defendants' failure to extend the early voting period during all elections taking place in Louisiana for the duration of the COVID-19 pandemic violates the First and Fourteenth Amendments of the U.S. Constitution and the Voting Rights Act;

D. Preliminarily and permanently enjoin Defendants from enforcing the Excuse Requirement for all eligible voters during all elections taking place in Louisiana in 2020;

E. Preliminarily and permanently enjoin Defendants from enforcing the Witness Requirements for all voters during all elections taking place in Louisiana in 2020;

F.  Preliminarily and permanently order Defendants to extend the early voting period to fourteen days during all elections taking place in Louisiana in November and December 2020;

G.  Preliminarily and permanently order Defendants to issue guidance instructing all local parish election officials, including registrars of voters, clerks of court, parish boards of election supervisors, and parish governing officials who perform election-related duties to issue absentee mail-in ballots to any eligible voter who requests one without requiring an excuse for all Louisiana elections in 2020;

H.  Preliminarily and permanently order Defendants to issue guidance instructing all local parish election officials, including registrars of voters, clerks of court, parish boards of election supervisors, and parish governing officials who perform election-related duties to count otherwise validly cast absentee ballots that are missing a witness signature for all Louisiana elections in 2020;

I.  Preliminarily and permanently order Defendants to issue guidance instructing all local parish election officials, including registrars of voters, clerks of court, parish boards of election supervisors, and parish governing officials who perform election-related duties to accept otherwise valid applications for an absentee by mail ballots that are missing a witness signature for all Louisiana elections in 2020;

J.  Award Plaintiffs their costs, expenses, and reasonable attorneys' fees; and

K.  Grant such other and further relief as this Court deems just and proper in the circumstances.

DATED this 7th day of May 2020.                    Respectfully submitted,


John Z. Morris*                          /s/ Ronald L. Wilson
NAACP Legal Defense &                   Ronald L. Wilson, (LSBN 13575)
   Educational Fund, Inc.               701 Poydras Street, Suite 4100
40 Rector Street, 5th Floor              New Orleans, LA 70139
New York, NY 10006                       Tel.: (504) 525-4361
Tel.: (212) 965-2200                     cabral2@aol.com
zmorris@naacpldf.org

Catherine Meza*                          Robert D. Fram*
NAACP Legal Defense &                    Morgan Lewis*
   Educational Fund, Inc.              Joshua González*
700 14th Street, NW, Suite 600           John Fraser*
Washington, D.C. 20005                   Covington & Burling LLP
Tel.: (202) 682-1300                     One Front Street
cmeza@naacpldf.org                       San Francisco, CA 94111-5356
                                         Tel: (415) 591-6000
                                         rfram@cov.com
                                         MELewis@cov.com
                                         jgonzalez@cov.com
                                         JFraser@cov.com

                                         * *Pro Hac Vice* Motions forthcoming

                                         ***Attorneys for Plaintiffs***