# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

POWER COALITION FOR EQUITY AND JUSTICE;
LOUISIANA STATE CONFERENCE OF THE
NAACP; JANE CHANDLER, JENNIFER HARDING,
EDITH GEE JONES, and JASMINE POGUE

*Plaintiffs*,

v.

JOHN BEL EDWARDS, in his official capacity as
Governor of Louisiana; KYLE ARDOIN, in his official
capacity as Secretary of State of Louisiana; STEVE
RABORN, in his official capacity as East Baton Rouge
Parish Registrar of Voters and Member of the Parish
Board of Election Supervisors; and SANDRA L.
WILSON, in her official capacity as Orleans Parish
Registrar of Voters and Member of the Parish Board of
Election Supervisors.

*Defendants*.

Case. No. 3:20-cv-00283
BAJ-EWD

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
# MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... ii

I.    INTRODUCTION ........................................................................................... 1

II.   FACTUAL BACKGROUND ........................................................................... 2

      A.    The Impact of the COVID-19 Pandemic .............................................. 2

            1.    The COVID-19 Pandemic in Louisiana ...................................... 5

            2.    COVID-19's Disproportionate Impact on Black People in
                  Louisiana ................................................................................... 7

            3.    The COVID-19 Pandemic and Voting ....................................... 10

      B.    Louisiana's Absentee-By-Mail Ballot Requirements ......................... 14

            1.    The Excuse Requirement ........................................................... 14

            2.    The Witness Requirements ......................................................... 15

            3.    Penalties Related to Enforcement of the Absentee Ballot Excuse
                  Requirement and Witness Requirements ................................... 16

            4.    The Absentee Ballot Review and Counting Process ................. 17

      C.    The Emergency Election Plan ............................................................ 18

III.  ARGUMENT ................................................................................................ 23

      A.    Plaintiffs are Likely to Succeed on the Merits of Their Constitutional
            Claims Against the Excuse Requirement and the Witness Requirements. .......... 23

            1.    The Excuse Requirement Imposes a Severe and Undue Burden on
                  the Right to Vote in Light of the COVID-19 Pandemic. ........................ 26

            2.    The Witness Requirements Imposes a Severe and Undue Burden
                  the Right to Vote in Light of the COVID-19 Pandemic. ........................ 31

      B.    Plaintiffs Will Suffer Irreparable Harm if an Injunction is Not Granted .............. 36

      C.    The Balance of Hardships and the Public Interest Favor a Preliminary
            Injunction. ....................................................................................... 39

IV.   CONCLUSION ............................................................................................. 41

i

**TABLE OF AUTHORITIES**

**Cases**

*Anderson v. Celebrezze*,
  460 U.S. 780 (1983) ............................................................................ 24
*Burdick v. Takushi*,
  504 U.S. 428 (1992) ............................................................................ 24
*Christian Legal Soc'y v. Walker*,
  453 F.3d 853 (7th Cir. 2006) ............................................................. 37
*Common Cause Ga. v. Kemp*,
  347 F. Supp. 3d 1270 (N.D. Ga. 2018) ............................................. 38
*Common Cause Ind. v. Lawson*,
  327 F. Supp. 3d 1139 (S.D. Ind. 2018) ............................................ 38
*Crawford v. Marion Cty. Election Bd.*,
  553 U.S. 181 (2008) ...................................................................... 24, 29
*Daniels Health Scis., LLC v. Vascular Health Scis., LLC*,
  710 F.3d 579 (5th Cir. 2013) ............................................................. 23
*Diretto v. Country Inn & Suites by Carlson*,
  No. 16-cv-1037, 2016 WL 4400498 (E.D. Va. Aug. 18, 2016) ............. 40
*Elrod v. Burns*,
  427 U.S. 347, 373 (1976) ............................................................. 37, 39
*Esshaki v. Whitmer*,
  No. 2:20-cv-10831-TGB, 2020 WL 1910154 (E.D. Mich. Apr. 20, 2020) ............ 25
*Fla. Democratic Party v. Scott*,
  215 F. Supp. 3d 1250 (N.D. Fla. 2016) ............................................ 25
*G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*,
  23 F.3d 1071 (6th Cir. 1994) ............................................................. 40
*Ga. Coal. for the People's Agenda, Inc. v. Deal*,
  214 F. Supp. 3d 1344 (S.D. Ga. 2016) ......................................... 25, 41
*Garbett v. Herbert*,
  No. 2:20-cv-245-RJS, 2020 WL 2064101 (D. Utah Apr. 29, 2020) ....... 24
*Giovani Carandola, Ltd. v. Bason*,
  303 F.3d 507 (4th Cir. 2002) ............................................................. 41
*Homans v. Albuquerque*,
  264 F.3d 1240 (10th Cir.2001) .......................................................... 39
*Hoover v. Morales*,
  164 F. 3d 221 (5th Cir. 1998) ............................................................ 23
*Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*,
  804 F.2d 1390 (5th Cir.1986) ............................................................ 36
*Jackson Women's Health Org. v. Currier*,
  760 F. 3d 448 (5th Cir. 2014) ............................................................ 23
*LAJIM, LLC v. Gen. Elec. Co.*,
  917 F.3d 933 (7th Cir. 2019) ............................................................. 38
*League of Women Voters of Fla. v. Browning*,
  863 F. Supp. 2d 1155 (N.D. Fla. 2012) ............................................ 40

*League of Women Voters of Fla., Inc., v. Detzner*,
   314 F. Supp. 3d 1205 (N.D. Fla. 2018) ................................................................. 40
*League of Women Voters of N. Carolina v. N. Carolina*,
   769 F.3d 224 (4th Cir. 2014) ................................................................................. 37
*League of Women Voters of Okla. v. Ziriax*,
   No. 118765, 2020 WL 2111348 (Okla. May 4, 2020) ........................................... 36
*League of Women Voters of Va. v. Va. State Bd. Of Elec.*,
   No. 6:20-cv-0024, _F. Supp. 3d _, 2020 WL 2158249 (W.D. Va. May 5, 2020) .. 24, 31, 34, 35
*Libertarian Party of Ill. v. Pritzker*,
   No. 20-cv-2112, 2020 WL 1951687 (N.D. Ill. Apr. 23, 2020) ................................ 24
*N.C. State Conf. of NAACP v. Cooper*,
   No. 1:18-cv-1034, _F. Supp. 3d _, 2019 WL 7372980 (M.D.N.C. Dec. 31, 2019) ................. 38
*Newsom v. Albemarle Cty. Sch. Bd.*,
   354 F.3d 249 (4th Cir.2003) ................................................................................. 40
*Norman v. Reed*,
   502 U.S. 279 (1992) .............................................................................................. 24
*Northeast Ohio Coalition for the Homeless v. Husted*,
   837 F.3d 612 (6th Cir. 2016) ................................................................................. 36
*Obama for Am. v. Husted*,
   697 F.3d 423 (6th Cir. 2012) ............................................................................. 37, 40
*OCA Greater Houston v. Texas*,
   No. 1:15-CV-679-RP, 2016 WL 4597636 (W.D. Tex. Sept. 2, 2016) .................... 37
*Opulent Life Church v. City of Holly Springs*, Miss.,
   697 F.3d 279 (5th Cir. 2012) ................................................................................. 36
*Pashby v. Delia*,
   709 F.3d 307 (4th Cir. 2013) ................................................................................. 40
*Price v. N.Y. State Bd. of Elections*,
   540 F.3d 101 (2d Cir. 2008) .................................................................................. 31
*Reynolds v. Sims*,
   377 U.S. 533 (1964) .............................................................................................. 37
*Taylor v. Louisiana.*,
   419 U.S. 522 (1975) .............................................................................................. 41
*Texans for Free Enter. v. Tex. Ethics Comm'n*,
   732 F.3d 535 (5th Cir. 2013) ................................................................................. 39
*Texas Democratic Party v. Abbott.*,
   No. SA-20-CA-438-FB, 2020 WL 2541971 (W.D. Tex. May 19, 2020) ................. 24
*Texas Indep. Party v. Kirk*,
   84 F.3d 178 (5th Cir. 1996) .......................................................................... 24, 29, 34
*Thakker v. Doll*,
   No. 1:20-cv-480, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020) ............................ 38
*United States v. Georgia*,
   892 F. Supp. 2d 1367 (N.D. Ga. 2012) ................................................................. 41
*Wash. St. Tammany Elec. Coop. v. La. Generating*,
   No. 08-430-JJB-DLD, 2008 U.S. Dist. LEXIS 135876 (M.D. La. July 30, 2008) .................. 23
*Williams v. Salerno*,
   792 F.2d 323 (2d Cir.1986) .................................................................................. 37

*Winter v. Nat'l Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ................................................................................ 39
*Yick Wo v. Hopkins*,
   118 U.S. 356 (1886) ............................................................................ 37

**Statutes**

La. R.S.  1306(E)(2)(b) .......................................................................... 35
La. R.S. 1308(B)-(C) .............................................................................. 35
La. R.S. 18:1303 .......................................................................... 2, 16, 41
La. R.S. 18:1303(B) ............................................................................... 15
La. R.S. 18:1303(C)–(G) ....................................................................... 15
La. R.S. 18:1303(D) ............................................................................... 15
La. R.S. 18:1303(I) ................................................................................ 15
La. R.S. 18:1303(J) ............................................................................... 15
La. R.S. 18:1306(D) ............................................................................... 16
La. R.S. 18:1306(D)-(E) ........................................................................ 35
La. R.S. 18:1306(E) ............................................................................... 17
La. R.S. 18:1306(E)(2)(a) ................................................................ 15, 17
La. R.S. 18:1306(E)(2)(b) ..................................................................... 16
La. R.S. 18:1306(E)(2)(a) .................................................................. 2, 41
La. R.S. 18:1307 .............................................................................. 2, 15
La. R.S. 18:1307(I) ................................................................................ 16
La. R.S. 18:1307A(2)–(B) ..................................................................... 15
La. R.S. 18:1308 ................................................................................... 14
La. R.S. 18:1308(B) ............................................................................... 17
La. R.S. 18:1308(C) ............................................................................... 17
La. R.S. 18:1311(C) ............................................................................... 18
La. R.S. 18:1313(A) ............................................................................... 17
La. R.S. 18:1313(F) ............................................................................... 17
La. R.S. 18:1313(F)(2) ........................................................................... 18
La. R.S. 18:1313(F)(5) ........................................................................... 18
La. R.S. 18:1313(F)(6) ........................................................................... 18
La. R.S. 18:401.3 ............................................................................ 18, 19

## I.    INTRODUCTION

Plaintiffs Power Coalition for Equity and Justice ("PCEJ"), Louisiana State Conference of the NAACP ("Louisiana NAACP"), Jane Chandler, Jennifer Harding, Edith Gee Jones, and Jasmine Pogue (collectively "Plaintiffs") respectfully submit this Memorandum of Law in support of their Motion, pursuant to Federal Rule of Civil Procedure 65, for a preliminary injunction directing Defendants John Bel Edwards, in his official capacity as Governor of Louisiana, Kyle Ardoin, in his official capacity as Secretary of State of Louisiana, Steve Raborn, in his official capacity as East Baton Rouge Parish Registrar of Voters and Member of the Parish Board of Election Supervisors, and Sandra L. Wilson, in her official capacity as Orleans Parish Registrar of Voters and Member of the Parish Board of Election Supervisors (collectively "Defendants"), to take immediate action to remove the barriers that place undue burdens on Louisianans' fundamental right to vote in connection with the July 11, 2020 Primary and August 15, 2020 Municipal Elections.

