# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| Clark, *et al.,* | |
| Plaintiffs, | |
| v. | Civil Action: 20-cv-308-SDD-RLB |
| Edwards, *et al*., | |
| Defendants, | |
| c/w | |

| | |
|---|---|
| Power Coalition for Equity and Justice, *et al.,* | |
| Plaintiffs, | |
| v. | |
| John Bel Edwards, the Governor of the State of Louisiana, in his Official Capacity, *et al*., | |
| Defendants, | Civil Action: 20-cv-283-SDD-RLB |
| and | |
| The State of Louisiana, | |
| Proposed Intervenor. | |

## <u>INTERVENOR-DEFENDANT THE STATE OF LOUISIANA'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS</u>

Intervenor-Defendant Jeff Landry, in his official capacity as Attorney General of Louisiana, on behalf of the State of Louisiana, hereby moves to dismiss Plaintiffs' Complaint for the following reasons: (1) any Court order will result in electoral chaos in violation of the Supreme Court and Fifth Circuit's *Purcell* doctrine; (2) the Court lacks subject matter jurisdiction under Rule 12(b)(1) as Plaintiffs' claims present non-justiciable political questions and Plaintiffs lack standing; (3)

Plaintiffs have failed to state claims upon which relief can be granted because a communicable disease is not state action and is not protected by the Voting Rights Act; and (4) Plaintiffs have failed to join the proper parties in order to accord them the requested relief.

## **INTRODUCTION**

Plaintiffs bring this case on the eve of a busy election season seeking to dictate through judicial enactment their own idea of what constitutes—according to them—a fairer election system in light of the current pandemic. This is despite the fact that the State of Louisiana, through its process designed to deal with these issues, has loosened some election regulations to make it *easier* for all Louisianans to vote. It can be no less than hubris to contend that laws that were perfectly legal—and arguably more restrictive—before the pandemic are suddenly now made illegal in their arguably less restrictive form during a pandemic.

Fortunately, a motions panel of the United States Court of Appeals for the Fifth Circuit recently addressed claims very similar to the claims here. *See Tex. Democratic Party v. Abbott*, 2020 U.S. App. LEXIS 17564 (5th Cir. June 4, 2020). The panel emphatically stayed a District Court order granting a preliminary injunction "because the spread of the Virus[1] has not given "unelected federal jud[ges]" a roving commission to rewrite state election codes." *Id.* at *3 (quoting *S. Bay United Pentecostal Church v. Newsom*, No. 19A1044, 2020 U.S. LEXIS 3041, *3 (U.S. May 29, 2020) (Roberts, C.J. concurring from the denial of cert.)). The reasoning of the Fifth Circuit is just as persuasive here.

Plaintiffs' Complaint is fundamentally deficient. At the outset, voting by absentee ballot is not a fundamental right. *See McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 807-09 (1969).

---

[1] In the interests of simplicity, just as the Fifth Circuit has done, all references to the current pandemic—coronavirus, COVID-19, and the like—will simply be to "the Virus." *See Tex. Democratic Party*, 2020 U.S. App. LEXIS 17564 at *3 n.1.

Louisiana's statutory scheme, including its emergency plans, are "designed to make voting more available to some groups who cannot easily get to the polls." *Id*. at 807-08; *see also Tex. Democratic Party*, 2020 U.S. App. LEXIS 17564 at *22. This fact "does not itself 'deny' the plaintiffs 'the exercise of the franchise.'" *Id*.; *see also Tex. Democratic Party*, 2020 U.S. App. LEXIS 17564 at *22.[2] Beyond this fundamental issue, there are two other truths to this litigation that cause Plaintiffs' claims to fail.

First, each and every claim brought by Plaintiffs requires *state* action. *See e.g*, 42 U.S.C. § 1983 ("Every person who, under color of any statute, ordinance, regulation, custom, or usage, *of any State* . . . ." (emphasis added)); Voting Rights Act of 1965 § 2, 52 U.S.C. § 10301(a) ("No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied *by any State* . . . ." (emphasis added)). However, the face of their Complaint is clear: it is the Virus and not the State of Louisiana that caused their alleged harms.

Second, it cannot be over emphasized that for every single rule Plaintiffs challenge, a more, or equally restrictive, version of that rule that was perfectly legal before the Virus. To that end, an otherwise constitutional (or statutorily compliant) law is not made less constitutional (or compliant) by non-state action such as the Virus. *See, e.g.*, *Mays v. Thurston*, No. 4:20-cv-341 JM, 2020 U.S. Dist. LEXIS 54498, at *4-5 (E.D. Ark. Mar. 30, 2020); *Bethea v. Deal*, No. CV216-140, 2016 U.S. Dist. LEXIS 144861, at *7 (S.D. Ga. Oct. 19, 2016).

Given these foundational truths as applied to the law, Plaintiffs' claims must fall.

---

[2] Louisiana's actions also, as it will be shown herein and in the response to Plaintiffs' Motion for Preliminary Injunction, does not and cannot result in a desperate impact under Section 2 of the Voting Right Act.

# I.   THE SUPREME COURT'S *PURCELL* DOCTRINE DICTATES THAT THIS COURT SHOULD NOT INTERFERE IN FAST APPROACHING ELECTIONS.

The Supreme Court and the Fifth Circuit "ha[ve] repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (per curiam); *see also Tex. Democratic Party*, 2020 U.S. App. LEXIS 17564 at *37; *Coalition for Good Governance v. Raffensperger*, No. 1:20-cv-1677, 8-9 (May 26, 2020), ECF No. 56 ("The Court's [dismissal] is bolstered by the fact that Plaintiffs seek extensive relief on the eve of/during an election"). "That is especially true where, as here, . . . local officials are actively shaping their response to changing facts on the ground." *Tex. Democratic Party*, 2020 U.S. App. LEXIS 17564 at *37 (quoting *S. Bay*, 2020 U.S. LEXIS 3041 at *3).