The COVID-19 pandemic has led to unprecedented crises throughout the country.  To date, the virus has infected over a million people in the U.S.  Louisiana has been particularly hard hit with 35,000 reported COVID-19 cases and over 2,400 reported deaths during the past three months.

In early March, in response to the spread of COVID-19, Governor Edwards declared a state of emergency in Louisiana and took a number of steps, including banning public gatherings, closing public schools, and closing "non-essential" businesses, that led up to a statewide Stay-at-Home order directing all Louisiana residents to stay home unless performing an essential activity and follow social distancing protocols.

In light of the need for social distancing to reduce the risk of COVID-19 transmission, multiple provisions of Louisiana law will impose severe and undue burdens on the right to vote

during the 2020 July Primary Election and August Municipal Election, including: (1) the requirement that a voter must qualify under a limited list of excuses in order to be eligible to vote through absentee ballot, La. R.S. 18:1303 (the "Excuse Requirement"); (2) the requirement that a voter sign an absentee by mail ballot certificate in the presence of a witness and also obtain the signature of the witness on the ballot, La. R.S. 18:1306E(2)(a) (the "Ballot Witness Requirement"); and (3) the requirement that absentee ballot applications certified with a mark also be signed by a witness, La. R.S. 18:1307 (the "Application Witness Requirement"; together with the "Ballot Witness Requirement" the "Witness Requirements").

In the context of COVID-19, these restrictive voting requirements will severely and unduly burden Plaintiffs' fundamental right to vote in violation of the First and Fourteenth Amendments. Unless the Excuse Requirement and Witness Requirements are soon enjoined, Plaintiffs will be forced to choose between either losing their right to vote to avoid virus exposure, on the one hand, or exercising their right to vote at risk to their personal safety and the public health, on the other. This scenario presents an unconstitutional threat to the protected rights of all Louisiana voters.

## II.    FACTUAL BACKGROUND

### A.    The Impact of the COVID-19 Pandemic

As this Court is aware, COVID-19 is now a global pandemic. The virus is highly infectious and leads to serious and sometimes deadly complications. As of May 21, 2020, the Centers for Disease Control and Prevention (the "CDC") estimate that there are 1,528,235 total cases of COVID-19 in the United States, resulting in more than 91,644 confirmed deaths.[1]  According to

---

[1] *See* Ctrs. for Disease Control & Prevention ("CDC"), Coronavirus Disease 2019 (COVID-19): *Cases in the U.S.*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html, (last visited May 21, 2020).

experts, even this figure substantially undercounts the virus's actual reach.[2]  There is no vaccine, and no certainty of when one will be available.  Decl. of Dr. Arthur L. Reingold ¶¶ 16-17 (hereinafter "Reingold Decl." attached as Ex. 1).  Further, there is no evidence that those who develop an immune response to the virus after an infection—known as antibodies—are safe from reinfection, nor is there sufficient data about how long any immunity to the virus would last. Reingold Decl. ¶ 12.

COVID-19 is extremely contagious; it spreads from person to person through respiratory droplets via coughing and sneezing, close personal contact, and contact with contaminated surfaces and objects.[3]  *Id*. ¶ 8.  The coronavirus can lead to dangerous symptoms and complications.  *Id*. ¶ 7.  The virus can cause severe damage to the lungs, brain, heart, liver, kidneys, and other organs, sometimes leading to permanent loss of respiratory capacity, cardiovascular disease, strokes, seizures, and other ailments.  *Id*. ¶ 7.  Persons of any age are at risk of developing severe and life-threatening complications.  *Id*. ¶ 11.  And while the risks for severe or deadly symptoms increase with each decade of a person's life, *Id*. ¶ 11, data from the CDC show that as of March, half of those people in the United States who were in intensive care because of the coronavirus were under the age of 65.[4]  *Id*. ¶ 11.

---

[2] Emma Brown et al., *U.S. deaths soared in early weeks of pandemic, far exceeding number attributed to COVID-19,* Washington Post (Apr. 27, 2020), https://www.washingtonpost.com/investigations/2020/04/27/covid-19-death-toll-undercounted/?arc404=true.

[3] *See* CDC, Coronavirus Disease 2019 (COVID-19): *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html, (last visited May 1, 2020).

The World Health Organization ("WHO") suggests the COVID-19 virus can survive "for up to 72 hours on plastic and stainless steel," up to "4 hours on copper," and up to 24 hours on cardboard." WHO, *Q&A On Coronaviruses (COVID-19)*, World Health Org. (Apr. 17, 2020), https://www.who.int/news-room/q-a-detail/q-a-coronaviruses.

[4] *See* Lisa Lockerd Maragakis, M.D., M.P.H., *Coronavirus and COVID-19: Younger Adults Are at Risk, Too*, Johns Hopkins Med., https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-and-covid-19-younger-adults-are-at-risk-too, (last visited Apr. 24, 2020).

As Dr. Reingold testifies, "[d]ue to the ease of transmission, the high risk to certain parts of the population, and the fact that [the virus] will continue to surge unless and until widespread vaccination and/or herd immunity is achieved, individuals will need to continue to take steps to prevent infection." *Id.* ¶ 23. It is unlikely that an FDA-approved vaccine will be available before the summer or fall of 2021; and further, because there is currently no vaccine, there has been no confirmation that those who have the virus develop immunity, and the vast majority of the population remains susceptible, it is unlikely that herd immunity will help to prevent the spread of the virus any time in the near future. *Id.* ¶ ¶ 17, 19.

Among the only currently available effective measures to mitigate the spread of COVID-19 are self-isolation, social distancing, wearing a face mask, frequent hand washing with soap and warm water, using hand sanitizer, and cleaning shared surfaces and objects. *Id.* ¶ 16. Self-isolation and social distancing measures—maintaining at least six feet between persons—are aimed at keeping infected individuals far enough from other individuals that they are unlikely to transmit the virus to others. *Id.* ¶ 16. Social distancing is so important to preventing the spread of COVID-19 that stay-at-home orders and similar guidelines have been implemented in over 42 states and the District of Columbia at some point during the surge of the virus.[5] In total, over 95% of the United States population was at one time under instruction to stay home.[6]

Fatalities related to COVID-19 are expected to continue through the summer months even if appropriate preventive measures remain in place. *Id.* ¶ 18. There will likely be a resurgence in

---

[5] *See* Sarah Mervosh, et al., *Which States and Cities have Told Residents to Stay at Home*, N.Y. Times (last updated Apr. 20, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-stay-at-home-order.html.

[6] Jack Brewster, *Americans Overwhelmingly Support Stay-At-Home Restrictions*, New Poll Finds, Forbes (Apr. 22, 2020), https://www.forbes.com/sites/jackbrewster/2020/04/22/americans-overwhelmingly-support-stay-at-home-restrictions-new-poll-finds.

number of COVID-19 cases and deaths as states, like Louisiana, begin to roll back protective measures and if social distancing guidelines are not followed.  *Id*. ¶ 22.

### 1.    The COVID-19 Pandemic in Louisiana

COVID-19 has had an outsized impact on the state of Louisiana.  Louisiana's current death rate from the virus is, per capita, the sixth highest in the fifty states and U.S. territories[7]  As of May 21, 2020, over 35,000 cases have been reported in Louisiana and over 2,400 Louisianans had died from COVID-19.[8]

On March 11, 2020 Governor John Bel Edwards declared a State of Emergency.[9] According to the Governor, this step was essential to "slow the spread [of the virus] so we don't overwhelm our capacity for healthcare."[10]  Among other things, the declaration imposed limits on the travel of state employees and empowered state agencies "to thoroughly prepare for any eventuality related to public health needs and deploy additional resources to assist local authorities."[11]

---

[7] *Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. Times (last updated May 21, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html#states

[8] La. Dep't of Health, *Coronavirus (COVID-19)*, http://ldh.la.gov/Coronavirus/ (last visited May 21, 2020).

[9] La. Exec. Dep't Proclamation No. 25 JBE 2020 (Mar. 11, 2020), https://gov.louisiana.gov/assets/ExecutiveOrders/25-JBE-2020-COVID-19.pdf.

[10] Greg Hilburn, *Louisiana's Coronavirus Death Toll Rises to 46; Governor Implores Residents to Stay Home*, New Star (Mar. 24, 2020), https://www.thenewsstar.com/story/news/2020/03/24/louisiana-coronavirus-death-toll-rises-46-stay-home-governor-says/2906648001/.

[11] La. Exec. Dep't Proclamation No. 25 JBE 2020 (Mar. 11, 2020), https://gov.louisiana.gov/assets/ExecutiveOrders/25-JBE-2020-COVID-19.pdf.

On March 12, Governor Edwards closed all public schools through April 13,[12] which he later extended to the remainder of the academic year.[13]  On March 16, Governor Edwards closed or limited the operations of certain, "non-essential" businesses,[14] a list which he expanded on March 22.[15]

Recognizing that despite having taken "aggressive measures to mitigate the spread of COVID-19 and flatten the curve," the actions already taken had not been enough, on March 22 Governor Edwards issued a statewide Stay-at-Home order banning public gatherings of more than 10 individuals and directing all Louisianans to remain at home unless engaging in an "essential activity."[16]  On April 30, the Governor extended the Stay-at-Home order until May 15 in order to continue to slow the spread of the disease.[17]

On March 13, after Secretary of State Ardoin certified to the Governor that the State of Emergency would impact upcoming elections, the Governor issued an executive order postponing the April 4 Presidential Preference Primary Election and the May 9 Municipal General Election to

---

[12] La. Exec. Dep't Proclamation No. JBE 2020-27 (Mar. 13, 2020), https://gov.louisiana.gov/assets/ExecutiveOrders/27-JBE-2020-COVID-19.pdf.

[13] La. Exec. Dep't Proclamation No. 47 JBE 2020 (Apr. 15, 2020), https://gov.louisiana.gov/assets/Proclamations/2020/modified/47-JBE-2020-Public-Health-Emergency-COVID-19-Education.pdf.

[14] La. Exec. Dep't Proclamation No. JBE 2020-30 (Mar. 16, 2020), https://gov.louisiana.gov/assets/Proclamations/2020/modified/30-JBE-2020-Public-Health-Emergency-COVID-19.pdf.

[15] La. Exec. Dep't Proclamation No. JBE 33 2020 (Mar. 22, 2020), https://gov.louisiana.gov/assets/Proclamations/2020/JBE-33-2020.pdf.

[16] *Id.*; Press Release Office of the Governor, *Gov. Edwards Issues Statewide Stay at Home Order to Further Fight the Spread of COVID-19 in Louisiana* (Mar. 22, 2020), https://gov.louisiana.gov/order/.

[17] La. Exec. Dep't Proclamation 52 JBE 2020 (Apr. 30, 2020), https://gov.louisiana.gov/assets/Proclamations/2020/52-JBE-20-Stay-at-Home-Order.pdf; *see also* Press Release, Office of the Governor, *Gov. Edwards Will Extend Stay at Home Order Until May 15 to Continue Flattening the Curve and Slowing the Spread of COVID-19* (Apr. 27, 2020), https://gov.louisiana.gov/home-order-extended-may15/.

June 20 and July 25, respectively.[18]  Following this same process, the elections were postponed a second time on April 14.  As of today, the Presidential Preference Primary Election will occur on July 11, 2020 ("the July election"), and the Municipal General Election will take place August 15, 2020 ("the August election").