This doctrine exists because judicial intrusion into elections must account for "considerations specific to election cases." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). These considerations include the fact that "[c]ourt orders affecting elections . . . can themselves result in voter confusion and consequent incentive to remain away from the polls." *Id.* at 4-5. "As an election draws closer, that risk will increase." *Id.* at 5.

Even assuming Plaintiffs' allegations are correct and there is a violation of either the Constitution, the Voting Rights Act, or both, the Court still ought to decline from interfering in Louisiana's upcoming elections. *See Reynolds v. Sims*, 377 U.S. 533, 585 (1964); *Veasey v. Abbott*, 830 F.3d 216, 243 (5th Cir. 2016). "In awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles." *Reynolds*, 377 U.S. at 585. The existence of the Virus does not change this analysis. Recently, the Supreme Court stated that "changing the election rules so close to the election date . . . contravened [Supreme

Court] precedent[].”*Republican Nat'l Comm.*, 140 S. Ct. at 1207 (staying a district court order changing election deadlines in response to the Virus).

Courts must weigh such factors as the harms associated with judicial action or inaction, the proximity of the upcoming election, the "possibility that the non-prevailing parties would want to seek" further review, and the risk of "conflicting orders" from such review. *Purcell*, 549 U.S. at 4-5; *see also Reynolds*, 377 U.S. at 585 (noting that withholding relief may be proper when "an impending election is imminent and a State's election machinery is already in progress.").

Here, we are on the eve of the election under the revised deadlines set forth in the Emergency Election Plan. Absentee ballot applications have been printed and widely distributed with current law set forth in the instructions. The first absentee ballots for this July's elections were mailed in February of 2020. Applications to vote absentee have been accepted since April 20. Secretary of State Emergency Action Plan (Apr. 20, 2020), https://www.sos.la.gov/OurOffice/PublishedDocuments/Revised_Emergency_Election_Plan_for_PPP_and_Mun_General_Rev._4-20.pdf The registration deadline for the July 11 elections is on June 10, a mere seven days away. Louisiana Secretary of State, Primary Election Quick Facts (2020), https://www.sos.la.gov/ElectionsAndVoting/PublishedDocuments/LouisianaElectionQuickFacts.pdf. The online registration deadline is on June 20, a mere 17 days away. *Id.* And early voting begins on June 20. *Id.* Absentee ballots with the current law set forth in the instructions have been printed and have already been mailed to the homes of those people who have registered. Changing the method of absentee balloting now will invite chaos into the system and harm more people through voter confusion than any remedy ordered by the Court would help.

The same issue repeats itself for the subsequent elections, as the post-election calendar of required events for the July 11 election have a cascading effect on the August run-off elections. In

order for ballots to be printed and mailed to absentee voters for the August run-off election, the Secretary must certify multi-district results and local election officials must finalize local election results.  Any movement in this final deadline risks the ability of the Secretary and local election officials to have absentee and in-person ballots printed and available in time for the run-off election on August 15.[3]

Finally, the extensive nature of the prohibitory and mandatory relief sought by Plaintiffs is yet another reason to deny their relief. *Coalition for Good Governance v. Raffensperger*, No. 1:20-cv-1677, 8-9 (May 26, 2020), ECF No. 56. Plaintiffs request no fewer than six mandatory injunctions that work to create a wholesale overhaul of Louisiana's election code. "The combination of the extensive nature of the relief Plaintiffs seek and the temporal proximity to the election is a further reason to deny them relief." *Id.* (denying plaintiffs' motion for reconsideration of the District Court's dismissal on political question grounds). As the Sixth Circuit Court recently said, "rewriting a state's election procedures or moving deadlines rarely ends with one court order. Moving one piece on the game board invariably leads to additional moves. This is exactly why we must heed the Supreme Court's warning that federal courts are not supposed to change state election rules as elections approach." *Thompson v. Dewine*, No. 20-3526, 2020 U.S. App. LEXIS 16650, at *17 (6th Cir. May 26, 2020) (citing *Republican Nat'l Comm.*, 140 S. Ct. at 1207; *Purcell*, 549 U.S. at 4-5)); *see also Tex. Democratic Party*, 2020 U.S. App. LEXIS 17564 at *37.

## II.    THIS COURT LACKS SUBJECT MATTER JURISDICTION.

"Federal courts cannot consider the merits of a case unless it 'presents an actual controversy, as required by Article III of the Constitution . . .'" *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 544 (5th Cir. 2008) (quoting *Steffel v. Thompson*, 415 U.S. 452, 458

---

[3] A similar series of post-election dates exist between the November 2020 and December 2020 elections.

(1974)). "The many doctrines that have fleshed out the case or controversy requirement—standing, mootness, ripeness, political question, and the like—are 'founded in concern about the proper— and properly limited—role of the courts in a democratic society.'" *Id.* (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984)). When a jurisdictional defect is raised, the party asserting jurisdiction has the burden of proof. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001); *see also Montez v. Dep't of the Navy*, 392 F. 3d 147, 149 (5th Cir. 2004). Plaintiffs' Complaint is facially and factually deficient in nearly every respect. However, the principal defects are jurisdictional in nature and require this Court's immediate dismissal.