On May 15, the Governor issued an order stating that the State would remain in a state of emergency and a statewide public health emergency as it enters phase one of lifting the Stay-at-Home order.[19]  The order instructs Louisianans to "stay at home as much as possible to avoid unnecessary exposure to COVID-19," and orders individuals who are at higher risk from severe illness from COVID-19 to stay at home, unless travelling outside the home for an essential activity, such as obtaining food or medicine.[20]  Under the phase one order, certain businesses, including restaurants, salons and barbershops, and shopping malls will be allowed to open with strict social distancing and enhanced sanitation in place; however, businesses deemed nonessential, such as amusement parks and entertainment venues, will remained closed.[21]

## 2.    COVID-19's Disproportionate Impact on Black People in Louisiana

The COVID-19 pandemic has had a devastating and disproportionate impact on Black people throughout the country.[22]  Decl. of Dr. Camara P. Jones ¶ 24 (hereinafter "Jones Decl." attached as Exhibit 2).  As of May 21, demographic data reported by the CDC on the number of

---

[18] La. Exec. Dep't Proclamation No. 28 JBE 2020 (Mar. 13, 2020), https://gov.louisiana.gov/assets/Proclamations/2020/modified/28-JBE-2020-Special-Elections-COVID19-Postponement.pdf.

[19] La. Exec. Dep't Proclamation No. 58 JBE 2020 (May, 15, 2020), https://gov.louisiana.gov/assets/Proclamations/2020/58-JBE-2020.pdf

[20] *Id*.

[21] *Id.*

[22] Reis Thebault, et al., *The coronavirus is infecting and killing black Americans at an alarmingly high rate*, Washington Post (Apr. 7, 2020), https://www.washingtonpost.com/nation/2020/04/07/coronavirus-is-infecting-killing-black-americans-an-alarmingly-high-rate-post-analysis-shows/?arc404=true&itid=lk_inline_manual_3

COVID-19 cases for which race was available nationwide (48.1% of the 1.2 million cases analyzed) showed that Black people make up 27% of the reported COVID-19 cases although they only make up 13% of the total U.S. population.[23]

The stark racial disparities in rates of COVID-19 infections and deaths have been particularly acute in Louisiana. Jones Decl. ¶ 25. Data reported by the Louisiana Department of Health indicates that Black Louisianans are dying from COVID-19 at disproportionately higher rates, making up 32% of the total population of the state but over 55% of coronavirus deaths.[24] Reingold Decl. ¶ 11; *see also*, Decl. of William S. Cooper (hereinafter "Cooper Decl." attached as Exhibit 3), Exhibit A-2 p. 1.

The disproportionate impact of the COVID-19 pandemic on the Black community, including the disparate death rates, reflects longstanding and systemic discrimination and socioeconomic inequities in Louisiana that have made Black people more susceptible to the virus's risks. Jones Decl. ¶¶ 24-31. According to the most recent data from the American Community Survey, in Louisiana nearly one third (30.1%) of Black residents live in poverty compared to 12.2% of white residents; the unemployment rate is 9.9% for Black residents compared to 4.5% for white residents; per capita income for Black residents is $17,491 compared to $33,856 for white residents; nearly one-fifth (19%) of Black residents have not completed high school compared to 10.8% of white residents; and for Black residents ages 25 and over, only 15.2% have a bachelor's degree or higher compared to 28.5% of white residents ages 25 and older. Cooper Decl. ¶¶ 15-16.

---

[23] CDC, Coronavirus Disease 2019 (COVID-19): *Cases in the U.S.: Cases by Race &Age*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited May 21, 2020).

[24] La. Dep't of Health, COVID-19 Updated, *Additional Data on COVID-19 Deaths in Louisiana*, http://ldh.la.gov/Coronavirus/ (last visited May 20, 2020).

Plaintiff's expert, Dr. Camara Phyllis Jones, explains that the racial disparities in health outcomes—including higher risk of illness and death due to COVID-19—are inextricably linked to social and economic factors, such as quality of housing, availability of healthy foods, air quality, access to clean water, quality of schools, availability of work, transportation options, and proximity to polluting industries.  Jones Decl. ¶ 12, 30.  As a result of housing segregation, for example, Black people are less likely to live close to medical facilities and supermarkets stocked with nutritious food.  Factors giving rise to chronic illness and comorbidities also include racial inequalities in access to healthcare and medical insurance, where 7.8% of Louisiana's Black residents lack medical insurance compared to 4.7% of white residents.  Cooper Decl. ¶ 16(f); Jones Decl. ¶¶ 8-10, 11.  Indeed, the Louisiana State Health Department reports that asthma and obesity are more prevalent among Black residents, and further, that they are more likely to die from conditions such as heart disease and diabetes,[25] all of which are medical conditions that the CDC has acknowledged make racial and ethnic minority groups especially vulnerable to COVID-19.[26] Jones Decl. ¶¶ 8-9, 30.

In addition, social and economic conditions related to occupational settings and access to transportation make it more difficult for Black people to take measures to mitigate the risks posed by COVID-19.  *Id.* ¶ 27.  For instance, 29.9% of employed Black people ages 16 and over work in service industry occupations compared to 14.8% of whites, and only 24.7% are in management and business positions compared to 39.3% of whites, limiting the option to work from home.  Also, 15.8% of Black Louisiana residents lack a vehicle compared to 4.7% white residents, and 12.5%

---

[25] La. Dep't of Health, Community Partnerships & Health Equity, *Minority Health Indicators*, http://ldh.la.gov/index.cfm/page/672

[26] CDC Coronavirus Disease 2019 (COVID-19): *People Who Need Extra Precautions, Others at Risk, Racial and Ethnic Minority Groups*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities.html (last updated Apr. 22, 2020).

of Black residents carpool or take public transportation to work compared to 7.7% of white residents.  Cooper Decl. ¶ 16(c); (g).

Notably, the CDC has identified racial and ethnic minority groups among "people who need to take extra precautions to protect themselves from COVID-19," expressly acknowledging that "[h]ealth differences in between racial and ethnic groups are often due to economic and social conditions that are more common among some racial and ethnic minorities than whites."[27]

### 3.    The COVID-19 Pandemic and Voting

The CDC has issued guidance specifically addressing election safety in the context of COVID-19.  The CDC's guidance recommends that election officials "[e]ncourage voters to use voting methods that minimize direct contact with other people and reduce crowd size at polling stations."[28]  The CDC lists "mail-in methods of voting" first among its recommendations to reduce person-to-person contacts and congestion at polling sites.[29]  COVID-19 spreads rapidly in environments where a large number of individuals are in close proximity, like at congested polling sites.  Reingold Decl. ¶ 23.  There is no evidence that the virus spreads through the mail.  *Id.* ¶ 26. In addition, the U.S. Postal Service has also implemented policies to reduce contacts between mail carriers and members of the businesses and households they serve.[30]

Polling places have already been sources for exposure to the coronavirus.  In Chicago, Revall Burke, a Marine and father of six, died of COVID-19 after volunteering as a poll worker

---

[27] *Id.*

[28] CDC, Coronavirus Disease 2019 (COVID-19): *Recommendations for Election Polling Locations: Interim Guidance to Prevent Spread of Coronavirus Disease 2019 (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html (last updated Mar. 27, 2020) [hereinafter CDC, Interim Guidance].

[29] *Id.*

[30] Press Release, United States Postal Service, *Media Statement – COVID-19* (Apr. 30, 2020), https://about.usps.com/newsroom/statements/usps-statement-on-coronavirus.htm (citing guidance from World Health Organization, CDC, and Surgeon General).

on March 17.[31]  Other poll workers and in-person voters who were asymptomatic on Election Day later became ill and tested positive for COVID-19.[32]  Just weeks later, in-person voting proceeded in Wisconsin with large crowds and long lines.[33]  Following that election, health officials identified at least 52 individuals who tested positive for COVID-19 after either voting in person or working at a polling site.[34]  This does not include individuals who may have contracted the virus but were not tested, or those who may have unknowingly contracted the virus and become asymptomatic carriers.  Reingold Decl. ¶ 24.

While voting by mail is the safest and most effective option for reducing the spread of the virus during an election, early voting and other options that mitigate risk during in-person voting are also critical.  The CDC guidance on conducting safe elections also recommends the use of early voting, specifically because crowds may be smaller throughout the day and early voting minimizes the number of other people a voter may come into contact with while at a polling

---

[31] *See* Mary Ann Ahern, *Poll Worker at Chicago Voting Site Dies of Coronavirus, Election Officials Say*, NBC Chicago (Apr. 13, 2020), https://www.nbcchicago.com/news/local/chicago-politics/poll-worker-at-chicago-voting-site-dies-of-coronavirus-election-officials-say/2255072/.

[32] *Id.*; *see also* Cate Cauguiran, *Chicago election worker who staffed March primary dies after contracting COVID-19*, ABC (Apr. 13, 2020), https://abc7chicago.com/coronavirus-deaths-fatalities-polling-worker-illinois-chicago/6100339/.

[33] Devi Shastri, *In-person voting was likely a "disaster" for Wisconsin's efforts to flatten coronavirus curve, national experts say*, Milwaukee J. Sentinel (Apr. 8, 2020), https://www.jsonline.com/story/news/politics/elections/2020/04/08/coronavirus-wisconsin-election-likely-hurt-effort-flatten-curve/2961718001/ (quoting Wisconsin Department of Health Services Secretary Andrea Palm); *Primary Recap: Voters Forced to Choose Between Their Health and Their Civic Duty*, NY Times (Apr. 7, 2020), https://www.nytimes.com/2020/04/07/us/politics/wisconsin-primary-election.html.

[34] Nolan D. McCaskill, *Wisconsin health dept.: 36 people positive for coronavirus after primary vote*, Politico (Apr. 27, 2020), https://www.politico.com/news/2020/04/27/wisconsin-tested-positive-coronavirus-election-211495; *see also The Latest: 52 Positive Cases Tied to Wisconsin Election*, The Associated Press (Apr. 28, 2020), https://apnews.com/b1503b5591c682530d1005e58ec8c267; *see also,* Chad Cotti, et al., *The Relationship Between In-Person Voting, Consolidated Polling Locations, and Absentee Voting on COVID-19: Evidence from the Wisconsin Primary* (May 10, 2020), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3597233

location.[35]  Smaller crowds at voting sites enable poll workers to enact the CDC's best practices for in-person voting during the COVID-19 pandemic, which include sanitizing surfaces and maintaining six feet of distance between individuals.[36]  Because some voters need or prefer to vote in person, including people who are homeless, visually impaired, have limited English proficiency, or are illiterate and need accessible voting machines and personal assistance, it remains necessary to provide safe and accessible in-person voting options.[37]

The majority of states are providing absentee voting-by-mail for all voters during upcoming elections.  Thirty-four states and the District of Columbia already offer all eligible voters a vote-by-mail ballot option; that is, no specific excuse or justification is required to be eligible to vote absentee.[38]  Of the 16 states that require an excuse to vote absentee-by-mail, several have made clear that concerns regarding transmission of COVID-19 will serve as a legitimate excuse.

---

[35] McCaskill, *supra* note 34.

[36] *See* CDC, Interim Guidance, *supra* note 28.

[37] *See, e.g.*, Ian Millhiser, *How to make sure everyone can vote during the coronavirus pandemic*, Vox (Mar. 20, 2020), https://www.vox.com/2020/3/20/21185184/vote-by-mail-coronavirus-pandemic-elections.