### A. Plaintiffs Lack Standing.

"Article III of the Constitution limits federal courts to deciding 'Cases' and 'Controversies.'" *Rucho v. Common Cause*, 139 S. Ct. 2484, 2493 (2019). The doctrine of standing arises out of the "case" or "controversy" language of Article III. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). "The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). "Relaxation of standing requirements is directly related to the expansion of judicial power." *Id.* at 408-09 (quoting *United States v. Richardson*, 418 U.S. 166, 188 (1974) (Powell, J., concurring)).

In *Gill v. Whitford*, the Court "insist[ed]" that a plaintiff must show that they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial opinion." 138 S. Ct. 1916, 1929 (2018) (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)). "The party invoking federal jurisdiction bears the burden of establishing [the three elements of standing]." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Here, Plaintiffs have failed to meet their burden to establish Article III

standing. As Plaintiffs lack standing, they cannot succeed on their claims, and their claims should be dismissed.

### 1. Plaintiffs Have Not Suffered an Injury in Fact.[4]

Foremost among a plaintiff's requirements in establishing Article III standing is pleading and proving an injury in fact. *Gill*, 138 S. Ct. at 1929. In order to prove an injury in fact sufficient to establish Article III standing, a plaintiff must plead and prove an injury which is "concrete, particularized, and actual or imminent . . . ." *Clapper*, 568 U.S. at 409 (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)). The requirement that an injury be "imminent" exists "to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Id.* (quoting *Lujan*, 504 U.S. at 565, n.2) (emphasis in original). The Supreme Court has repeatedly reiterated that a "'threatened injury'—such as Plaintiffs are alleging here—"must be *certainly impending* to constitute injury in fact' and that '[a]llegations of *possible* future injury' are not sufficient'" to establish Article III standing. *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)) (emphasis in original). A plaintiff cannot sufficiently establish an injury in fact when the alleged injury is based on "their fears of hypothetical future harm that is not certainly impending"—such as Plaintiffs are attempting to do here. *Id.* at 416.

Plaintiffs' alleged injury in fact is not "actual or imminent"—and therefore fails.[5] *Clapper*, 568 U.S. at 409. Here, Plaintiffs allege that "[i]n the context of the COVID-19 pandemic",

---

[4] The presentation of this case is peculiar in that Plaintiffs are alleging purely conjectural harms that stem not from the state, but from a virus, and as such are neither traceable nor redressable by Defendants. However, even if one were to remove COVID-19 from the equation, there is every reason to believe that Plaintiffs would still lack individual and associational standing. *See, e.g., Gill*, 138 S. Ct. at 1929 ("[A] person's right to vote is individual and personal in nature." (internal quotation omitted)); *NAACP v. City of Kyle*, 626 F.3d 233 (5th Cir. 2010) (holding, in part, that organizations and associations must meet *Lujan's* standing requirements).

[5] It is also important to note that voting by absentee ballot is not a fundamental right. *See McDonald*, 394 U.S. at 807-09. When a state legislature passes laws that make voting easier for certain demographics but not others, such as absentee voter laws, such laws cannot be viewed as an "abridgment" of one's right. *Veasy*, 830 F.3d at 279 (Higginson, J. concurring). "There is a difference between making voting *harder* in ways that interact with historical and social conditions to disproportionately burden minorities and making voting *easier* in ways that may not benefit all

Louisiana voters suffered a sufficient injury in fact due to the *potential* "risk of infection and death" by *possibly* coming in contact with the Virus through the act of physically voting or by having a third party sign their absentee ballot as a witness. *See* Compl. ¶ 4, 110 (May 7, 2020), ECF No. 1. In addition to the articles and studies cited in their Complaint, Plaintiffs proffer multiple experts, medical and otherwise, in their Motion for Preliminary Injunction who discuss the risks associated with the Virus and state that voters are potentially at risk of contracting the disease by voting. *See* Pls.' Mot. for Prelim. Inj. (May 21, 2020), ECF No. 14. In total, Plaintiffs' Complaint and Motion for Preliminary Injunction, with all the associated expert and witness declarations, total over 350 pages. *See id.* Unfortunately for Plaintiffs, increasing the number of pages in their pleadings does not decrease their burden of proof in establishing an injury in fact which is "certainly impending" and not based on "fears of hypothetical future harms"—which Plaintiffs have *certainly* failed to do. *See Clapper*, 568 U.S. at 416.

The estimated population of Louisiana is 4,648,794.[6] According to the Centers for Disease Control and Prevention ("CDC"), Louisiana has had a total of 40,857 Virus cases.[7] While not diminishing the seriousness of the disease to those infected, an infection rate of less than one percent could not be classified as "certainly impending" under any definition. On June 5, 2020, Louisiana moved from Phase 1 to Phase 2 of the re-opening process, and while Phase 2 will last at least 21 days, it is pure speculation to guess what phase Louisiana may be in as the July, August,

---

demographics equally (like motor-voter)." *Id.* (emphasis in original). "Every decision that a State makes in regulating its elections will, inevitably, result in somewhat more inconvenience for some voters than for others." *Greater Brimingham Ministries v. Merrill*, 284 F. Supp. 3d 1253, 1279-81 (N.D. Ala 2018) (citing *Frank v. Walker*, 768 F.3d 744, 754 (7th Cir. 2014)). As such, Plaintiffs' claims that Louisiana's absentee ballot laws are unconstitutional and therefore cause injury, cannot be supported by the law.