[38] The Brennan Center for Justice, Research & Reports, *Preparing Your State for an Election Under Pandemic Conditions*, https://www.brennancenter.org/our-work/research-reports/preparing-your-state-election-under-pandemic-conditions (last updated Apr. 27, 2020).

For example, Arkansas,[39] Alabama,[40] Delaware,[41] Massachusetts,[42] New Hampshire,[43] South Carolina,[44] Virginia,[45] and West Virginia[46] have expanded the scope of existing state election laws establishing absentee ballot eligibility for illness, injury, or disability to now include all qualified voters concerned about or taking preventative measures because of the COVID-19 pandemic.

---

[39] Governor of Arkansas, Exec. Order No. 20-08, (Mar. 20, 2020), https://governor.arkansas.gov/images/uploads/executiveOrders/EO_20-08._.pdf.

[40] Ala. Legis. Servs. Agency, *Absentee Voting During State of Emergency, 17-11-3(e)* (Mar. 18, 2020), https://www.sos.alabama.gov/sites/default/files/SOS%20Emergency%20Rule%20820-2-3-.06-.01ER.pdf; *see also* Press Release, Alabama Secretary of State, 100 Days Left to Apply for Absentee Ballot for the Primary Runoff Election (Mar. 31, 2020), https://www.sos.alabama.gov/newsroom/100-days-left-apply-absentee-ballot-primary-runoff-election; Ala. Code § 17-11-3(a)(2).

[41] *See* Governor of Delaware, Exec. Dep't, Sixth Modification of the Declaration of a State of Emergency for the State of Delaware Due to a Public Health Threat (Mar. 24, 2020), https://governor.delaware.gov/wp-content/uploads/sites/24/2020/03/Sixth-Modification-to-State-of-Emergency-03242020.pdf (Delaware executive order providing that for upcoming primary and special elections "the qualification of 'sick or physically disabled' [in Delaware vote-by-mail provisions] shall apply to and include any such voter who is asymptomatic of COVID-19 . . . and who herself or himself freely chooses to use such qualification to vote by absentee ballot.").

[42] An Act Granting Authority to Postpone 2020 Municipal Elections in the Commonwealth and Increase Voting Option in Response to the Declaration of Emergency to Respond to COVID-19, 191st General Court of the Commonwealth of Mass., ch. 45 (2020), https://malegislature.gov/Laws/SessionLaws/Acts/2020/Chapter45 (new Massachusetts law clarifying that "any person taking precaution related to COVID-19 in response to a declared state of emergency or from guidance from a medical professional, local or state health official, or any civil authority shall be deemed to be unable by reason of physical disability to cast their vote in person," which is one of the reasons set forth in the state constitution that permits a Massachusetts voter to vote by mail).

[43] Memorandum from the Sec'y of State and Att'y General to New Hampshire Election Officials re: Elections Operations During the State of Emergency at 2 (Apr. 10, 2020), https://www.governor.nh.gov/news-media/press-2020/documents/20200410-absentee-voting.pdf.

[44] S635, (RAT#0138) Act to Amend Section 7-13-35, Code of Laws of South Carolina, https://www.scstatehouse.gov/billsearch.php?billnumbers=635&session=123&summary=B.

[45] Absentee Voting, Va. Dep't of Elections, https://www.elections.virginia.gov/casting-a-ballot/absentee-voting/ (last visited May 6, 2020) (Virginia Department of Elections statement clarifying that "[v]oters may choose reason '2A My disability or illness'" to vote absentee in upcoming elections due to COVID-19).

[46] W. Va. Sec'y of State Mac Warner, Admin. Law Div., Notice Of An Emergency Rule (Mar. 20, 2020), http://apps.sos.wv.gov/adlaw/csr/readfile.aspx?DocId=53039&Format=PDF.

Courts have similarly removed the burdens of witness and notary requirements for absentee ballots within the context of the pandemic.[47]

### B.    Louisiana's Absentee-By-Mail Ballot Requirements

At least four major elections are scheduled to take place in Louisiana before the end of the calendar year, including statewide and federal elections.   The first two elections—currently scheduled to take place on July 11, 2020 and August 15, 2020—will be subject to Louisiana election laws as modified by the Revised Emergency Plan.   *See infra*, Part II.C.  As of now, the November 3, 2020 (Presidential General and Open Congressional Primary Election) ("the November Election"), and December 5, 2020 (Congressional and Open General Election) ("the December Election") will take place in accordance with state election laws, as described below, and are not affected by the Revised Emergency Plan.[48]

### 1.    The Excuse Requirement

Only voters who meet one of the specific excuses enumerated in Louisiana's state election code and can provide the required documentation are eligible to apply for and vote by absentee-by-mail ballot (the "Excuse Requirement").  La. R.S. 18:1308.  Individuals who can vote absentee by mail include the following five categories of voters:

---

[47] *See League of Women Voters of Va. v. Va. State Bd. of Elections*, F. Supp. 3d, No. 6:20-cv-00024, 2020 WL 2158249, at *8 (W.D. Va. May 5, 2020) ("*LWVV*") (approving order enjoining enforcement of absentee ballot witness requirement, noting "[n]otwithstanding the proffered steps which could be taken to mitigate the risks to health in having somebody witness one's absentee ballot, many would be dissuaded from exercising their vote both on account of the remaining health risks and required steps to mitigate them"); *League of Women Voters of Okla. v. Ziriax*, No. 118765, 2020 WL 2111348, at *1 (Okla. May 4, 2020) (barring use of notary requirement for absentee ballots).

[48] *See* 2020 Elections Calendar, La. Sec. State, https://www.sos.la.gov/ElectionsAndVoting/PublishedDocuments/ElectionsCalendar2020.pdf (last visited May 20, 2020).

1. Voters who expect to be out of the parish in which they would be qualified to vote in person on Election Day, such as service members, students, clergy members, and overseas citizens.  La. R.S. 18:1303(B).

2. Voters who remain incarcerated pre-trial or sequestered as a jury member during the election.  La. R.S. 18:1303(C)–(G).

3. Eligible disabled voters who submit certain identification or documentation of a qualifying disability.  La. R.S. 18:1303(I).

4. Voters who are 65 years of age and older.  La. R.S. 18:1303(J).

5. Voters who were unable to participate in early voting and will be unable to vote on Election Day due to hospitalization.  La. R.S. 18:1303(D).

Absentee ballot applications may be returned by mail, fax, or hand delivery, or through the state's online voter portal, and must include the reason for the request and any necessary supporting documentation.  La. R.S. 18:1307A(2)–(B).  Unless the applicant is a member of the United States Service, living outside the United States, or is hospitalized, an application must be received by the registrar by 4:30 p.m. four days prior to the election for which the ballot is requested.  La. R.S. 18:1307.

### 2.    The Witness Requirements

Absentee ballot applicants who are unable to sign their name and instead use a mark to sign their application must obtain the signature of two third-party witnesses on their *application* ("Application Witness Requirement").  La. R.S. 18:1307.  All voters using an absentee-by-mail *ballot* must insert the ballot in the accompanying envelope and sign the certificate printed on the flap of envelope in the presence of one witness, who must also sign the envelope ("Ballot Witness Requirement").  La. R.S. 18:1306(E)(2)(a) (collectively, the "Witness Requirements").  Members

of the United States Service or voters residing outside the U.S. are not required to sign the certificate in front of a witness.  La. R.S. 18:1306(E)(2)(b).

Louisiana is only one of eleven states with a witness requirement for absentee ballots.[49]

### 3.    Penalties Related to Enforcement of the Absentee Ballot Excuse Requirement and Witness Requirements

Absentee-by-mail ballot applications list in bold font that false certifications may subject the applicant to a fine of up to $2,000 and imprisonment for 2 years.[50]  If the registrar of voters has reason to believe that an applicant's eligibility to vote by mail pursuant to La. R.S. 18:1303 is based upon false or fraudulent information, they must "immediately notify the parish board of election supervisors."  La. R.S. 18:1307(I).  If, after the applicant has been provided a hearing and opportunity to be heard, the parish board of election supervisors finds that the voter's eligibility to vote absentee-by-mail was based upon false or fraudulent information, "the board shall inform the appropriate district attorney and the registrar of voters who shall not allow the voter to vote absentee by mail."  *Id*.

Every ballot is mailed in an envelope with the following on its face in red bold face type: "VIOLATION OF ABSENTEE BY MAIL OR EARLY VOTING LAWS VOIDS BALLOT AND MAY RESULT IN CRIMINAL PENALTIES" and "VOTING AT POLLS AFTER VOTING ABSENTEE BY MAIL OR DURING EARLY VOTING IS PROHIBITED AND MAY RESULT IN CRIMINAL PENALTIES."  La. R.S. 18:1306(D).

---

[49] *See* Chart, "Verifying Authenticity of Absentee/Mailed Ballots," Voting Outside the Polling Place: Absentee, All-Mail and other Voting at Home Options, Nat'l Conf. of State Legislatures (Apr. 3, 2020), https://www.ncsl.org/research/elections-and-campaigns/absentee-and-early-voting.aspx;

[50] General Application for Absentee by Mail Ballot, La. Sec. of State, https://www.sos.la.gov/ElectionsAndVoting/PublishedDocuments/GeneralApplicationForAbsenteeByMailBallot.pdf. (last visited May 20, 2020).

As described, the envelope also includes a "Certificate" with an affidavit to be signed by the voter, certifying that they "applied for the ballot, marked the enclosed ballot(s) [themselves] or that they were marked for [the voter] according to [the voter's] instructions and in [the voters] presence"; that the voter is entitled to vote at the precinct they name; that the parish board of election supervisors is authorized to open the envelope and count their ballot; and that the statements made by the voter are true and correct and that the voter is aware of the penalties for knowingly making false statements therein.  La. R.S. 18:1306(E).  The voter's certificate also "shall be made under penalty of perjury for providing false or fraudulent information."  La. R.S. 18:1306(E)(2)(a).

### 4. The Absentee Ballot Review and Counting Process

Absentee ballots must be returned to the registrar by the U.S. Postal Service, a commercial courier, or by hand delivery.  La. R.S. 18:1308(B).  Under most circumstances, absentee ballots must be received by 4:30 p.m. on the day before Election Day in order to be counted.  La. R.S. 18:1308(C).  If an absentee ballot is delivered by someone other than the voter, a commercial courier, or the U.S. Postal Service, the registrar must have the person delivering the absentee ballot sign a statement certifying that they have the authorization and consent of the voter to hand deliver the marked absentee ballot.  La. R.S. 18:1308(B).  No person except the immediate family of the voter may hand deliver more than one marked absentee ballot to the registrar.  *Id*.

Parish boards of election supervisors conduct the counting and tabulation of all absentee-by-mail and early voting ballots in the parish.  La. R.S. 18:1313(A).  During the process of counting absentee-by-mail ballots, several steps are taken to validate each ballot.  La. R.S. 18:1313(F).  First, a member of the board announces the name of each absentee-by-mail voter and the ward and precinct where they are registered to vote.  Then, the board must compare the name on the certificate or on the flap of the envelope containing the absentee-by-mail ballot with the names on

17

the absentee-by-mail voter report, which is a listing of all voters from whom the registrar has received an absentee by mail ballot before election day.  La. R.S. 18:1313(F)(2).  The absentee-by-mail report is printed from the state voter registration system, certified by the parish registrar for correctness, and delivered to the parish board of election supervisors on election day for use in the tabulation and counting of absentee by mail ballots..  La. R.S. 18:1311(C).