[6] *QuickFacts: Louisiana*, U.S. Census Bureau (last accessed June 3, 2020), https://www.census.gov/quickfacts/LA

[7] *Cases in the U.S.*, Center for Disease Control and Prevention (last accessed June 3, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

November, and December elections approach.[8] In moving from Phase 1 to Phase 2, Governor John Del Edwards cited to "continued improvement in Louisiana's COVID-19 outlook and a significant increase in testing capacity and contact tracing" in support of the move.[9] *Id.* While Louisiana health officials are allowing for most businesses, including children's museums and arcades, to open safely (following occupancy and other guidelines), Plaintiffs argue that voting centers, following the same guidelines, cannot safely accommodate them. *Id.*

In support of their proposition that voting in accordance with Louisiana law will lead to an increase in infections of the Virus, Plaintiffs cite to a few news stories that claim Wisconsin suffered higher infection rates following their recent election. Compl. ¶ 62. However, these exaggerated reports have since been proven false.[10] At least two studies have been published as "pre-prints" to evaluate the election's impact on the spread of the virus. These two research studies show no such effect. The first, titled "No Detectable Surge in SARS-CoV-2 Transmission due to the April 7, 2020 Wisconsin Election."[11] That study concluded, "[t]aken together, it appears that voting in Wisconsin on April 7 was a low-risk activity." *Id.* A second study examining Wisconsin found that the virus' rate of spread actually declined following the election, and declined in the three most populated counties in Wisconsin. That study, entitled "Wisconsin April 2020 Election Not Associated with Increase in COVID-19 Infection Rates."[12] That study concluded, "[t]here was no increase in COVID-19 new case daily rates observed for Wisconsin or its three largest counties

---

[8] *Gov. Edwards Announces Louisiana's Roadmap to Resilience Will Start Phase 2 on Friday, June 5*, Louisiana Office of the Governor (June 1, 2020), https://gov.louisiana.gov/index.cfm/newsroom/detail/2521

[9] Under 12(b)(1), parties are permitted to supplement

[10] When a party is challenging the facts upon which jurisdiction depends, matters outside the pleadings can be considered. *Ramming*, 281 F.3d at 161.

[11] Kathy Leung et al., No Detectable Surge in SARS-CoV-2 Transmission due to the April 7, 2020 Wisconsin Election, https://www.medrxiv.org/content/10.1101/2020.04.24.20078345v1.full.pdf

[12] Andrew C. Berry et al., Wisconsin April 2020 Election Not Associated with Increase in COVID-19 Infection Rates, https://www.medrxiv.org/content/10.1101/2020.04.23.20074575v1.full.pdf

following the election on April 7, 2020, as compared to the US, during the post-incubation period."

*Id.* The available data surrounding the recent Wisconsin election, coupled with the data supporting the move from Phase 1 to Phase 2 in Louisiana, show that the likelihood of infection with the Virus while voting is not  "actual or imminent" or "certainly impending" but is merely a "fear[] of hypothetical future harm[]". *Clapper*, 568 U.S. at 409, 416.

Plaintiffs' injury in fact theory is similar to the theory advanced by the plaintiffs in *Clapper*. In *Clapper*, the plaintiffs argued that the Foreign Intelligence Surveillance Act of 1978 would allow the government to perform unconstitutional surveillance on them and sought a declaration of unconstitutionality and an injunction against the government performing surveillance authorized under the challenged law. 568 U.S. at 401. The *Clapper* plaintiffs claimed injury in fact and Article III standing because "there is an objectively reasonable likelihood that their communications will be acquired [by government surveillance] at some point in the future." *Id.* The Court rejected this theory of injury because the plaintiffs failed to allege or prove that their communications had been unconstitutionally monitored, and the plaintiffs' fear of non-certainly impending hypothetical future harm was insufficient to establish Article III standing. *Id.* at 411-416. Here, Plaintiffs attempt to argue injury in fact under a failed theory similar to the *Clapper* plaintiffs—that by voting in-person or by having a witness sign an absentee ballot, Louisiana voters will suffer a sufficient injury in fact due to the *potential* "risk of infection and death" by *possibly* coming in contact with the Virus. *See* Compl. at ¶ 110. Here, just as in *Clapper*, because Plaintiffs' alleged injury in fact is based on *uncertain possible* future harm, it must fail for the same reasons as the plaintiffs' claims in *Clapper*. To hold otherwise would be to allow for a nearly limitless range of possible speculative injuries that have not yet occurred and are likely to never

occur. Article III exists to limit and define the power of the federal judiciary, not expand it. *See Clapper*, 568 U.S. at 408-09.

### 2. Plaintiffs' Alleged Injuries are Neither Traceable to nor Redressable by Defendants.

#### a. Because the Virus Is Not State Action, Plaintiffs' Alleged Injury Is Neither Traceable to nor Redressable by Defendants.

In addition to proving injury in fact, Plaintiffs must also show that the injury-in-fact is fairly traceable to the challenged conduct of Defendants, and that the injury is likely to be redressed by a favorable judicial opinion. *Lujan,* 504 U.S. at 560-61; *Gill*, 138 S. Ct. at 1929; *Spokeo, Inc.*, 136 S. Ct. at 1547. However, like their failure to present a proper injury-in-fact, Plaintiffs also fail to show that their alleged injury can be traced to Defendants or redressed by a favorable judicial opinion.

It is important to note that Plaintiffs are not alleging the laws in question are unconstitutional or violative of the VRA writ large, but only *temporarily* due to the Virus. *See*, *e.g.*, Compl. at 4. In effect, Plaintiffs' entire complaint hinges upon the Virus. *See*, *e.g.*, Compl. at ¶¶ 6, 10. 16 (allegation are typically prefaced by "[i]n the context of the COVID-19 pandemic" or other similar language); Compl. at ¶¶ 31-65 (detailing all the alleged harms attributable to the Virus). Plaintiffs' alleged injuries boil down to the claim that, "[i]n light of the COVID-19 pandemic", Louisiana voters suffered a sufficient injury due to the *potential* "risk of infection and death" by *possibly* coming in contact with the Virus through the act of voting in person or by having a third-party sign their absentee ballot as a witness. *See* Compl. at ¶ 110. Assuming *arguendo* that Plaintiffs properly claimed a sufficient injury-in-fact, which they did not, their alleged injury cannot be traced to Defendants for one simple reason: the existence and proliferation of the Virus is not state action.