Next, the board will consider any properly filed challenges to the ballot.  If the board determines that an absentee-by-mail ballot is valid, the ballot certificate must be signed by two board members.  La. R.S. 18:1313(F)(6).  But, if a majority of the members of the board determine that an absentee-by-mail ballot is invalid, the members must leave the envelope sealed, and a board member must write the word "rejected," together with the reasons for rejecting the ballot, and their initials.  La. R.S. 18:1313(F)(5).  Rejected absentee-by-mail ballots and certificates must be placed in the special absentee-by-mail and early voting ballot envelope or container.  *Id*.  No rejected absentee-by-mail ballot is counted.  *Id*.

C.    **The Emergency Election Plan**

Under Louisiana law, after the Governor declares a state of emergency, the Secretary of State may certify that the state of emergency will impact upcoming elections.  *See* La. R.S. 18:401.3.  The Secretary of State must then present an "Emergency Plan" to the Governor, the Senate Committee on Senate and Governmental Affairs ("the Senate Committee"), and the House Committee on House and Governmental Affairs ("the House Committee") for approval before the plan may be voted on and approved by the full legislature.  *See id*.

On March 13, 2020, Louisiana Secretary of State Ardoin certified that the statewide COVID-19 emergency would impair the upcoming elections.[51]  *See* La. R.S. 18:401.3.  On April 14, 2020, he presented an emergency plan ("the First Emergency Plan") detailing procedures to safely hold the 2020 July and August elections to the Senate Committee and the House Committee for their approval. [52]

The First Emergency Plan recognized the threat COVID-19 posed to the health and safety of voters, poll workers, volunteers, and others should Louisiana push forward with in-person voting for both the July and August elections.[53]  Among its measures to allow Louisianans to vote safely, the First Emergency Plan would have made eligible to vote by absentee ballot any voters who are "[u]nable to appear in public due to concern of exposure to or transmission of COVID-19."[54]  In other words, the First Emergency Plan would have ensured that any voter could vote absentee-by-mail due to the COVID-19 pandemic.

The First Emergency Plan also would have reduced the number of witness signatures required on an absentee ballot application where the applicant is unable to sign their own name (and uses a mark) from two witnesses to one witness, provided polling locations and election

---

[51] *See* La. Exec. Dep't: Proclamation No. 46 JBE 2020 (Apr. 14, 2020), https://gov.louisiana.gov/assets/Proclamations/2020/modified/46-JBE-2020-Elections.pdf.

[52] *See* Sam Karlin, *Louisiana Republicans block emergency coronavirus election plan; future of election unclear*, The Advocate (Apr. 15, 2020), https://www.theadvocate.com/baton_rouge/news/coronavirus/article_4dfccfd6-7f44-11ea-b67e-73d2172ba20b.html; *see also* Melinda Deslatte, *Louisiana Lawmakers Approve Emergency Summer Elections Plan*, U.S. News (Apr. 28, 2020), https://www.usnews.com/news/best-states/louisiana/articles/2020-04-28/louisiana-lawmakers-approve-emergency-summer-elections-plan.

[53] *See* Secretary of State Emergency Election Plan for the July 11, 2020 Presidential Preference Primary and August 15, 2020 Municipal General Elections in the State of Louisiana, at 2 (Apr. 14, 2020) [hereinafter "First Emergency Plan"], https://house.louisiana.gov/Agendas_2020/Apr_2020/Emergency%20Election%20Plan%20for%20PPP%20and%20Mun%20General%20Rev.%204-13.pdf.

[54] *Id*.

19

workers with supplies to prevent against the spread of the virus, and expanded early voting from seven to thirteen days prior to Election Day.[55]

The First Emergency Plan failed after the Senate Committee refused to bring it to a vote.[56] Splitting on partisan lines, the majority of the Committee refused to certify that there was a state of emergency and deferred consideration of the First Emergency Plan—effectively rejecting it.[57] Although numerous studies show that mail-in ballot fraud is very rare and no Committee member presented evidence that such fraud had occurred or was likely to occur in Louisiana, members of the Committee asserted they were deferring consideration of the plan primarily based on concerns about voter fraud.[58]  For example, Sen. Barry Milligan (R-Shreveport) stated the plan was "extremely broad and basically covers everyone in Louisiana," and claimed: "There is not an election cycle that goes through that we wake up to the news that votes are found in somebody's garage or somebody's truck."[59]

In contrast, during the hearing at which the First Emergency Plan was considered, when asked whether voter fraud was something he had seen in Louisiana, the Secretary of State replied that voter fraud was rare, and also asserted that he would rank Louisiana among the top five in comparison to other states when it came to election integrity and election security.[60]

---

[55] *See id.*

[56] *See* Karlin, Louisiana Republicans Block Election Plan, *supra* note 52; *see also* Deslatte, Lawmakers Approve Election Plan, *supra* note 52.

[57] *See id.*

[58] *See* Wendy R. Weiser & Harold Ekeh, *The False Narrative of Vote-By-Mail Fraud*, Brennan Center for Justice (Apr. 10, 2020), https://www.brennancenter.org/our-work/analysis-opinion/false-narrative-vote-mail-fraud ("Mail ballot fraud is incredibly rare, and legitimate security concerns can be easily addressed.").

[59] Fritz Esker, *La. Legislature Approves Emergency Election Plan*, The Louisiana Weekly (May 4, 2020), http://www.louisianaweekly.com/la-legislature-approves-emergency-election-plan/.

[60] Video, Louisiana House Committee on Governmental Affairs, Hearing to Consider the Emergency Election Plan, Apr. 15, 2020; 18:25-21:00, https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2020/apr/0415_20_HG.

After again certifying that the pandemic posed risks for the upcoming election, Secretary Ardoin released a second, revised emergency election plan on April 20, 2020 ("the Revised Emergency Plan").[61]  Following hearings on April 22, 2020, both the Senate Committee and the House Committee approved the plan.[62]  On April 27, 2020, it was approved by the full Legislature and the Governor.[63]  With the approval process complete, the Revised Emergency Plan now has the force of law.

The Revised Emergency Plan omits or scales back many of the protections included in the First Emergency Plan, purportedly to appease the unsupported concerns of the Senate Committee Members who opposed its first iteration.[64]  Critically, the plan no longer allows voters with a "concern of exposure" to COVID-19 to request an absentee by mail ballot.  It also removes previously proposed absentee ballot eligibility for voters aged over 60 but under 65, as well as voters caring for a child or grandchild whose school or daycare is closed and/or where alternative childcare is not available due to COVID-19 concerns.

Under the Revised Emergency Plan, voters may only qualify for an emergency absentee ballot if they are:

---

[61] Secretary of State Emergency Election Plan for the July 11, 2020 Presidential Preference Primary and August 15, 2020 Municipal General Elections in the State of Louisiana (Apr. 20, 2020) [hereinafter "Revised Emergency Plan"], https://www.sos.la.gov/OurOffice/PublishedDocuments/Revised%20Emergency%20Election%20Plan%20for%20PPP%20and%20Mun%20General%20Rev.%204-20.pdf.

[62] *See* Esker, *supra* note 59.

[63] *See* Louisiana Secretary of State: Get Election Information (last visited May 20, 2020), https://www.sos.la.gov/ElectionsAndVoting/GetElectionInformation/Pages/default.aspx ("[T]he Secretary of State's Emergency Election Plan . . . [was] approved by the Governor and the Louisiana Legislature on Monday, April 27, 2020 . . . .").

[64] David Jacobs, *Louisiana legislative committees approve COVID-19 voting plan; full bodies will vote by mail*, The Center Square (Apr. 22, 2020), https://www.thecentersquare.com/louisiana/louisiana-legislative-committees-approve-covid-19-voting-plan-full-bodies-will-vote-by-mail/article_7ce4de16-84c0-11ea-9a98-cbff2bfdb2ea.html.

- "At a higher risk of severe illness from COVID-19 due to serious underlying medical conditions as identified by the Centers for Disease Control and Prevention (including chronic lung disease, moderate to severe asthma, hypertension and other serious heart conditions, diabetes, undergoing chemotherapy, severe obesity (BMI of 40 or higher), chronic kidney disease and undergoing dialysis, liver disease, pregnancy, or immunocompromised due to cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications)";

- "Subject to a medically necessary quarantine or isolation order as a result of COVID-19";

- "Advised by a health care provider to self-quarantine due to COVID-19 concerns";

- "Experiencing symptoms of COVID-19 and seeking a medical diagnosis"; and/or

- "Caring for an identified individual who is subject to a medically necessary quarantine or isolation order as a result of COVID-19 or who has been advised by a health care provider to self-quarantine due to COVID-19 concerns."[65]

The Revised Emergency Plan does not explain how its most central elements will be enforced. For instance: the Revised Emergency Plan does not define or explain qualifying terms such as "medically necessary," and "moderate to severe."[66] Likewise, the Emergency Plan does not provide guidance on what qualifies as being "advised by a health care provider" or "seeking a medical diagnosis."[67] The absentee ballot application created by the state does not provide voters with any additional guidance on how to interpret these terms or what evidence they must provide to show they meet one of the COVID-19 related excuse requirements.[68]

---

[65] *See* Secretary of State Emergency, Revised Emergency Plan, *supra* note 61; State of Louisiana, Official COVID-19 Emergency Ballot Application [hereinafter "Emergency Ballot Application"], https://www.sos.la.gov/OurOffice/PublishedDocuments/COVID-19%20VR2%20Absentee%20by%20Mail%20Application%20(Rev.%204-20)%20Ver.%201.pdf.

[66] *Id.*

[67] *Id.*

## III.   ARGUMENT

Plaintiffs seeking a preliminary injunction must establish: (1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is denied; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest.  *Jackson Women's Health Org. v. Currier*, 760 F. 3d 448, 452 (5th Cir. 2014) (quoting *Hoover v. Morales*, 164 F. 3d 221, 224 (5th Cir. 1998).  Plaintiffs here satisfy each of these requirements.

### A.   Plaintiffs are Likely to Succeed on the Merits of Their Constitutional Claims Against the Excuse Requirement and the Witness Requirements.

To demonstrate a likelihood of success on the merits, Plaintiffs "must present a prima facie case" that they are likely to succeed, "but need not prove that [they are] entitled to summary judgment."  *Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579, 582 (5th Cir. 2013)*; see also Wash. St. Tammany Elec. Coop. v. La. Generating*, No. 08-430-JJB-DLD, 2008 U.S. Dist. LEXIS 135876, at *5–*6 (M.D. La. July 30, 2008) ("[C]ourts agree that the plaintiff 'must present a prima facie case but need not show that he is certain to win.'").  Plaintiffs are likely to prevail on the merits of their claim that, in the context the COVID-19 pandemic, the Excuse Requirement and the Witness Requirements impose undue burdens on the fundamental right to vote in violation of the First and Fourteenth Amendments.

Under the test set forth by the Supreme Court in *Anderson v. Celebrezze* and *Burdick v. Takushi*, a court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the State as justification for the burden imposed by its rule, taking into consideration the extent to which those

23

interests make it necessary to burden the plaintiff's rights. *Burdick v. Takushi,* 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *see also Texas Indep. Party v. Kirk*, 84 F.3d 178, 182 (5th Cir. 1996) (citations omitted).  When the restriction on the right to vote is a severe burden, then it is subject to strict scrutiny. *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 205 (2008).  Strict scrutiny requires the restriction to be "narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434CH (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)).