Plaintiffs' claims fail because each and every claim requires *state* action. *Compare* Compl. at 46-48 (Count I – "Violations of the Fundamental Right to Vote under the First and Fourteenth Amendments to the U.S. Constitution (42 U.S.C. § 1983)") *and* Compl. at 48-50 (Count II – "Violations of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301") *with* U.S. Const. amend. I ("*Congress* shall make no law . . . ."(emphasis added));  U.S. Const. amend. XIV ("No *state* shall make any law . . . nor shall any *state* deprive any person of life, liberty, of property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." (emphasis added)); 42 U.S.C. § 1983 ("Every person who, *under color of any statute*, ordinance, regulation, custom, or usage, *of any state* . . . ." (emphasis added)); Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301 ("No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied *by any State* . . . ." (emphasis added)); *Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 206 (1999) (discussing the *Anderson/Burdick* framework). The Virus is not state action. *Tex. Democratic Party,* 2020 U.S. App. LEXIS 17564 at *24 (finding that "the Constitution is not offended" even if voting is impossible "because of circumstances beyond the state's control, such as the presence of the Virus."); *Coalition*, No. 1:20-cv-1677-TCB, 2020 U.S. Dist. LEXIS 86996 at *9 n.2.

Moreover, it cannot be reiterated enough that for every single rule they challenge, there is a more or equally "restrictive" version of that rule that was perfectly lawful before the Virus. To that end, an otherwise constitutional (or statutorily compliant) law is not made less constitutional (or compliant) by non-state action such as the Virus. *See*, *e.g*, *Bethea*, No. CV216-140, 2016 U.S. Dist. LEXIS 144861 at *7; *Mays,* No. 4:20-cv-341 (JM), 2020 U.S. Dist. LEXIS 54498 at *4-5.

States throughout the country, including Louisiana—as Plaintiffs admit, have taken measures to protect "the right to vote during this global pandemic" by taking actions including

"suspending the normal prerequisites . . . for requesting an absentee ballot" and encouraging "social distancing and other protections" while voting in person.  *Mays*, No. 4:20-cv-341 (JM), 2020 U.S. Dist. LEXIS 54498 at *4-5. With that backdrop, "[t]he real problem [for Plaintiffs] here is COVID-19, which all but the craziest conspiracy theorist would concede is not the result of any act or failure to act by the Government." *Coalition*, No. 1:20-cv-1677-TCB, 2020 U.S. Dist. LEXIS 86996 at *9 n.2. It is undeniable that the Virus has impacted the lives of Louisianans, but "these circumstances are not impediments created by the state." *Bethea*, No. CV216-140, 2016 U.S. Dist. LEXIS 144861 at *7. "While Plaintiffs contend that Defendants have done a poor job of responding to [the Virus], the fact that the virus's provenance was not through Defendants further increases, in this Court's opinion, the impropriety of judicial intervention." *Coalition*, No. 1:20-cv-1677-TCB, 2020 U.S. Dist. LEXIS 86996 at *9 n.2; *cf., Bethea*, No. CV216-140, 2016 U.S. Dist. LEXIS 144861 at *6-7.

A number of courts, including the Fifth and Sixth Circuits, have specifically relied upon, at least in part, the fact that the Virus—or another natural disaster—does not present state action as reason to stay a grant of preliminary injunction, dismiss claims, or to deny a motion for preliminary injunction.

In *Tex. Democratic Party v. Abbott*, the Circuit Court, upon granting a motion to stay the Western District of Texas' order granting a preliminary injunction, held that:

> The Constitution is not "offended simply because some" groups "find voting more convenient than" do the plaintiffs because of a state's mail-in ballot rules. *That is true even where voting in person "may be extremely difficult, if not practically impossible," because of circumstances beyond the state's control, such as the presence of the Virus*.

2020 U.S. App. LEXIS 17564 at *24 (emphasis added) (quoting *McDonald*, 394 U.S. at 810). The Circuit Court indicated that the result is similar in the VRA context. *See id* at *24 n.32 ("And here,

unlike in *Veasey* [*v. Abbott*], the *state* has not placed any obstacles on the plaintiffs' ability to vote in person." (emphasis in original)). The lack of state action is further emphasized in the concurring opinion, which notes "[f]or courts to intervene, a voter must show that *the state* 'has in fact precluded [voters] from voting.'" *Id*. at 44-45 (Ho, J. concurring) (emphasis in original) (quoting *McDonald*, 394 U.S. at 808 & n.7)).

In a case before the United States Court of Appeals for the Sixth Circuit, plaintiffs were challenging the signature gathering requirement of Ohio's ballot-initiative laws in light of the the Virus. *Thompson*, No. 20-3526, 2020 U.S. App. LEXIS 16650 at *2. When staying the District Court's order granting plaintiffs preliminary injunction, the Sixth Circuit noted the lack of state action inherent in claims resting upon the foundation of the Virus as rationale. *Id*. at *12 ("[J]ust because procuring signatures is now harder (largely because of a disease beyond the control of the State) doesn't mean that Plaintiffs are *excluded* from the ballot."). The court went further by noting that both First Amendment and Section 1983 actions require state action. *Id*. at *12-13 (going on to discuss the implication under the *Anderson/Burdick* standard).