During the course of the pandemic, courts engaging in the *Anderson-Burdick* analysis have applied strict scrutiny to similar absentee ballot witness requirements and ballot access laws given the unprecedented and extraordinary circumstances brought about by COVID-19. *See, e.g.*, *Texas Democratic Party v. Abbott*., No. SA-20-CA-438-FB, 2020 WL 2541971, at *32 (W.D. Tex. May 19, 2020) (applying the *Anderson-Burdick* framework and finding that under strict scrutiny, Defendants were "unable to supply any legitimate or reasonable interest" to justify denying absentee voting opportunities to voters under 65 years of age during the COVID-19 pandemic and would fail even if rational basis review was alternatively applied); *League of Women Voters of Va. v. Va. State Bd. Of Elec*., No. 6:20-cv-0024, _F. Supp. 3d _, 2020 WL 2158249, at *7-8 (W.D. Va. May 5, 2020) ("*LWVV*") (finding that a witness requirement's "substantial" burdens outweighed any countervailing state interests and approving a consent decree enjoining it); *Garbett v. Herbert*, No. 2:20-cv-245-RJS, 2020 WL 2064101, at *43 (D. Utah Apr. 29, 2020) (finding that, as applied in the "unforeseen, extraordinary circumstances" of COVID-19, a state ballot access framework imposed a severe burden on the right to vote and was not narrowly tailored to serve a compelling government interest); *Libertarian Party of Ill. v. Pritzker*, No. 20-cv-2112, 2020 WL 1951687, at *3-4  (N.D. Ill. Apr. 23, 2020) (finding that, when assessing state-imposed burden within the

context of "the extraordinary circumstances arising from COVID-19, . . . the combined effect of . . . Illinois' stay-at-home order and the usual in-person signature requirements [created] a nearly insurmountable hurdle"); *Esshaki v. Whitmer*, No. 2:20-cv-10831-TGB, 2020 2020 WL 1910154, at *20 (E.D. Mich. Apr. 20, 2020) (finding strict scrutiny analysis appropriate where "unprecedented . . . restrictions imposed on daily life by the Stay-at-Home Order, when combined with the ballot access requirements . . . created a severe burden").  Courts have also applied strict scrutiny in non-pandemic emergencies burdening the right to vote.  *See also Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250, 1257 (N.D. Fla. 2016) (holding that where Hurricane Matthew "foreclosed the only methods of registering to vote" in the final week of voter registration, the State's statutory deadline "amount[ed] to a severe burden on the right to vote"); *Ga. Coal. for the People's Agenda, Inc. v. Deal*, 214 F. Supp. 3d 1344, 1345-46 (S.D. Ga. 2016) (acknowledging that "[a]n individual's ability to participate in local and national elections is arguably the most cherished right enshrined in our constitution," and granting an injunction that extended a voter registration deadline in the wake of a hurricane).

In the context of the ongoing and significant health risks posed by COVID-19, the Excuse Requirement and the Witness Requirements will severely burden the right to vote for many thousands of Louisiana voters, forcing them to choose between exposing themselves and others to the serious risk of contracting COVID-19 by voting in-person or obtaining a witness signature, or foregoing their right to vote altogether.  As Plaintiffs demonstrate, this constitutes effective disenfranchisement, an unequivocally severe and undue burden on the right to vote that Defendants cannot justify by any compelling state interest.  Thus, Plaintiffs are likely to prevail on the merits of their constitutional claims.

1.  **The Excuse Requirement Imposes a Severe and Undue Burden on the Right to Vote in Light of the COVID-19 Pandemic.**

Amid the public health crisis brought about by the COVID-19 pandemic, Louisiana's requirement that voters must qualify under one of a limited list of allowable excuses in order to be eligible to even request an absentee-by-mail ballot deprives the State's voters of the opportunity to safely vote in the upcoming elections and constitutes a severe and undue burden on the right to vote.  Because the Excuse Requirement forces voters to take on what has the potential to be a life-or-death risk in order to cast their ballot and have it count, Plaintiffs are likely to succeed in showing that enforcement of the requirement imposes an undue burden on the fundamental right to vote in violation of the Constitution.

As of May 21, 2020, over 35,000 cases of COVID-19 have been reported in Louisiana, and over 2,400 people have died.[69]  Even where COVID-19 infection is not fatal, it threatens severe symptoms, hospitalization, lasting physical damage, and unknowing asymptomatic transmission.  Reingold Decl. ¶¶ 7, 9, 11.  Despite these circumstances and the dire risks posed by COVID-19, the Excuse Requirement would compel several thousands of qualified Louisiana voters to engage in conduct that has been identified by the CDC and public health officials as potentially unsafe during the COVID-19 pandemic.[70]  Specifically, voters not eligible to vote using an absentee-by-mail ballot pursuant to the Excuse Requirement will only have the option of voting in-person and will have to leave the safety of their homes, congregate in public spaces with unknown individuals, and touch shared public surfaces.  Reingold Decl. ¶ 8 (opining that such activities increase the risk of transmission).

---

[69] *See* La. Dep't of Health, Coronavirus (COVID-19), http://ldh.la.gov/Coronavirus/ (last visited May 21, 2020).

[70] *See* CDC, Coronavirus Disease 2019 (COVID-19): *Prevent Getting Sick – Social Distancing*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html (last visited May 21, 2020).

While all of the State's residents are susceptible to the risks posed by COVID-19, the undue burdens imposed by the Excuse Requirement in the face of the pandemic will fall with particular severity on vulnerable categories of voters. For instance, older voters are at increased risk of infection, where the age group with the highest number of all COVID-19 cases reported in Louisiana are individuals ages 50–59 (19%), yet only voters age 65 and older are eligible to vote by absentee ballot without an additional excuse.[71] Moreover, qualified voters with known medical conditions that place them at increased risk of complications from COVID-19, but who do not qualify to request an absentee mail in ballot under any of the existing excuses or the Revised Emergency Plan's COVID-19-related excuses, will be more severely burdened by the Excuse Requirement. The Excuse Requirement will also disproportionately burden Black voters, who face heightened risk of death and infection from COVID-19 due to the compounding effects of longstanding institutional racism and social and economic disparities, *see* Jones Decl. ¶¶ 24-32; *supra* Part II.A.2; *see also* Decl. of Michael W. McClanahan ¶¶ 5-6 (hereinafter "McClanahan Decl." attached s Exhibit 4).

The Revised Emergency Plan does not adequately address nor remedy the severe and undue burdens posed by the Excuse Requirement. The five COVID-19-related excuses in the Revised Emergency Plan are restrictive and vague, as described *supra* Part II.C, and do not, for instance, apply to voters who have underlying medical conditions that put them at greater risk of COVID-19 infection but do not qualify as "moderate to severe", or older voters who are not 65 and over. Most notably, the COVID-19-related excuses in the Revised Emergency Plan do not apply to the many thousands of voters who reasonably fear exposure to or transmission of COVID-19.

---

[71] *See* La. Dep't of Health, Coronavirus (COVID-19), http://ldh.la.gov/Coronavirus/ (last visited May 21, 2020)

Although Plaintiff Jasmine Pogue has been diagnosed with asthma and has a history of upper respiratory infections, she would not qualify for vote absentee under the Revised Emergency Plan's COVID-19-related excuses. Decl. of Jasmine Pogue ¶¶ 5, 8 (hereinafter "Pogue Decl." attached as Exhibit 5). Ms. Pogue has severe difficulty breathing and requires an inhaler when experiencing an attack but does not require asthma medication on a habitual basis. *Id* ¶¶ 6-7. She does not believe her diagnosis qualifies as "moderate to severe," as listed among the "serious underlying medical conditions" on the COVID-19 emergency absentee application as a qualifying comorbidity to vote absentee. *Id*. ¶¶ 7, 11. She reasonably fears that voting in person would pose severe and potentially fatal risk to her and will be disenfranchised if provided no opportunity to vote by mail in July or August. *Id.* ¶¶ 9, 12, 15. These reasonable fears are shared by Black voters throughout Louisiana. McClanahan Decl. ¶¶ 6-7.

Plaintiff Jennifer Harding, who is healthy, has been engaging in strict social distancing from non-family members due to fear of unknowingly exposing her family to COVID-19. Harding Decl. of Jennifer Harding ¶¶ 4, 8 (hereinafter "Harding Decl." attached as Exhibit 6). Ms. Harding is a fulltime caretaker for her 10-year-old son and provides assistance for her elderly parents and grandmother who live close by and require help with basic tasks, like taking out the trash. *Id*. ¶ 6. Her father has Parkinson's disease, her mother has limited mobility due to post-polio syndrome, and her grandmother has been diagnosed with dementia. *Id*. Because Ms. Harding does not provide live-in or full-time caretaking for her parents and grandmother, she does not believe she qualifies to vote under the Revised Emergency Elections Plan's COVID-19 excuse related to "caring for" an individual in a medically necessary quarantine. *Id*. ¶¶ 11-13. Ms. Harding will be disenfranchised in the July and August elections if the Excuse Requirement remains in place or, at a minimum, forced to make a devastating choice between her right to vote and risking her family's

health.  *Id.* ¶ 16.

The scope of the burden imposed by the Excuse Requirement is broad, threatening to prevent several thousands of eligible Louisiana voters who are concerned about the effects of COVID-19 and are ineligible to vote by absentee ballot from participating in the upcoming elections.  To begin, Louisiana currently has 2.9 million registered voters.[72]  According to statistics reported by the Louisiana Secretary of State, for the 2018 primary election, total turnout was 240,941 (20.22%),[73] and for the 2018 municipal elections it was 121,329 (10.24%).[74]  Yet, without the option of absentee mail in voting, it is likely that for the upcoming July primary election and August municipal election many voters who would have otherwise participated in the elections will be forced to forfeit their right to vote in order to protect their health and the health of their families and communities.  Burdens on the right to vote "are severe if they go beyond the merely inconvenient."  *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 205 (2008) (Scalia, J., concurring).  Enduring a credible risk of virus exposure exceeds mere inconvenience.

Even where an election law "imposes only reasonable, nondiscriminatory restrictions," the State must still justify those restrictions with "important regulatory interests."  *Texas Indep. Party*, 84 F.3d at 182.  As Plaintiffs demonstrate, while the severity of the burden imposed by the Excuse Requirement calls for the application of strict scrutiny, even under a more relaxed threshold Defendants cannot identify an important regulatory interest in blocking expanded access to

---

[72] Registration Statistics, La. Secretary of State, https://electionstatistics.sos.la.gov/Data/Registration_Statistics/Statewide/2020_0501_sta_comb.pdf.

[73] Post Election Statistics, La. Secretary of State, https://electionstatistics.sos.la.gov/Data/Post_Election_Statistics/Statewide/2018_0324_sta.pdf

[74] *Id.*

absentee-by-mail voting in light of the COVID-19 pandemic and putting voters and their families at risk.

When the First Emergency Election Plan was rejected, opponents of the plan articulated the concern that increased absentee voting would enable voter fraud.[75]  However, there is no evidence to support this alleged concern, and Louisiana officials, including Secretary of State Ardoin, have repeatedly stated that voter fraud in the State's elections is not a significant concern.[76] *See supra* at 20.  Instances of election fraud via absentee voting are extremely rare in the United States, and are minimal to nonexistent in Louisiana.[77]  Louisiana has robust mechanisms in place to ensure that election fraud does not occur for absentee voting, including: review of absentee voting eligibility by the registrar of voters, *supra* at 16, strict requirements for voter attestation and verification under penalty of perjury, *supra* at 17, specific criminal penalties for violation of absentee voting laws with notice of such penalties highlighted on every absentee ballot, *supra* at 16, and ballot-by-ballot review of each absentee ballot by parish boards of election supervisors to

---

[75] *See* Karlin, Louisiana Republicans Block Election Plan, *supra* note 52; *see also* Deslatte, Lawmakers Approve Election Plan, *supra* note 52.