In *Mays v. Thurston*, plaintiffs sought a mandatory temporary restraining order that the Governor of Arkansas "do more to ensure that Arkansans are allowed to have their vote counted by absentee ballot." No. 4:20-cv-341 (JM), 2020 U.S. Dist. LEXIS 54498 at *2. The District Court found that the plaintiffs lacked Article III standing. *Id*. at *4-5. Specifically, the court stated that:

> Plaintiffs have failed to articulate an injury suffered at the hands of . . . any . . . state official. Plaintiffs' right to vote during this global pandemic have been made easier by the Governor's . . . executive order suspending the normal prerequisites for requesting an absentee ballot. Plaintiffs complain that the Governor did not do enough. However, Plaintiffs' injury, if any, will occur only if they did not follow the absentee voting requirements as loosened by the Governor or if they do not show up to vote at a designated voting place exercising the social distancing and other protections suggested by the State and the federal government. ***Any injury caused by Plaintiffs' failing to take advantage of these available avenues to exercise their rights to vote are not caused by or fairly traceable to the actions of***

> **the State, but rather are caused by the global pandemic.** Therefore, the Court finds
> that Plaintiffs do not have standing to pursue their requested remedy.

*Id*. (emphasis added).

The Court's analysis is not changed due to the type of emergency. In *Bethea v. Deal*, plaintiffs, including the NAACP, sought a statewide mandatory preliminary injunction seeking to extend the voting registration deadline in response to Hurricane Matthew, alleging, *inter alia*, violations of the Fourteenth Amendment and Section 2 of the Voting Rights Act. No. CV216-140, 2016 U.S. Dist. LEXIS 144861 at *3-4. The court found that the plaintiffs' Section 2 and Fourteenth Amendment arguments "relie[d] on the unsupported notion that Defendants' decision not to extend the [voter] registration deadline was some sort of action that created an impediment to the right to vote." *Id*. at *6. The District Court was "unable to locate any precedent that would constitutionally or statutorily mandate that Defendants provide an extension *in the absence of actual government action that burdens an individual's right to vote*." *Id*. (emphasis added). The court goes on to discuss how the fact that the hurricane coincided with an election "made it difficult, but not impossible" for affected residents to vote and, in any event, "these circumstances [were] not impediments created by the State." *Id*. at *7.

In wake of Hurricane Katrina, the Eastern District of Louisiana dismissed plaintiffs' request to extend the deadline for counting absentee ballots. *Assoc. of Communities for Reform Now v. Blanco*, No. 2:06-cv-611, Order at 1-2 (E.D. La April 21, 2006) (ECF No. 58). The court noted that plaintiffs' issues "do not rise to the level of a constitutional or Voting Rights Act violation." *Id*. at 3. The court further noted that "[i]t is ironic that a step taken by the State, apparently to allow as many displaced voters as possible the ability to request and receive and absentee ballot . . . is now being challenged as having the exact opposite effect." *Id*. The court then reminded plaintiffs that "our evacuation emanated from a natural disaster that ravaged [New

Orleans] casting thousands of our fellow citizens across the face of America. Hurricane Katrina (and Rita) crossed all divides, human-made and others." *Id*. at 5. Finally, in light of the state officials' work to "ameliorate the impact" of the natural disaster, the court held that the plaintiffs' claims that the "[State's] efforts will 'disenfranchise' minority voters is disingenuous." *Id*.

Because Plaintiffs' alleged injuries under the Fourteenth Amendment and VRA "are not caused by or fairly traceable to the actions of the State, but rather are caused by the global pandemic", their claims must be dismissed.  *See Mays,* No. 4:20-cv-341 (JM), 020 U.S. Dist. LEXIS 54498 at *4-5.

> b. Even Assuming the Virus Represents State Action, Plaintiffs'
> Purported Injuries Are Not Redressable By the Current Defendants.

Plaintiffs' alleged injury cannot be redressed by a favorable judgment from this Court and should therefore fail. *See Lujan,* 504 U.S. at 560-61; *Gill*, 138 S. Ct. at 1929; *Spokeo, Inc.*, 136 S. Ct. at 1547. In other words, assuming proper injury-in-fact and traceability, if this Court were to rule in favor of Plaintiffs, the present Defendants could not act in a way that would cure Plaintiffs' alleged injuries.

In Louisiana, the respective parish boards are responsible for determining who is eligible to vote by absentee ballot and for determining whether an absentee ballot is properly cast. *See*  La. R.S. §§ 18:423, 18:1307(1), 18:1303. Plaintiffs have failed to include any parish boards in this suit. While Plaintiffs have sued two parish registrars, registrars can take no action themselves—they act only at the direction of the parish boards.[13] *See Louisiana v. United States*, 380 U.S. 145, 151 n. 10 (1965); *Cf. Jacobson v. Fla. Sec'y*, No. 19-14552, 2020 U.S. App. LEXIS 13714, *28-44 (11th Cir. 2020) (because individual county election officials were not part of suit, Court could not redress alleged injury and therefore lacked standing). While the parish boards are not parties to

---

[13] The fact that a Registrar is a member of the board does not effectuate suit against the board as a body.

17

this suit, Plaintiffs nonetheless request that the Court order Defendants to "issue guidance" to parties absent from this litigation to act in a certain manner. Compl. at 51. This requested relief not only serves as evidence that the Court cannot redress Plaintiffs' injury without additional parties present, but is contrary to the law in that a court cannot control the conduct of parties absent from the present litigation. *See Jacobson*, No. 19-14552, 2020 U.S. App. LEXIS 13714 at *28-44.