[76] Video, Louisiana House Committee on Governmental Affairs, *supra* note 60; Dede Willis, *Elections chief says no evidence of voter fraud in Louisiana*, KNOE News (Jan. 26, 2017), http://www.knoe.com/content/news/Elections-chief-says-no-evidence-of-voter-fraud-in-Louisiana-411805135.html (Secretary of State announced that "Louisiana did not have any widespread irregularities or allegations of fraud" during the 2016 presidential election); Amber Phillips, *Trump's Voting Commission was doomed from the start*, Wash. Post (Jan. 4, 2018) https://www.washingtonpost.com/news/the-fix/wp/2018/01/04/trumps-voter-fraud-commission-was-doomed-from-the-start/ (Secretary of State denying that significant voter fraud exists in Louisiana); Amber Phillips, *Why Louisiana is refusing to hand over voter registration data to Trump's election probe*, Wash. Post (Jul. 7, 2017), https://www.washingtonpost.com/news/the-fix/wp/2017/07/06/why-louisiana-is-refusing-to-hand-over-voter-registration-data-to-trumps-election-probe/ (Secretary of State denying that significant voter fraud exists in Louisiana.

[77] Even the Heritage Foundation, an organization dedicated to "[p]reventing, deterring, and prosecuting election fraud," https://www.heritage.org/voterfraud, has not identified a single case of election fraud via absentee voting in Louisiana. *See* Heritage Foundation, Election Fraud Cases, https://www.heritage.org/voterfraud/search?combine=&state=LA&year=&case_type=All&fraud_type=24489 (last visited May 20, 2020).  *See also* Weiser and Ekeh, *supra* note 58.

identify ballots that must be rejected and not counted, *supra* at 17-18.  The plain absence of absentee voting election fraud in Louisiana and the array of mechanisms already in place to ensure the integrity of each absentee ballot indicate no risk in expanded access to absentee voting, and demonstrates that the State has no distinct compelling interest in foreclosing such access during the COVID-19 pandemic.  Plaintiffs are likely to succeed on the merits of their claim that the Excuse Requirement imposes an undue and severe burden on the right to vote that is not justified by any significant state interest.

> ### 2.    The Witness Requirements Imposes a Severe and Undue Burden the Right to Vote in Light of the COVID-19 Pandemic.

Even for those voters who satisfy the Excuse Requirement and are eligible to vote through absentee-by-mail ballot, Louisiana's requirements that voters obtain a witness signature on an absentee ballot and on an absentee ballot application where the applicant is unable to sign their own name (and uses a mark) (the "Witness Requirements") will impose an undue burden on voters who live alone or without any other adult in their household who can act as a witness.  In light of the COVID-19 public health emergency, these voters will be forced to choose between putting themselves at risk of infection and severe illness through contact with a third party or foregoing their right to vote.

The character and magnitude of the burden imposed by the Witness Requirements warrant the application of strict scrutiny.  *See LWVV*, 2020 WL 2158249, at *8 (order recognizing that during the COVID-19 pandemic, the burden imposed by the enforcement of a similar witness requirement "is substantial"); *cf. Price v. N.Y. State Bd. of Elections*, 540 F.3d 101, 107 n.8 (2d Cir. 2008) (stating that "for voters who are . . . housebound" the burden of lack of access to absentee voting "could be quite significant").  Accordingly, Plaintiffs are also likely to succeed in

showing that enforcement of the Witness Requirements imposes an undue burden on the fundamental right to vote in violation of the Constitution.

Despite guidance from public health officials and the Governor instructing all Louisiana residents to minimize person-to-person contact, avoid gathering in public, and keep six feet of distance between themselves and another person in order to avoid the risk of contracting and transmitting COVID-19, the Witness Requirements require those voters who are able to obtain an absentee ballot to engage in person-to-person contact in order for their votes to be counted. This uniquely burdens voters who live alone or who do not have access to a witness by making them deviate from protective measures in order to have someone witness and sign their ballot envelope. According to Dr. Reingold, not only would this place individuals "at increased risk of infection" it would also "be particularly risky for those who are at a greater risk of complications and death from COVID-19." Reingold Decl. ¶ 27.

The Ballot Witness Requirement has the potential to affect tens of thousands voters. According to data from the Election Assistance Commission for the 2018 election—an election not affected by the COVID-19 pandemic—approximately 43,000 (3%) of the 1,519,552 voters who turned out for the November 2018 election voted by absentee mail-in ballot.[78] Of those absentee ballots, 1,218 voters or approximately 3%, were rejected for a witness signature deficiency.[79] With the addition of voters who will be eligible to vote by absentee mail-in ballot under the COVID-19-related excuses in the Revised Emergency Plan, and factoring in the risks of voting in person, there will likely be a significant increase in the number of requests for absentee-by-mail ballots for the July primary and August municipal elections. Correspondingly, under the

---

[78] *See* Exhibit 7, Data from 2018 Election Administration and Voting Survey (EAVS), https://www.eac.gov/research-and-data/datasets-codebooks-and-surveys

[79] *Id*.

Revised Emergency Plan, there will also be a significant increase in the number of voters disenfranchised by the Witness Requirements, as compared to 2018.

Additionally, considering the number of Louisiana residents who live alone, the burden imposed by forcing voters who cannot readily obtain a witness signature on their absentee mail in ballot or application (if the voter uses a mark) to make a bleak calculation between their health, the health of their families and communities, and their right to vote, will be significant. According to data from the 2018 ACS 1-Year estimates, approximately 15% (or 532,678 individuals) of the 3,560,000 Louisiana residents of voting age live alone. Cooper Decl. ¶ 7.

While people of any age are susceptible to contracting COVID-19, and any voter required to leave their home to obtain a witness signature will necessarily take on risk to their health during the pandemic, voters who are older, who have underlying medical conditions and disabilities, and Black voters will be put at even more extreme risk. Reingold Decl. ¶ 11. Of Louisiana residents who live alone, 35.8% are over 65 years old. Cooper Decl. ¶ 7. Of Louisiana residents who live alone, 27.5% are disabled. *Id*. ¶ 8. Of Louisiana residents 65 and older living alone, 44% are disabled. *Id*. ¶ 8. Black voters as a group are also put at heightened risk by the Witness Requirements. Approximately 18.1% of Black people of voting age in Louisiana live alone, as compared to 14.9% of white people of voting age. *Id* ¶ 9-10.

Plaintiffs' individual circumstances highlight how the Witness Requirements impose a significant burden on voters. Plaintiff Jane Chandler, who is 76 years old and lives alone, plans to request an absentee ballot for the upcoming elections because she suffers from a lung condition that is a comorbidity of COVID-19 and believes the risk of exposure to the virus at her polling site is too severe to vote in person. Decl. of Jane Chandler ¶¶ 8-9 (hereinafter "Chandler Decl." attached as Exhibit 8). To guard her health, she has engaged in extreme social distancing since

33

mid-March by not inviting people into her house and limiting all trips she makes outside of her home. *Id.* ¶ 10. Plaintiff Chandler is concerned that she would endanger her life by unnecessarily disrupting her self-isolation to have her absentee ballot witnessed by a signatory. *Id.* ¶ 14.

Even eligible voters who do not live alone may not live with someone capable of serving as a witness, which may disproportionately impact Black voters. Approximately 14.9% of Black households in Louisiana are headed by women who live alone with their children under 18, as compared to only 4.9% of white households. Cooper Decl. ¶ 16(d). For vulnerable and concerned voters who will rely on absentee voting to evade potential virus exposure and transmission via in-person voting, the Witness Requirement threatens to completely nullify such preventative action. *See* McClanahan Decl. ¶ 6. As Dr. Reingold states, "[r]equiring individuals to have one or more people who they are not otherwise being exposed to come into close enough proximity to witness their ballot would place them at increased risk for infection." Reingold Decl. ¶ 27.

Given the circumstances brought about by COVID-19, including loss of life and the threat of serious illness, the character and magnitude of the Witness Requirements demonstrate a particularly severe burden on the right to vote, requiring the application of strict scrutiny. *LWVV*, 2020 WL 2158249, at *7. However, even if the Court were to apply a more relaxed level of scrutiny, the intensity of the burden imposed by the Witness Requirement within the context of the COVID-19 pandemic outweighs any "important regulatory interests" identified by the State. *Texas Indep. Party*, 84 F.3d at 182.

The State's interest in maintaining the integrity of its elections will not be materially enhanced by enforcement of the Witness Requirements. Current State law already requires voters to certify their absentee ballot application, as well as their ballots, under penalty of perjury and

subjects them to criminal penalties for false certifications.[80]  La. R.S. 18:1306(D)-(E).  Notably, Louisiana exempts voters in the military or those residing outside of the United States who submit absentee ballots from the witness signature requirement, allowing their certificate to be made under penalty of perjury.  La. R.S.  1306(E)(2)(b).  Considering these attestation requirements and criminal penalties together with the number of processes the State has in place to verify and protect the integrity of absentee ballots, including existing methods for accepting, handling, tabulating, and counting absentee mail-in ballots, *supra* at Part II.B.3-4, the Witness Requirements do not add any sound protection against fraud.  La. R.S. 1308(B)-(C); 1313; *see LWVV*, 2020 WL 2158249, at *9 ("For the fraudster who would dare to sign the name of another qualified voter at the risk of being charged with [a felony], writing out an illegible scrawl on an envelope to satisfy the witness requirement would seem to present little to no additional obstacle.").

For the State's upcoming elections administered amidst the COVID-19 pandemic, there is no discernible additional protection that the Witness Requirements will provide to the integrity of an absentee ballot, as supported by the fact that Louisiana is only one of eleven remaining states with a witness or notarization requirement.[81]  Notably, within the context of the COVID-19 pandemic, courts have removed the burdens of witness and notary requirements for absentee ballots, *see, e.g., Id.* at *8 (order approving consent decree enjoining enforcement of absentee ballot witness requirement, noting "[n]otwithstanding the proffered steps which could be taken to

---

[80] General Application for Absentee by Mail Ballot, Louisiana Secretary of State, https://www.sos.la.gov/ElectionsAndVoting/PublishedDocuments/GeneralApplicationForAbsenteeByMailBallot.pdf.