In the end, Plaintiffs' purported injury is fear of infection, or *potential* infection, of an individual by the Virus. When acting properly under its jurisdiction, this Court can do a great many things. However, no matter how well-intentioned, this Court cannot enjoin the Virus from infecting a Louisiana citizen. As such, the Court cannot redress Plaintiffs' injury.

### B.  Plaintiffs' Claims Present Non-Justiciable Political Questions.

Issues that are "entrusted to one of the political branches or involve[] no judicially enforceable rights . . . present a political question . . . outside the courts' competence and therefore beyond the courts' jurisdiction." [14] *Rucho*, 139 S. Ct. at 2494 (internal quotations omitted). As it is Plaintiffs' burden to prove jurisdiction, *Ramming*, 281 F.3d at 161, "[a]bsent pellucid proof provided by plaintiffs that a political question is not at issue, courts should not substitute their own judgments for state election codes." *Coalition*, No. 1:20-cv-1677-TCB, 2020 U.S. Dist. LEXIS 86996 at *9. The purpose of the political question doctrine is to "protect[] the separation of powers and prevent[] federal courts from overstepping their constitutionally defined role." *Baker v. Carr,* 369 U.S. 186, 210 (1962). "That the line might have been drawn differently" in response to the

---

[14] The opinion in *Tex. Democratic Party* does not change the applicability of the political question doctrine here because Plaintiffs go even further than the Texas plaintiffs in seeking judicial enactment of their policy preference. *See* 2020 U.S. App. LEXIS 17564 at 13. This suit, similar to the suit in *Georgia*, "challenge[s] the *wisdom* of" Louisiana's policy choices. *See id* (emphasis in original). While the Fifth Circuit determined it "need not . . . consider the prudence of Texas's plan" because those plaintiffs failed to raise it, *see id.*, Plaintiffs here specifically make Louisiana's policy choices a fundamental feature of their Complaint. *See, e.g.,* Compl. at 50 (requesting numerous mandatory and prohibitory injunctions).

Virus "is a matter for legislative, rather than judicial, consideration." *Tex. Democratic Party*, 2020 U.S. App. LEXIS 17564 at *28 (internal quotations omitted).

The Supreme Court has found at least six areas where courts are not competent to render a decision, any one of which causes the case to present a non-justiciable political question outside the judicial expertise:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; [2] or a lack of judicially discoverable and manageable standards for resolving it; [3] or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; [4] or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; [5] or an unusual need for unquestioning adherence to a political decision already made; [6] or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker,* 369 U.S. at 210. At least two of these factors is implicated here: (1) "a textually demonstrable constitutional commitment of the issue to a coordinate political department;"[15] and (2) "a lack of judicially discoverable and manageable standards for resolving it." *Id*. Therefore, it is not for courts to second guess the policy choices of the State in response to the Virus, *see Tex. Democratic Party*, 2020 U.S. App. LEXIS 17564 at 29; *see also id.* at *40 (Ho, J. concurring), especially when there exist no judicially manageable standards for it to do so. *See Coalition*, No. 1:20-cv-1677-TCB, 2020 U.S. Dist. LEXIS 86996 at *9

---

[15] The regulation of congressional elections is conferred by the federal constitution to the States via the Elections Clause. *See* U.S. Const. art. I, § 4, cl. 1; *see also* U.S. Const. art. II, § 1 (granting to the state legislatures the power to appoint electors for presidential elections). The states also retain their own plenary power to regulate state elections. *See Tex. Democratic Party*, 2020 U.S. App. LEXIS 17564 at 29; Tashjian *v. Republican Party*, 479 U.S. 208, 217 (1986). In either event, the power to regulate and administer elections is committed to "Congress and state legislatures—not courts." *See Coalition*, No. 1:20-cv-1677-TCB, 2020 U.S. Dist. LEXIS 86996 at *8-9; *cf.* ); *Clapper*, 568 U.S. at 408 ("The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches.").

1.  **There Exist No Judicially Manageable Standards to Determine State Policy in Response to the Virus.**

The second *Baker* factor asks whether there exist "judicially discoverable and manageable standards for resolving" the question at issue. *Baker*, 369 U.S. at 210. Before a court conducts any analysis on whether the right to vote is burdened, it must "identify the burden before [it] can weigh it." *Jacobson*, No. 19-14552, 2020 U.S. App. LEXIS 13714 at *54-55 (Pryor, W. J. concurring) (quoting *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 205 (2008) (Scalia, J. concurring in judgment)). Here, the burden, if any, arises from the Virus and not any action of the State. *See supra* at Section II(A)(2)(a). However, even assuming that state action is implicated here, there are no judicially manageable standards to determine what measures must be taken to regulate elections in light of the Virus. As the Northern District of Georgia recently articulated:

> "How early is too early for the election to be held in light of COVID-19? How many safeguards must be in place to protect those who would choose to vote in person from the possibility of contracting COVID-19? Have Defendants already implemented enough safeguards to avoid a constitutional violation? Plaintiffs have provided the Court with no non-speculative way to answer these questions . . . ."

*Coalition*, No. 1:20-cv-1677-TCB, 2020 U.S. Dist. LEXIS 86996 at *6.