[81] *See* Chart, "Verifying Authenticity of Absentee/Mailed Ballots," Voting Outside the Polling Place: Absentee, All-Mail and other Voting at Home Options, Nat'l Conf. of State Legislatures (Apr. 3, 2020), https://www.ncsl.org/research/elections-and-campaigns/absentee-and-early-voting.aspx; cf. Ala. Code §§ 17-9-30(b), 17-11-7, 17-11-10; Alaska Stat. § 15.20.030; La. Stat. Ann. § 18:1306(2)(a); Miss. Code Ann. §§ 23-15-627, 23-15-635, 23-15-633; Mo. Rev. Stat. §§ 115.279, 115.283, 115.295; N.C. Gen. Stat. § 163-231; Okla. Stat. tit. 26, § 14-108; 17 R.I. Gen. Laws § 17-20-23; S.C. Code Ann. §§ 7-15- 220, 7-15-230; Va. Stat. §§ 24.2-706, 24.2-707, 24.2-711.1; Wis. Stat. § 6.87(4)(b)(1).

mitigate the risks to health in having somebody witness one's absentee ballot, many would be dissuaded from exercising their vote both on account of the remaining health risks and required steps to mitigate them"); *League of Women Voters of Okla. v. Ziriax*, No. 118765, 2020 WL 2111348, at *1 (Okla. May 4, 2020) (barring use of notary requirement for absentee ballots); and in comparable non-pandemic circumstances, *see, e.g.*, *Northeast Ohio Coalition for the Homeless v. Husted*, 837 F.3d 612, 632 (6th Cir. 2016) (invalidating law rejecting absentee ballot envelopes with technical errors given that burden on even a few voters with rejected ballots outweighed State's purported interest in combating voter fraud given the State's failure to present compelling evidence or argument that the measure was necessary to prevent alleged fraud.).

The Witness Requirements impose a severe and undue burden on Plaintiffs' right to vote that is not outweighed by the State's interest; thus, Plaintiffs are likely to succeed on the merits of their claim that the Witness Requirements violate the Constitution.

### B.     Plaintiffs Will Suffer Irreparable Harm if an Injunction is Not Granted

To demonstrate the irreparable harms they will endure if the Excuse Requirement and Witness Requirements are not enjoined, Plaintiffs "need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir.1986) (citations omitted). Where "an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Opulent Life Church v. City of Holly Springs*, Miss., 697 F.3d 279, 295 (5th Cir. 2012) (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (2d ed. 1995)).

Individual plaintiffs will face an irreversible loss if forced to forego voting to maintain strict social distancing practices during the July and August elections.  Chandler Decl. ¶ 14; Harding Decl. ¶ 16; Pogue Decl. ¶ 15.  *See also* McClanahan Decl. ¶¶ 7-8.  The right to vote is a "fundamental political right, because [it is] preservative of all rights."  *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).  Indeed, '[t]he right of suffrage is a fundamental matter in a free and democratic society."  *Reynolds v. Sims*, 377 U.S. 533, 561–62 (1964).  Encroachment on this most fundamental of constitutional rights "unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  Therefore, invariably, a "restriction on the fundamental right to vote . . . constitutes irreparable injury."  *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (citing *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir.1986) (finding that the denial of the right to vote is "irreparable harm")).

Injunctive relief is urgent and appropriate because "money damages are not adequate" to remedy a constitutional violation.  *See Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) (reversing denial of preliminary injunction on complaint alleging First Amendment claims).  Put simply, "it is not possible to pay someone for having been denied the right to vote."  *OCA Greater Houston v. Texas*, No. 1:15-CV-679-RP, 2016 WL 4597636, at *4 (W.D. Tex. Sept. 2, 2016).  Absent injunction, Plaintiffs will lose all means to have their voices heard equally in Louisiana's July and August elections because once an election occurs, "there can be no do-over and no redress."  *League of Women Voters of N. Carolina v. N. Carolina*, 769 F.3d 224, 247 (4th Cir. 2014).

Plaintiffs, and indeed all Louisianans, face a substantial and enduring health threat if COVID-19 is spread through avoidable in-person contacts made upon voting.  There "can be no injury more irreparable" than "serious, lasting illness or death."  *Thakker v. Doll*, No. 1:20-cv-480,

2020 WL 1671563, at *4 (M.D. Pa. Mar. 31, 2020). "[T]he denial of injunctive relief after a district court has found a risk of imminent and substantial danger to public health or to the environment should be rare." *LAJIM, LLC v. Gen. Elec. Co.*, 917 F.3d 933, 942 (7th Cir. 2019). Courts have already established that "COVID-19 constitutes an irreparable harm" that supports the grant of preliminary relief. *Thakker*, 2020 WL 1671563, at *7. An injunction thus provides the only effective means to protect both the rights *and* safety of Louisiana voters.

Plaintiffs Power Coalition for Equity and Justice ("PCEJ") and the Louisiana State Conference of the NAACP ("LA NAACP") also face irreparable harm. A voting rights organization is "irreparably harmed when the right to vote is wrongfully denied or abridged— whether belonging to its membership or the electorate at large." *N.C. State Conf. of NAACP v. Cooper*, No. 1:18-cv-1034, _F. Supp. 3d_, 2019 WL 7372980, at *24-25 (M.D.N.C. Dec. 31, 2019) (noting that organizational plaintiffs demonstrated diversion of resources from other voter-education efforts to respond to challenged law, that they would continue this diversion if the law was not enjoined, that this diversion compromised their overall mission, and that the voters they represent were at risk of being deprived of their right to vote); *see also Common Cause Ga. v. Kemp*, 347 F. Supp. 3d 1270, 1295 (N.D. Ga. 2018) (finding plaintiff organization's harm "to its organizational interests is coterminous with the harms suffered by its citizen members" where voting was made more difficult); *Common Cause Ind. v. Lawson*, 327 F. Supp. 3d 1139, 1154 (S.D. Ind. 2018), *aff'd* 937 F.3d 944 (7th Cir. 2019) (similar). Moreover, the Excuse Requirement and Witness Requirements irreparably harm the organizational missions of ensuring that all qualified voters can successfully register and securely cast a ballot. McClanahan Decl. ¶¶ 4-5, 8; Decl. of Ashley Shelton ¶¶ 4-5, 16 (hereinafter "Shelton Decl." attached as Exhibit 9). Absent injunction, both PCEJ and the LA NAACP will be forced to use their limited resources to help

their target constituencies overcome the burdens and confusion caused by the Excuse Requirement and Witness Requirements, thus diverting time from other critical registration and voter mobilization efforts.  Shelton Decl. ¶¶ 15, 17; McClanahan Decl. ¶¶ 3-5, 8.  For some members, such burdens will be insurmountable.

### C. The Balance of Hardships and the Public Interest Favor a Preliminary Injunction.

A party seeking a preliminary injunction must "establish . . . that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  No interest of the broader public will be compromised by enjoining the Excuse Requirement and Witness Requirements.  Louisiana's absentee ballots and ballot applications make explicit the strict criminal penalties associated with falsifying voting information, and there is no evidence that limiting absentee voting or requiring a witness signature offer any additional deterrent to those who would act to undermine the process.  By contrast, the epidemiological and testimonial evidence presented herein show that the Excuse Requirement and Witness Requirements threaten public health and burden the franchise.  These avoidable outcomes strike at the core of a robust democracy.

Among the most essential of public interests, the protection of fundamental constitutional rights is tantamount.  *See, e.g.*, *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) (citing *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir.2006)) ("'injunctions protecting First Amendment freedoms are always in the public interest.'"); *see also Elrod v. Burns,* 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Homans v. Albuquerque*, 264 F.3d 1240, 1244 (10th Cir.2001) ("[W]e believe that the public interest is better served by . . . protecting [ ] core First Amendment right [s]"); *Newsom v. Albemarle Cty. Sch. Bd*., 354 F.3d

249, 261 (4th Cir.2003) ("Surely, upholding constitutional rights serves the public interest."); *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."); *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1167 (N.D. Fla. 2012) ("The vindication of constitutional rights . . . serve[s] the public interest almost by definition," including specifically when the right at issue is the right to vote). An injunction would protect Plaintiffs' constitutional right to vote and the health of the public at large by enabling voting opportunities that do not require unnecessary and unsafe in-person interactions.

An injunction would favor the public interest by "permitting as many qualified voters to vote as possible." *Obama for Am.*, 697 F.3d at 437; *see also League of Women Voters of Fla., Inc., v. Detzner*, 314 F. Supp. 3d 1205, 1224 (N.D. Fla. 2018) ("Quite simply, allowing for easier and more accessible voting for all segments of society serves the public interest.".). Enjoining the Excuse Requirement and Witness Requirements also promotes "the public interest in . . . safeguarding public health." *Pashby v. Delia*, 709 F.3d 307, 331 (4th Cir. 2013); *see also Diretto v. Country Inn & Suites by Carlson* No. 16-cv-1037, 2016 WL 4400498, at *4 (E.D. Va. Aug. 18, 2016) ("The public interest is clearly in remedying dangerous or unhealthy situations and preventing the further spread of disease."). Yet in the converse, if these restrictive voting requirements remain intact, the sacred interests of both the franchise and the public health will be put in unavoidable conflict. A preliminary injunction would ensure they are both equally protected.

Defendants risk no irreparable harm nor substantial burden if the Excuse Requirement and Witness Requirements are enjoined. A "state is in no way harmed by the issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional.

If anything, the system is improved by such an injunction.'" *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002). While Defendants and their agents will be tasked with facilitating expanded absentee voting opportunities and educating voters on their rights, these duties already fall within the purview of their offices and, more so, "administrative convenience" cannot justify limiting voters' access to their fundamental rights. *Taylor v. Louisiana.*, 419 U.S. 522, 535 (1975). The increased administrative burden of "disseminating information" and "training [election workers] . . . is minimal compared to the potential loss of a right to vote." *Ga. Coal. for People's Agenda,* 347 F. Supp. 3d at 1268. In sum, any potential hardships to Defendants and their agents are "minor when balanced against the right to vote, a right that is essential to an effective democracy." *United States v. Georgia*, 892 F. Supp. 2d 1367, 1377 (N.D. Ga. 2012).

## IV.    CONCLUSION

For the reasons stated, Plaintiffs respectfully request that the Court issue a preliminary injunction that: (1) enjoins Defendants from enforcing the Excuse Requirement, La. R.S. 18:1303, for absentee-by-mail voting for the 2020 July primary election and the August municipal election; and (2) enjoins Defendants from enforcing the Witness Requirements, La. R.S. 18:1306E(2)(a) and 1307, for an absentee-by-mail application and in order to vote by absentee-by-mail ballot for all Louisiana voters for the 2020 July primary election and the August municipal election.

DATED this 21st day of May 2020.        Respectfully submitted,


/s/ John Z. Morris                          /s/ Ronald L. Wilson
John Z. Morris*                          Ronald L. Wilson, (LSBN 13575)
NAACP Legal Defense &                    701 Poydras Street, Suite 4100
   Educational Fund, Inc.                 New Orleans, LA 70139
40 Rector Street, 5th Floor              Tel.: (504) 525-4361
New York, NY 10006                       cabral2@aol.com
Tel.: (212) 965-2200
zmorris@naacpldf.org


/s/ Catherine Meza                       /s/ Robert D. Fram
Catherine Meza*                          Robert D. Fram*
NAACP Legal Defense &                    Morgan Lewis*
   Educational Fund, Inc.                 Joshua González*
700 14th Street, NW, Suite 600           Covington & Burling LLP
Washington, D.C. 20005                   One Front Street
Tel.: (202) 682-1300                     San Francisco, CA 94111-5356
cmeza@naacpldf.org                       Tel: (415) 591-6000
                                         rfram@cov.com
                                         MELewis@cov.com
                                         jgonzalez@cov.com

                                         John Fraser**
                                         Covington & Burling LLP
                                         The New York Times Building
                                         620 Eighth Avenue
                                         New York, NY 10018-1405
                                         Tel: (212) 841-1000
                                         JFraser@cov.com


                                         * *Pro Hac Vice*
                                         ** *Pro Hac Vice* Motion forthcoming
                                         ***Attorneys for Plaintiffs***