The exact same is true here. Plaintiffs seek various prohibitory and mandatory injunctions, effectively rewriting Louisiana's election code. For example, why is a 14-day early voting period constitutional or compliant with the Voting Rights Act, but a seven-day period is not? *See Coalition,* No. 1:20-cv-1677-TCB, 2020 U.S. Dist. LEXIS 86996 at *6. Why is a two-person signature requirement constitutional and valid under the VRA, but a one-person signature requirement is not? Why is less access to an absentee ballot constitutional and statutorily valid, but more access under Louisiana's emergency election plan is not? As applied to each of those questions, which is fairer? How can the judiciary determine "fairness"? The truth is that no one knows, and this Court certainly cannot know because "federal courts can address only questions

'historically viewed as capable of resolution through the judicial process.'" *Rucho*, 139 S. Ct. at 2493-94 (quoting *Flast v. Cohen*, 392 U.S. 83, 95 (1968)). As fairness is not a judicially manageable standard, "it is not even clear what fairness looks like in this context." *Id.* at 2499-50. "Because 'it is axiomatic that the Constitution contemplates that democracy is the appropriate process for change', some questions—even those existential in nature—are the province of the political branches." *Juliana*, *v. United States*, 947 F.3d 1159, 1173 (9th Cir. 2020) (internal citations and some quotations omitted).

"Ultimately, ordering Defendants to adopt Plaintiffs' [relief] would require the Court to micromanage the State's election process. The relief Plaintiffs seek bears little resemblance to the type of relief plaintiffs typically seek in election cases aimed to redress state wrongs." *Coalition,* No. 1:20-cv-1677-TCB, 2020 U.S. Dist. LEXIS 86996 at *9. As such, the questions put forth to the Court by Plaintiffs present political—not judicial—questions that are not addressable by the federal courts.

III.    **PLAINTIFFS HAVE FAILED TO STATE A CLAIM.**

Although this Court must accept all of Plaintiffs' factual allegations as true, this Court is not required to accept any legal conclusions as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim will survive a motion to dismiss only if the factual allegations in the complaint are "enough to raise the right to relief above the speculative level . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). Additionally, this Court need not accept as true any conclusory factual assertions. *Id*. Accordingly, to survive a motion to dismiss, Plaintiffs' claims must be plausible on their face. *Iqbal*, 556 U.S. at 678. This means that Plaintiffs must plead "factual content that allows the court to draw the reasonable inference that *the defendant* is liable for the misconduct alleged." *Id*. (emphasis added). Plaintiffs have failed to do so here.

The conduct alleged by Plaintiffs points to a singular culprit: the Virus.  Plaintiffs again and again point to this invisible menace while addressing nearly everything in their Complaint. For example, the first paragraph of the Complaint does not address voting rights or Louisiana's alleged actions against Plaintiffs, but instead discusses the Virus. This is true for the vast majority of the Complaint. *See generally* Compl. At the first mention of Plaintiffs claims, they make it clear that this lawsuit is "[i]n the unprecedented context of the COVID-19 pandemic . . . ." Compl. at ¶ 4.  In large part, Plaintiffs have failed to state a claim because the action they complain of was not brought about or caused by the State. *See supra* at Section II(A)(2)(a). Therefore, for reasons similar to why Plaintiffs lack standing, they have failed to state a claim under Rule 12(b)(6). *Id*.

For each and every one of Plaintiffs' claims they need to show a burden on the right to vote that resulted from some action of the State. They have failed to do so because each harm they allege would not exist but for the Virus, a non-state actor.[16]

## IV.    PLAINTIFFS HAVE FAILED TO JOIN THE REQUIRED PARTIES.

Rule 12(b)(7) of the Federal Rules of Civil Procedure establishes that a plaintiff's claim may be dismissed for "failure to join a party under Rule 19." Fed. R. Civ. P. 12(b)(7). Rule 19(a)(1)(A) states that a party is required to be joined to the litigation if, "in that [party's] absence, the court cannot accord complete relief among existing parties[.]" Fed. R. Civ. P. 19(a)(1)(A). Here, as discussed *supra* at Section II(A)(2)(b), Plaintiffs have failed to add the necessary parties in the respective parish boards, and as such, this Court cannot accord complete relief among the existing parties. Therefore, due to the improbability of Plaintiffs being able to add all 64 parish boards prior to the upcoming July and August elections, the Court should dismiss this matter for failure to join necessary parties under Rule 19.

---

[16] Proposed-Intervenor will provide additional and more detailed analysis of the why the relief sough should not be granted in its anticipated Opposition to Plaintiffs' Preliminary Injunction should intervention granted.

## CONCLUSION

For the aforementioned reasons, Plaintiffs' claims should be dismissed with prejudice.

Dated: June 5, 2020                              Respectfully Submitted,

JEFF LANDRY
ATTORNEY GENERAL

*/s/ Angelique Duhon Freel*
Angelique Duhon Freel (La. Bar Roll No. 28561)
Assistant Attorneys General
Louisiana Department of Justice
Civil Division
P. O. BOX 94005
Baton Rouge, Louisiana 70804-9005
Telephone: (225) 326-6017
Facsimile: (225) 326-6098
Email: freela@ag.louisiana.gov

Jason B. Torchinsky*
Phillip M. Gordon*
Holtzman Vogel Josefiak Torchinsky PLLC
45 N. Hill Dr., Suite 100
Warrenton, VA 20186
Telephone: (540) 341-8808
Facsimile: (540) 341-8809
Email: jtorchinsky@hvjt.law
pgordon@hvjt.law
*pro hac vice* motions forthcoming

*Counsel for Intervenor-Defendant the State of
Louisiana*

## CERTIFICATE OF SERVICE

I do hereby certify that, on this 5th day of June 2020, the foregoing was electronically filed

with the Clerk of Court using the CM/ECF system, which gives notice of filing to all counsel of

record.

                              */s/ Angelique Duhon Freel*
                              Angelique Duhon Freel

                              *Counsel for Intervenor-Defendant the State of
                              Louisiana*

23